**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 11-cv-9147 |
| | ) | |
| ROSEBUD FARMSTAND, ET AL., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' motion for summary judgment [140] and Plaintiff's motion to allow surreply instanter [158]. For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment [140] and grants Plaintiff's motion to allow surreply instanter [158].

**I.     Background**

**A.     Procedural History**

Plaintiff Robert Smith sued Defendants Rosebud Farmstand, Rocky Mendoza, and Carlos Casteneda for sexual and racial harassment (Counts I and II), retaliation (Count III), and constructive discharge (Count IV) pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), a violation of the Illinois Gender Violence Act (Count V), and for violating 42 U.S.C. § 1981 (Count VI). Defendants moved to dismiss all claims except Plaintiff's sexual harassment claim against Defendant Rosebud. In November 2012, the Court granted in part and denied in part Defendants' motion to dismiss, granting the motion with respect to Plaintiff's claims of racial harassment (Count II) and constructive discharge (Count IV) and denying the motion in all other respects. In dismissing Plaintiff's claim for racial harassment, the Court pointed out:

Nothing in [Plaintiff's EEOC Charge] suggests that Plaintiff was alleging that he was the victim of racial harassment (as opposed to racial discrimination, a claim clearly set forth in his EEOC charge but not included as a claim in his complaint). Plaintiff makes no mention of harassment on account of race in either his statement of the bases for his Charge or the body of the Charge. He does not mention any of the alleged comments (racial slurs, racial remarks, and racial epithets), conduct, or incidents that he now alleges in Count II of his complaint. Instead, Plaintiff specifically alleges that he was "sent home * * * due to his race" and that he had a "reduction in hours * * * due to his race." Being sent home from work and suffering a reduction in hours are classic examples of race discrimination, which is a different claim from being harassed with racial epithets, slurs, and comments. See *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110-1111 (7th Cir. 1992) (concluding that racial harassment claim was beyond the scope of plaintiff's charge where plaintiff included a specific race discrimination claim in her charge, but failed to include any reference to racial harassment) * * * * The specificity in Plaintiff's Charge with respect to his claims for sexual harassment and race discrimination belie his argument that he did not understand how to plead a racial harassment claim. He set forth detailed facts to support both sexual harassment and race discrimination claims, yet failed to include any reference to conduct that would support a racial harassment claim. To allow him now to claim additional instances of racial harassment would not be consistent with Title VII's goal of providing notice to an employer of the nature of the claims.

See DE 30 at 6–7. Despite the Court's clear ruling that Plaintiff's racial harassment claim was beyond the scope of his EEOC charge, Plaintiff in a footnote in his response brief appears to reassert his racial harassment claim, contending that the Court "dismissed plaintiff's racial harassment claim under Title VII without prejudice" and "plaintiff's racial harassment claim was incorporated within his race discrimination charge." Plaintiff's untimely, informal attempt to reassert his racial harassment claim fails. Plaintiff never moved for leave to amend his complaint or sought reconsideration of the motion to dismiss. Nor would he have been successful: Plaintiff's EEOC Charge clearly failed to raise any, let alone the detailed, allegations he now makes about racial harassment. Attempting to reassert in a footnote of a response to Defendant's summary judgment motion a claim that was previously dismissed does not suffice. Plaintiff (i) no longer has a racial harassment claim and (ii) never asserted a claim for race discrimination

in his complaint.  Thus, the only claims remaining that are related to Plaintiff's race are his Title VII retaliation[1] and § 1981 claims.

## B.    Statements of Fact

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements.  Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law.  The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts.  L.R. 56.1(a)(3).  The rule also requires the non-movant (here, Plaintiff) to file a concise response to a movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials."  L.R. 56.1(b)(3)(A).

While Plaintiff has complied with the local rules in some respects, many of Plaintiff's "admitted but" or "otherwise admitted" responses to Defendants' fact statements contain argument and information not responsive to or extraneous to the paragraph to which Plaintiff is responding.  See generally Pls.' Resp. to Defs. SOF at 5, 11, 12, 16, 17, 19, 20, 21, 23, 25, 26, 27, 38, 29, 32, 33, 34, 35, 36, 37, 38, 39, 40, 47, 49, 51, 53, 54, 57, 61, 65.  To the extent that Plaintiff's responses are improper, Defendants' fact statements will be admitted.  See, *e.g.*, *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003)); *Nehan v. Tootsie Roll Industries, Inc.*, --- F. Supp. 2d ---, 2014 WL 3734232 at *1 (N.D. Ill. July 23, 2014) ("To the extent that [plaintiff] fails to effectively dispute facts properly set forth and supported by [defendant], those facts are deemed admitted for the purposes of this motion.").

---

[1]  As noted by the Court in denying Defendants' motion to dismiss Plaintiff's retaliation claim, Plaintiff's retaliation claim is limited to instances of retaliation which occurred after the filing of his EEOC charge.

Plaintiff has not fully complied with other aspects of Local Rule 56.1. As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in [her] client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006). A Rule 56.1(b)(3) response is not the place for a party to assert additional facts. See *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995)). Thus, such extraneous assertions in Plaintiff's response to Defendants' statement will be disregarded.

Another flaw is Plaintiff's repeated references either to his or former employees' post-deposition affidavits. See Pls.' Resp. to Defs. SOF at 18, 20, 28, 29, 33, 35, 36, 38, 39, 54, 57, 68. Affidavits "used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant * * * is competent to testify on the matters stated * * * speculation and conjecture contained in a declaration cannot create a material issue of fact." *Hoosier v. Greenwood Hospitality Mgmt., LLC*, 2014 WL 1245112 at *1 n.1 (N.D. Ill. 2014) (quotations and citations omitted). Courts here are highly critical of efforts to patch up a deponent's testimony with his or her subsequent affidavit without a credible explanation. *Nehan*, 2014 WL 3734232 at *2 (N.D. Ill. July 23, 2014) (citation omitted). Thus, to the extent that Plaintiff's post-deposition affidavits conflict

with deposition testimony in the record, the assertions in the affidavits will be disregarded. See *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) (quoting *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) ("[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions."); see also *Basta v. American Hotel Register Co.*, 872 F. Supp. 2d 694, 699 (N.D. Ill. 2012).

Because Plaintiff achieved partial compliance with the local rules governing summary judgment motions, the Court will exercise its discretion in the direction of leniency and consider those responses and additional fact statements that arguably meet the requirements of the local and federal rules. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges."). With that said, it is still within the district court's discretion to strictly enforce compliance with Rule 56.1 within the universe of facts that the Court will consider here. See *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir. 2009); *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). As discussed above, merely including facts in a

responsive memorandum is insufficient to put issues before the Court. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

In addition, Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). Where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. Thus, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on the summary judgment motions. Any paragraph or fact that is not supported by record evidence will be disregarded.

## C.     Facts

Defendant Rosebud Farm, Inc. is an Illinois corporation with its principal place of business located in Chicago, Illinois. Rosebud's business has two factions: one side is the wholesale distribution of meat to restaurants, and the other side is the operation of a retail grocery store called Rosebud Farmstand. Defendant Carlos Castaneda has been the general manager of Rosebud Farmstand and has done all of the hiring, firing, and scheduling of employees since the store opened in 1996. Defendant Roque Mendoza has been an assistant manager for the last six or seven years. Mendoza could not and did not hire employees, fire employees, or suspend employees. He also testified that he did not recommend that employees be suspended or fired.

Rosebud rehired Plaintiff Robert Smith on November 14, 2003, to work as a customer server in the meat department at Rosebud Farmstand.[2]  Plaintiff's duties as a customer server in the meat department included taking care of customers as quickly as possible, paying attention to customer's orders, being friendly, communicating, keeping the work area clean, and keeping the meat bins filled.  When he worked, Plaintiff wore a long jacket and an apron, unless there were not enough aprons available, and wore clothes under his coat and apron.  During his employment at Rosebud Farmstand, Plaintiff would tell Castaneda the dates and times that he was available to work.  Plaintiff typically worked on Tuesdays, Thursdays, Saturdays, and Sundays.

All of the regular employees in the Rosebud Farmstand meat department were male. Castaneda testified that Rosebud had an "open door policy" and that he told employees that if problems arose in the store or with other employees, they should report it to him.  However, Rosebud did not have training on or a formal policy for dealing with discrimination or harassment.

Plaintiff testified that his performance at work was always excellent, from the day he started in 2003 until the day he left, and that he never had a single performance problem. Plaintiff described himself as a sociable person at work who got along with people regardless of race.  During his deposition, Plaintiff testified that between the time he filed a charge of discrimination in January 2008 and the day he quit, he was never written up, disciplined, or threatened with termination.  Plaintiff testified that no one in the meat department physically hurt, drugged, or screamed at him.

---

[2]  Plaintiff worked at Rosebud Farmstand as a bagger during an earlier period of employment between September 2, 2001 and January 12, 2002.

While Plaintiff was working at Rosebud Farmstand as a part-time employee, he applied for a position at Fairplay Finer Foods. Plaintiff testified he began working at Fairplay Finer Foods in May 2008 and that he quit voluntarily in July 2008, right before he moved to Arizona.[3]

Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights on January 7, 2008. Other than Plaintiff's Charge of Discrimination, Plaintiff never prepared or gave any written statements to anybody at Rosebud Farmstand regarding the alleged sexual harassment. However, Plaintiff testified that he verbally complained to management about the touching and name-calling several times a month from 2003 to 2008, to both Castaneda and another manager named Oscar. Plaintiff alleged in his Charge of Discrimination that from at least July 2007 until January 6, 2008, Defendants Castaneda and Mendoza and other Hispanic employees at Rosebud Farmstand repeatedly grabbed and slapped him on his buttocks and repeatedly grabbed and fondled his penis. Plaintiff denies ever touching any other male employees on the testicles, buttocks, or penis.

During his deposition, Plaintiff testified about the sexual harassment that he allegedly suffered. Plaintiff testified that generally, co-workers in the meat department touched each other at various times. Specifically, Plaintiff testified that male employees would touch his penis and buttocks over the apron and coat that he wore when he was serving a customer and then laugh. Plaintiff described a "fondle" or a "grab" as lasting for approximately one second and being "unobvious." Plaintiff claimed that in 2003, Castaneda went past and put his hand between Plaintiff's legs and also grabbed his buttocks when Plaintiff was behind the meat counter. Plaintiff also testified that Mendoza grabbed him in 2006, winked at him a few times, did a "let's

---

[3] Plaintiff's employment application submitted to Fairplay and his W-2 Wage Statement show that Plaintiff worked at Fairplay starting in March 2007 and that he never worked at Fairplay in 2008.

go" signal, and called to him, "hey, hey." He further testified that in September 2007, Mendoza offered to ride to a hotel and to have sex with him.

Plaintiff testified that he heard Castaneda say that "blacks got big dicks" and Mendoza say "niggers have big dicks and asses."[4] Plaintiff further testified that between 2006 and 2008, other employees, specifically Pablo Velasco, would frequently say, "Niggers have big dicks and big asses. Can I touch it? Can I touch yours?" Pablo also allegedly called Plaintiff a monkey, an Ethiopian, and a nigger and told him to go back to Africa. In turn, Pablo testified that Plaintiff called him a "wetback," told Velasco that he was going to call immigration on him, called him a midget, and told Pablo to go back to Mexico.

Gary Holloway, a fellow employee, testified that he heard employees refer to Plaintiff as "fuckin' nigger." Holloway also testified that he heard co-workers say that Plaintiff has a "fucking Mandingo cock or dick," which Holloway said meant "large African males with large penises," and that co-workers stated that Plaintiff could "take his ass back to Africa."

Plaintiff testified that after he filed his Charge, the other employees began acting aggressively toward him. For instance, he testified that other employees would leave knives sticking out of their trays when they were near Plaintiff; that other employees would bang their cleavers on the meat board or point their knives at Plaintiff; that they would give Plaintiff the cold shoulder; that they wrecked his television; and that his car, parked in the Rosebud employee parking lot, was scratched and spit on and a tire was slashed and the windshield broken. Plaintiff could not identify the employees who allegedly broke his TV or vandalized his car. Plaintiff testified that after he filed his EEOC Charge, none of the employees touched, fondled or grabbed

---

[4] As set forth previously, there are no allegations in Plaintiff's EEOC Charge related to racial slurs or racial harassment.

his buttocks, penis, or testicles again. Plaintiff also testified that he was not disciplined nor were his job duties altered after he filed his Charge.

After Castaneda received Plaintiff's Charge of Discrimination in January 2008, Castaneda investigated the Charge allegations and met with every meat department employee named in the Charge. Castaneda prepared a written report of the interviews. According to Castaneda's report, the employees interviewed, with the exception of Frederico Lopez, told Castaneda that they and Plaintiff traded slaps on the butt in a playful manner and were goofing around and also that Plaintiff initiated slaps. According to Castaneda, he instructed everyone he interviewed to stop the horseplay and goofing around immediately.

On June 21, 2008, Plaintiff left Rosebud and moved to Arizona the next month. Plaintiff maintains that he quit due to "intolerable" working conditions. On September 26, 2011, the EEOC issued a Notice of Right to Sue with respect to Plaintiff's Charge, stating conciliation failure.

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*,

743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

Defendants have moved for summary judgment on all of Plaintiff's remaining claims: sexual harassment (Count I), retaliation (Count III), violation of the Illinois Gender Violence Act (Count V), and violation of § 1981 of the Civil Rights Act (Count VI).[5] The Court addresses each claim in turn.

---

[5] The Court briefly considered, and now rejects, Plaintiff's argument that Defendants' summary judgment motion is untimely. Plaintiff previously filed a motion asking the Court to forgo dispositive motions in this case, and the Court denied his motion. The Court did not set a deadline for dispositive motions and, in any event, the parties were still engaged in discovery disputes in this highly contentious litigation in the weeks just before Defendants' motion was filed. The Court encourages parties to resolve legal disputes prior to trial if possible, and Defendants' motion is attempting to do just that.

A.      **Title VII Sexual Harassment**

Plaintiff claims that Defendant Rosebud violated Title VII by subjecting him to a hostile work environment based on sexual harassment.  Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The purpose of this provision as it relates to discrimination on the basis of sex is to prevent "'disparate treatment of men and women in employment,'" regardless of its form.  *Oncale*, 523 U.S. at 78 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  Therefore, whenever "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'"  *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

To establish a *prima facie* case of hostile work environment sexual harassment, such as Plaintiff is claiming, an employee must establish that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of his employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)).  The third prong of this test—the severity or pervasiveness of the harassment—has both an objective and a subjective component.  *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002)).  The plaintiff may satisfy the subjective prong by presenting evidence that he in fact perceived his workplace

as hostile or abusive. *Hilt-Dyson*, 282 F.3d at 463. In determining whether a workplace is objectively hostile, the court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" See *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness per se but only * * * against discrimination in the conditions of employment." (quoting *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994))).

Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. An employer is strictly liable for harassment by a supervisor. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (citing *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006)). A "supervisor" for Title VII purposes is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.* (citation omitted). This power includes generally "the authority to hire, fire, promote, demote, discipline or transfer * * *." *Id.* (citing *Rhodes v. Illinois Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)). An employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) ("Put

differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.").

The Supreme Court has reiterated that "Title VII's prohibition of discrimination 'because of sex' protects men as well as women," (*Oncale*, 523 U.S. at 78), and it held that this prohibition applies to the same-sex harasser, whether or not that harasser is motivated by sexual desire. See *id.* at 79–80 ("If our precedents leave any doubt on the question, we hold today that nothing in Title VII necessarily bars a claim of discrimination 'because of * * * sex' merely because the plaintiff and the defendant * * * are of the same sex."). In doing so, it underscored that the touchstone of Title VII is, of course, discrimination or disparate treatment. See *id.* at 80 ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimina[tion] * * * because of * * * sex.'" (emphasis in original)). "The critical issue * * * is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris*, 510 U.S. at 25). This inquiry applies to both same and opposite–sex harassment. *Id.* at 80–81 ("A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes * * *."). The Court emphasized that it has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80. Rather, the critical issue "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "In same-sex harassment cases, [the] inquiry requires careful consideration of the social context in which the particular behavior occurs and is experienced by the target."

*Oncale*, 523 U.S. at 81. "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* at 82.

It is undisputed that Castaneda was Plaintiff's direct supervisor, making Defendant strictly liable for any sexual harassment of Plaintiff by Castaneda. Additionally, as indicated above, Plaintiff must show that the alleged harassment was subjectively and objectively severe or pervasive. See *Whittaker*, 424 F.3d at 645. Defendant did not address the subjective hostility prong. Viewing the evidence in the light most favorable to Plaintiff, the Court is satisfied that Plaintiff found his work environment to be hostile and moves onto the objective prong.

Defendants contend that the social context that Plaintiff has described amounts to juvenile horseplay among members of the same sex—conduct which the Supreme Court and courts in this Circuit have deemed as not actionable harassment or discrimination. See, *e.g.*, *Oncale*, 523 U.S. at 80–82 (sexually explicit roughhousing among men is not sex discrimination); *Shafer*, 417 F.3d at 665–67 (incidents of aggressive physical touching found insufficient for claim of sex harassment); *Walton v. Van Ru Credit Corp.*, 2011 WL 6016232 at *8 (N.D. Ill. Dec. 2, 2011) (summary judgment for employer in same-sex harassment case where employer investigated complaint and alleged offensive conduct stopped); *Lord*, 2013 WL 6009246, at *5 (plaintiff failed to show discrimination against men was the "animating impulse"). However, viewing the evidence in the light most favorable to Plaintiff as the Court must at this stage of the case (*Foley*, 359 F.3d at 928), the offensive conduct at issue here occurred frequently: Plaintiff claims to have been subjected to unwanted, inappropriate comments of a sexual nature plus unwanted touching for approximately five years, or pretty

much the entire time that he was working at Rosebud. Furthermore, there is evidence in the record that this behavior was happening on a daily basis.

In evaluating severity, the Seventh Circuit has explained that on one side are sexual assaults, other physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures; on the other side lies conduct that generally does not create a hostile work environment, such as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). Again, viewing the facts in the light most favorable to Plaintiff, Plaintiff's co-workers, including assistant manager Mendoza and, early on,[6] manager Castenada, would (1) repeatedly grab and slap him on his buttocks and grab and fondle his penis over the apron and coat that he wore when he was serving a customer and then laugh; (2) proposition him for sex by winking at him, making a "let's go" signal, and calling to him, "hey, hey"; (3) proposition him for sex by offering to ride to a hotel and to have sex with him; (4) comment that "blacks got big dicks" or "niggers have big dicks and asses"; (5) comment that "[n]iggers have big dicks and big asses" and then ask to touch Plaintiff's; and (6) note that Plaintiff has a "fucking Mandingo cock or dick."

In *Quantock v. Shared Marketing Services, Inc.*, the Seventh Circuit viewed an employee's outright solicitation for numerous sex acts, which were made directly to the plaintiff, as more severe than "occasional vulgar banter tinged with sexual innuendo." 312 F.3d 899, 904 (7th Cir. 2002). The court held that a reasonable jury could find these sexual propositions

---

[6] Defendants' brief makes vague reference to certain conduct occurring before the time period reflected by the EEOC Charge. However, Defendants do not address legal issues such as the continuing violation doctrine or cite any case law that addresses what conduct can be considered as falling within the scope of an EEOC Charge.

sufficiently severe as to have created a hostile work environment. *Id.* The harassing employee in *Quantock* worked in close quarters with the plaintiff and held a significant position of authority over her; here, the harassing employees in this case also worked in close quarters with Plaintiff and some—Mendoza and Castenada—held significant positions of authority over him. Furthermore, Plaintiff has set forth specific instances of harassment, identified specific comments with precise language, and presented witnesses who corroborate some of his testimony. He has not set forth bald, conclusory allegations such as "I was sexually harassed" or "he talked about my body."

"In a typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816–17 (7th Cir. 2006). This case provides such a combination. For the most part, the employees did not merely make gender-related jokes or engage in occasional teasing. Nor can the conduct be described as infrequent. Construing all facts in Plaintiff's favor, as this Court must, the Court views the conduct at Rosebud to be, at a minimum, approaching threatening and intimidating statements and not merely, as Defendant puts it, "horseplay." Although Defendants write off the conduct as horseplay and normal joking—because it occurred between males, as opposed to between males and females—a trier of fact, if it were to credit Plaintiff's testimony as well as the testimony of Holloway and others that support Plaintiff's testimony, could find that the other employees (including assistant manager Mendoza and manager Castaneda) knew that Plaintiff felt harassed, that he did not see the comments and touching as "horseplay" or goofing around, and that action needed to be taken to stop the conduct.

Furthermore, accepting Plaintiff's version of the facts, he repeatedly complained to management about the behavior. In fact, prior to filing his EEOC Charge in January 2008,

Plaintiff testified that he verbally complained to management about the touching and name-calling several times a month from 2003 to 2008, to both Castaneda and another manager named Oscar. Yet it was not until Plaintiff filed an EEOC Charge that Castaneda conducted an investigation into Plaintiff's allegations.[7] Plaintiff's testimony, as well as the testimony of other employees that supports Plaintiff's testimony, would permit a trier of fact to conclude that a complainant could reasonably expect that Castaneda had the responsibility to, and would, address the problem before requiring Plaintiff to file an EEOC Charge.

In sum, the evidence viewed in the light most favorable to Plaintiff does not simply paint the picture of a group of immature guys horsing around; rather, the evidence supports an inference that the alleged harassment was frequent, humiliating, and threatening enough to create a hostile work environment. Thus, the Court concludes that a trier of fact could find the conduct complained of sufficiently severe and pervasive so as to have created a hostile work environment.

## B. Title VII Retaliation[8]

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of*

---

[7]   Defendants contend that Plaintiff did not actually complain to management prior to filing his EEOC Charge. But this is a disputed issue of fact that the Court cannot resolve on summary judgment.

[8]   Once again, in their summary judgment briefs, Defendants and Plaintiff ignore portions of the Court's prior opinion addressing Defendants' motion to dismiss. The Court previously held that Plaintiff's retaliation claim is limited to instances of retaliation which occurred after the filing of his EEOC charge (or to ongoing sexual harassment and race discrimination). The Court also held that Plaintiff's failure to allege racial harassment in his EEOC Charge would not bar his Title VII retaliation claim. The Court need not repeat its legal analysis in this opinion.

*Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'" *Tomanovich*, 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).

The Seventh Circuit has broadly defined an adverse employment action. *Smart*, 89 F.3d at 441. It is not limited solely to loss or reduction of pay or monetary benefits, but can encompass other forms of adversity. *Id.* Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." *Id.* To be actionable, there must be a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Retaliatory harassment by co-workers can rise to this level if

it is severe enough to cause a significant change in the plaintiff's employment status. For example, in *Knox v. Indiana*, 93 F.3d 1327 (7th Cir. 1996), the Seventh Circuit upheld a jury verdict in favor of a plaintiff whose co-workers embarked on a campaign of vicious gossip and profanity aimed at making "her life hell" in response to her complaints that a supervisor sexually harassed her. The court reasoned that retaliation could come in many forms and there was sufficient evidence to support the jury's verdict that the plaintiff's co-workers engaged in a campaign of retaliatory harassment and the employer failed to correct it. *Id.* at 1334–35. However, in *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998), the court found that ostracism by co-workers that did not result in material harm to the plaintiff was not enough to constitute an adverse employment action. *Id.* at 1039. Similarly, in *Bell*, the Seventh Circuit found that conduct by a supervisor was not sufficiently severe to be actionable. In *Bell*, the supervisor failed to greet or speak to the plaintiff and cancelled a meeting that the plaintiff had scheduled, apparently in response to the plaintiff's sex discrimination complaint. 232 F.3d at 555. The court found these matters trivial. *Id.* Likewise, in *Hill*, the court concluded that a supervisor's rummaging through the plaintiff's desk drawers and garbage can and listening to the plaintiff's telephone calls did not rise to the level of actionable retaliation. 218 F.3d at 645.

Here, Plaintiff was not fired or demoted nor were his hours or pay reduced following his EEOC Charge. In essence, he did not lose any benefits following his formal complaint. Instead, Plaintiff asserts that the "continued" harassment that he endured after filing the EEOC Charge constituted an adverse employment action because it was so bad that it forced him to quit. Taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that the conduct of Plaintiff's fellow co-workers was severe enough to rise to the level of an adverse

employment action. Plaintiff contends that he was subjected to the following harassment after filing his EEOC Charge: (1) other employees began acting aggressively toward him, for instance, leaving knives sticking out of their trays when they were near Plaintiff and banging their cleavers on the meat board or pointing their knives at Plaintiff; (2) other employees gave Plaintiff the cold shoulder; (3) someone destroyed his television; and (4) his car, parked in the Rosebud employee parking lot, was scratched and spit on and a tire was slashed and the windshield broken. Here, if Plaintiff's version of the events were limited to cold shoulders and rude coworkers, the conduct complained of likely would not rise to the level of an adverse employment action. See, *e.g.*, *Parkins*, 163 F.3d 1027 (shunning is an adverse action only when it causes material harm); *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (colleague's failure to greet or speak to employee in response to sex discrimination complaint was too trivial); *Walker*, 408 F.3d at 334 (name-calling and hostility among the workers was yet another iteration of inappropriate behavior that appeared to have been common at the facility); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (a dirty look or the silent treatment is insufficient). But Plaintiff also perceived physical threats from other co-workers, including aggressive behavior that involved knives and cleavers. Although Defendants write this off as, essentially, hazards of the job, Plaintiff's testimony that his co-workers were threatening him with knives and cleavers, coupled with testimony about the destruction of his personal property that was located at the work site, raises the conduct beyond merely insulting or rude. The amount of tension, friction, and outward displays of aggressive behavior is more indicative of retaliation than simply a difficult working environment.

Moreover, Plaintiff's testimony demonstrates a link between his EEOC Charge and the aggressive behavior that followed. See *Nair*, 464 F.3d at 769 ("motive must be to retaliate for activity protected by Title VII"). Giving Plaintiff's testimony the weight it deserves as this

juncture, it appears as if Plaintiff filed his charge and employees began demonstrating threatening, aggressive behavior toward him.  Although the employees stopped the sexual behavior and the racist comments, they engaged in behavior that could reasonably be perceived as threatening.  At trial, a jury might disbelieve Plaintiff's account or might think that Plaintiff's fear of knives and cleavers was simply unreasonable given the environment that he worked in; on the other hand, a jury might believe Plaintiff and accept his testimony that he feared for his safety due to the threatening behavior of his co-workers.  At this stage, Plaintiff has established the necessary causal connection between his EEOC Charge and the adverse, threatening consequences that followed.

In light of the foregoing, the Court concludes that a reasonable fact-finder could find that Plaintiff was retaliated against for lodging an EEOC Charge against his co-workers and supervisors.  Although he was not fired or demoted following the filing of the charge, his testimony takes this case out of the group of cases in which a retaliation claim failed because an employee was merely unhappy or inconvenienced.  *C.f. Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (noting that retaliation is not "mere unhappiness and inconvenience").  Rather, if a jury credited Plaintiff's testimony, a reasonable fact-finder could conclude that Plaintiff felt so unsafe at work that he, in essence, was constructively discharged when he decided to quit.  Taking all the facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court finds that the record simply cannot support Defendants' request for summary judgment on Plaintiff's retaliation claim.

## C.    Racial Harassment in Violation of § 1981

The Court already has determined that Plaintiff cannot proceed with a Title VII racial harassment claim because Plaintiff failed to allege that he was a victim of racial harassment in

the EEOC Charge that underlies this lawsuit. As a consequence, Plaintiff's allegations of racial harassment must be addressed through 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991. Plaintiff testified that the same group of employees who sexually harassed him also harassed him on the basis of his race (African-American). Plaintiff further testified, as set forth in detail above, that "employees would say niggers have big dicks and asses * * * would refer to the plaintiff as a nigger, monkey and an Ethiopian * * * and told the plaintiff to go back to Africa." Plaintiff also maintains that Defendants Castaneda and Mendoza participated in the alleged racial harassment and did nothing to stop it when Plaintiff complained, until Plaintiff filed his EEOC Charge in January 2008.

The legislative history of the Civil Rights Act of 1991 indicates that it was enacted in response to a number of decisions by the United States Supreme Court that were perceived to sharply cut back on the scope and effectiveness of federal civil rights laws. See H.R. Rep. No. 102–40(I), at 18, *reprinted* in 1991 U.S.C.C.A.N. 549, 556. The Act overruled the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), in which the Court held that § 1981 did not apply to conduct after a contractual relationship had been established. 491 U.S. at 171. Section 12 of the Act amended § 1981 to reaffirm that the right "to make and enforce contracts" includes the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. See H.R. Rep. 102–40(II), at 37, *reprinted in* 1991 U.S.C.C.A.N. 549, 730–31. Specifically, Congress added subsection (b) to § 1981: "For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." H.R. Rep. 102–40(II), at 37, *reprinted in* 1991 U.S.C.C.A.N. 549, 730–31; see also *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 383 (2004) ("The 1991

Act overturned *Patterson* by defining the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"); *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Thus, a plaintiff bringing a Title VII claim often includes a § 1981 claim as well. The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981. See *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008).[9]

As the Seventh Circuit explained in *Walker v. Abbott Laboratories*, "at-will employment, though capable of being terminated by either party at any time, is nonetheless a contractual relationship." 340 F.3d 471, 476 (7th Cir. 2003). Moreover, the court noted, excluding at-will employment relationships from the ambit of § 1981 would "contravene Congress's intention [that] the Civil Rights Act of 1991 * * * restore the broad scope of Section 1981 to ensure that all Americans may not be harassed, fired or otherwise discriminated against in contracts because of their race." *Id.* at 477 (quotation omitted). Thus, the Seventh Circuit has concluded that at-will employment relationships are governed by § 1981. See *id.* at 476–77.

The testimony of record, detailed above, gives rise to an inference that Plaintiff was an "at-will" employee of Rosebud, that his fellow employees discriminated and retaliated against

---

[9]    One key difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer. Under § 1981, individuals may be liable. Compare *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) (holding that supervisor may not held liable in his individual capacity for discrimination under Title VII), with *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts"). Other important differences are that claims under § 1981 have a relatively long four-year statute of limitations, see *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004), are not subject to the damage caps enacted in the Civil Rights Act of 1991, see 42 U.S.C. § 1981a(b)(4), and do not require exhaustion of administrative remedies. See, *e.g., Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).

him on the basis of his race, that he complained regularly about the harassment,[10] and that his supervisors did not act to stop the harassment until Plaintiff filed an EEOC Charge.  Defendants maintain that the record only details sporadic instances of harassing conduct, but this reading of the record fails to view the evidence in the light most favorable to Plaintiff.  The repeated name-calling, coupled with the reference to a particular race looking like certain animals and having certain attributes simply on account of one's race, are classic examples of racial harassment that have not been tolerated by the Seventh Circuit.  There is sufficient evidence that Defendant Rosebud discriminated against Plaintiff on the basis of his race.

On the other hand, there is not sufficient evidence that Defendants Casteneda or Mendoza personally discriminated or retaliated against Plaintiff on the basis of his race.  Although Plaintiff has testified as to sexual harassment by Castaneda and Mendoza, Plaintiff admits that Castaneda never called him a nigger or monkey and never told Plaintiff to go back to Africa or Ethiopia.  Plaintiff also has failed to offer evidence that Castaneda was personally involved in the racial harassment that he alleges or that Castaneda intended to discriminate against Plaintiff because of his race.  With respect to Mendoza, Plaintiff maintains that Mendoza referred to him as a "nigger" back in 2003; however, even accepting Plaintiff's testimony about Mendoza as true, these sparse contentions about conduct occurring in 2003 and not after are simply too antiquated to support Plaintiff's § 1981 claim against Mendoza personally.  In the absence of credible evidence that Mendoza engaged in racial harassment in the four years leading up to Plaintiff's

---

[10]    Defendants contend that there is no basis for employer liability because there is "no credible evidence Plaintiff ever reported alleged racial harassment to Castaneda, his manager, during his employment at Rosebud beyond his after-the-fact, vague deposition testimony that he did so."  But Plaintiff's deposition testimony was not vague; rather, he maintains that he regularly (four to five times per month) complained to Castaneda about the harassment and that Castaneda did nothing until Plaintiff filed an EEOC Charge.  Thus, there is a disputed issue of fact as to whether, how often, and about what Plaintiff complained.  Although Defendants can certainly cross-examine Plaintiff at trial about why he did not complain about the racial harassment in his EEOC Charge, his failure to do so does not bar his § 1981 claim.

lawsuit, that Mendoza said more than a word or two to Plaintiff about his race, or that Mendoza intended to discriminate against Plaintiff because of his race, there simply is an insufficient record to hold Mendoza personally liable for racial harassment. Thus, while Plaintiff's § 1981 claim may proceed against Rosebud, his § 1981 claims against Castaneda and Mendoza personally must be dismissed.

### D.    Illinois Gender Violence Act

Plaintiff contends that Defendants Rosebud, Castaneda, and Mendoza violated the Illinois Gender Violence Act. Section 10 of the Act provides a civil cause of action for victims of gender-related violence:

> Any person who has been subjected to gender-related violence as defined in Section 5 may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence. For purposes of this Section, 'perpetrating' means either personally committing the gender-related violence or personally encouraging or assisting the act or acts of gender-related violence." 740 ILCS 82/10 (West 2008).

Section 5 of the Act defines "gender-related violence" to include: "[o]ne or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex" and "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois." 740 ILCS 82/5.

Defendants' primary argument in favor of dismissal of Plaintiff's state law Illinois Gender Violence Act claim is that all of Plaintiff's federal claims should be dismissed and therefore the Court should decline to exercise supplemental jurisdiction over his state law claim. However, as set forth above, several of Plaintiff's federal claims survive summary judgment and therefore the Court will continue to exercise supplemental jurisdiction over Plaintiff's state law Gender Violence Act claim.

Defendants also briefly argue that (i) they did not commit gender violence and (ii) the Act was intended to protect only women. First, based on the record before the Court, there are disputed issues of material fact as to whether Defendants assisted or encouraged gender violence. As set forth in detail above, Plaintiff has testified that Rosebud (via its managers and supervisors) received Plaintiff's complaints of sexual harassment or assault by its managers and employees and that it took no action against these managers and employees as a result of the complaints. There is no question that the conduct of Rosebud employees, as well as Castaneda and Mendoza—if believed by a jury—would be considered acts of gender-related violence. In other words, if the jury believes that Plaintiff was repeatedly touched inappropriately and was made to endure comments about his private parts, that he complained monthly about the abuse he suffered, and that his managers did nothing to stop the complained of conduct, then the jury could find that Defendants encouraged or assisted in the acts of gender-related violence. Second, with respect to Defendants' claim that the act was only intended to help women, they do not cite any case law for that proposition and the Court declines Defendants' invitation to draw this line.

It is less clear whether Rosebud is susceptible to liability, but once again Defendants provide the Court with minimal support (two district court cases) for dismissal. Defendants appear to argue that Rosebud cannot be held liable for a violation of the Act because Plaintiff cannot show that Rosebud was *personally* involved in an act of gender-related violence on account of Rosebud's corporate identity. At this stage, without mandatory authority on point, the Court will allow Plaintiff's claim against Defendant Rosebud to proceed. In the event the law is clarified prior to trial, Defendants may ask the Court to reconsider its ruling. But at this stage, the Court concludes that Plaintiff's testimony is sufficient to support an inference that all Defendants violated the Act by encouraging or assisting acts of gender-related violence by not

responding promptly to Plaintiff's complaints about the sexual conduct that to which he was subjected.

**IV.  Conclusion**

For these reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [140] and grants Plaintiff's motion to allow surreply instanter [158].  The Court grants the motion with respect to Plaintiff's § 1981 claims against Defendants Mendoza and Castaneda and denies the motion in all other respects.  The Court also grants Plaintiff's motion to allow surreply instanter [158], as the Court found the surreply helpful in ruling on the instant motion.

Dated:  December 8, 2014

_____
Robert M. Dow, Jr.
United States District Judge