# IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 11 CV 9147** |
| | ) | |
| **ROSEBUD FARM, INC.,** | ) | |
| **d/b/a ROSEBUD FARMSTAND,** | ) | **Judge Robert M. Dow, Jr.** |
| **ROCKY MENDOZA,** | ) | |
| **CARLOS CASTANEDA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' PHASE II PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................1

II.     GOVERNING PRINCIPLES FOR PHASE II RESOLUTION ..............................2

III.    PROPOSED FINDINGS OF FACT .........................................................2

        A.      Smith's Employment History at Rosebud Farmstand ...................................2

        B.      Smith's Job, Pay and Hours at Rosebud Farmstand .....................................3

        C.      Smith Maintained No Records ....................................................5

        D.      Smith's Discovery Responses Relating to Mitigation of Damages...............5

        E.      Smith Moves Back and Forth Between Chicago and Arizona ....................7

        F.      Smith Goes to School ...........................................................8

        G.      Statements by Party-Opponent at Smith's Deposition .................................8

                1.      Efforts to Find Work Prior to Smith's August 13, 2013 Deposition.....8

                2.      Smith's Driving Ability in Arizona and Places of Residence in
                        Arizona...........................................................10

        H.      Rosebud Farmstand Subpoenas and Responses............................................11

                1.      Walmart.............................................................11

                2.      Fry's................................................................12

                3.      Washington Inventory Service ("WIS") ................................13

                4.      Citywide Janitorial Service ("Citywide") .............................13

        I.      Jobs Since Returning to Arizona in June 2014 ............................14

        J.      Smith's Testimony About Alleged Job Search Efforts After He Quit
                Rosebud Farmstand ..........................................................14

        K.      Smith's Receipt of Unemployment Compensation .......................................17

        L.      Defendants' Expert Dr. Malcolm Cohen ......................................18

IV.     CONCLUSION OF LAW..........................................................21

A.      Overview of the Phase II Evidence .................................................21

B.      False Testimony/Fraud on the Court .................................................23

C.      Application of *Dunnigan* and *ABF Freight* ....................................24

D.      Relevance of Post-Termination Evidence ........................................25

E.      Application of *McKennon*, *Medlock* and *Sellers* Here ..................26

F.      The Parties' Burdens Where Failure to Mitigate Is Pled................27

G.      Assessment of the Parties' Satisfaction of Their Respective Burdens ..........31

H.      Federal Rule of Civil Procedure 26(e) ............................................34

I.      Duty to Preserve Evidence ..............................................................34

J.      Daubert, Federal Rules of Evidence 702 and 703............................35

K.      Application of Daubert and Fed. R. Evid. 702 and 703...................36

L.      Federal Rules of Civil Procedure 26(a)(2)(B) ................................37

M.      Illinois Department of Employment Security ("IDES") Recordkeeping Requirements ........................................................38

N.      Application of IDES Rules Here ......................................................39

V.      CONCLUSION..........................................................................................40

# TABLE OF AUTHORITIES

## CASES

*ABF Freight Systems, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 114 S.Ct. 835 (1994) ........................ 24

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ........................................... 35

*Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004) ..................................................... 31

*Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985) ................................... 30

*Bryant v. Gardner*, 587 F. Supp.2d 951, 967-68 (N.D. Ill. 2008) ................................................. 34

*C.W. ex. Rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) ....................................... 36

*Daubert v. Merrell Down Pharma., Inc.*, 509 U.S. 579, 113 S. Ct. 2766 (1983) ................... 35, 36

*Dreger v. Mid-America Club*, 1998 WL 102927 at 3 (N.D. Ill. Mar. 5, 1998) ........................... 30

*E.E.O.C. v. Grady*, 857 F.2d 383, 390 (7th Cir. 1988) .................................................................. 38

*E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990) ........................................... 27, 28

*E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) ....................... 29, 30, 31

*Fleming v. County of Kane, State of Ill.*, 898 F.2d 553, 560 (7th Cir. 1990) ................................. 28

*Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231, 102 S.Ct. 3057 (1982) ............................... 27, 30

*Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) ................................... 28

*Harper v. Godfrey Co.*, 45 F.3d 143, 149 (7th Cir. 1995) ............................................................. 29

*Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014) ............................................ 35

*Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1427 (7th Cir. 1986) ........................................ 27

*Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) ...................... 28, 29

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48, 119 S.Ct. 1167 (1999)............. 35, 36

*McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362, 115 S.Ct. 879 (1995)... 25, 26

*McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992) ................................... 29

*Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir. 1999) .............................................. 25, 26

*Metavante Corp. v. Emigrant Serv. Bank,* 619 F.3d 748, 760 (7th Cir. 2010) ............................. 35

*Meyer v. United* Airlines*, Inc.*, 950 F. Supp. 874, 877 (N.D. Ill. 1997) ...................................... 28

*Midwest Fence Corp. v. U.S. Dept. of Transportation*, 84 F.Supp.3d 705, 723-24 (N.D. Ill. 2015) ............................................................................................................................. 36

*Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) ........................................................ 2

*Payne v. Security Savings and Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991) .......................... 29

*Phelps Dodg Corp. v. NLRB*, 313 U.S. 177, 198, 61 S.Ct. 845 (1941) ...................................... 30

*Sangster v. United Airlines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980) .......................................... 30

*Sellers v. Mineta*, 358 F.3d 1058 (8th Cir. 2004) ...................................................................... 26

*Smith v. America Service Co. of Atlanta, Inc.*, 796 F.2d 1430 (11th Cir. 1986) .......................... 29

*Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 439 (7th Cir. 1992) .......................... 29

*Syvock v. Milwaukee Boiler Manufacturing Co., Inc.*, 665 F.2d 149, 160 n. 14 (7th Cir. 1981) .. 29

*Taylor v. Phillips Indus., Inc.* 593 F.2d 783, 787 (7th Cir. 1979)..................................... 27, 28, 30

*Trask – Morton v. Motel 6 Operating L.P.*, 534 F.3d 672 (7th Cir., 2008) .................................. 34

*U.S. v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111 (1993) ...................................................... 23

*Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997)..................................................... 25

*Williams v. Imperial Eastman Acquisition Corp.*, 994 F. Supp. 926, 931 (N.D. Ill. 1998)... 28, 29, 31

*Woods v. Von Maur, Inc.*, 2012 WL 2062400 at *7 (N.D. Ill. June 7, 2012) ......................... 30, 32

## Statutes & Administrative Codes

830 ILCS §105/4 (a)(i)........................................................................................................... 4

18 U.S.C. §1621 .................................................................................................................. 23

42 U.S.C. §2000e-5(g)(1) ..................................................................................................... 30

56 Ill.Admin.Code Section 2720.115(c) .................................................................................. 39

**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 11 CV 9147** |
| | ) | |
| **ROSEBUD FARM, INC.,** | ) | |
| **d/b/a ROSEBUD FARMSTAND,** | ) | **Judge Robert M. Dow, Jr.** |
| **ROCKY MENDOZA,** | ) | |
| **CARLOS CASTANEDA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' PHASE II PROPOSED FINDINGS OF FACT**
**AND PROPOSED CONCLUSIONS OF LAW**

Defendants Rosebud Farm, Inc., d/b/a Rosebud Farmstand, Carlos Castaneda and Roque Mendoza, by and through their attorneys, and in accordance with this Court's Order dated May 12, 2016, submit their Proposed Findings of Fact and Proposed Conclusions of Law.

## I.    <u>INTRODUCTION</u>

The Phase II equitable relief determination this Court now must make presents a fact pattern of first impression in this District. While the standards to determine whether a Plaintiff is entitled to back pay are neither novel nor unprecedented in this Circuit, the totality of circumstances based on the record presented in this case, necessitates a far more comprehensive analysis of Plaintiff's request for equitable damages than Plaintiff has suggested throughout these Phase II proceedings. As demonstrated in Defendants' Proposed Findings of Fact ("POF") and Defendants' Proposed Conclusions of Law ("COL"), the following issues all should be addressed and resolved before the Court can determine what, if any, equitable relief, can be awarded based on the evidence in the record. While Defendants acknowledge some amount of back pay often is

1

awarded to a plaintiff who obtains a jury verdict in his or her favor, no back pay or other equitable relief should be awarded here based on the evidence, or lack thereof.

## II.   GOVERNING PRINCIPLES FOR PHASE II RESOLUTION

1.     At a bench trial, the Court is the "trier of fact", *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011).

2.     Where, as here, the Court decides what, if any, equitable relief is appropriate, "the Court determines the weight and credibility of each witness's testimony." *Morisch*, 653 F.3d at 529.

## III.   PROPOSED FINDINGS OF FACT

### A.   *Smith's Employment History at Rosebud Farmstand*

3.     Smith first began employment at Rosebud Farmstand on September 2, 2001. (Exh. 19, Docket No. 261-1, p. 1).  Smith quit voluntarily January 12, 2002.  (*Id.*, p. 9, p. 3).

4.     Smith returned to Rosebud Farmstand on November 11, 2003.  (*Id.*, pp. 4-5).

5.     In 2006, Smith was convicted of a felony. (Trial Tr., p. 71, ll:12-13).[1]  Smith pled guilty and received two years of probation.  (Trial Tr., p. 73, ll:2-4).  As a condition of Smith's probation, Smith was not permitted to leave the State of Illinois for two years following the conviction in 2006.  (Trial Tr., p. 74, ll:20-21, 75, ll:1).  Smith's probation ended in January, 2008.  (Trial Tr., p. 75, ll:3-4).

6.     Rosebud Farmstand kept Smith's employment even though it could have terminated him.  (Smith Dep., p. 39, ll:6-8, 40, ll:3-10).[2]

7.     Smith confirmed that Rosebud Farmstand was not involved in the conduct that led

---

[1]     All references herein to the Trial Transcript (Trial Tr.) are to the transcript from the April 2016 Phase II trial unless otherwise indicated as "Trial Tr. 1."

[2]     The transcript from Smith's Deposition was filed with the Court as Defendants' Exhibit 46 on June 24, 2016.

to his conviction nor was it Rosebud Farmstand's fault Smith was convicted of a felony. (Trial Tr., p. 71, ll:23-25-72, ll:1-7).

8.      According to Smith, his last day worked was June 28, 2008. (Trial Tr., p. 77, ll:17-19).

9.      Smith testified he worked 70 hours per week at Rosebud and he would have continued to work 70 hours per week after 2008. (Trial Tr., p. 436, ll:3-9).

10.     While Smith still was working at Rosebud Farmstand, he admits he discussed with his girlfriend and his children moving to Arizona. (Trial Tr., p. 86, ll:8-20).

11.     Smith did not want to switch his girls in the middle of a school semester. (Trial Tr., p. 80, ll:14-16).

### B.      *Smith's Job, Pay and Hours at Rosebud Farmstand*

12.     Smith was a customer service employee in Rosebud Farmstand's meat department. Smith had not been a butcher before, his position was entry-level, it required no special skills or education and he was trained on the job. (Trial Tr., p. 241, ll:23 – 242, ll:1-9).

13.     Throughout his employment at Rosebud Farmstand, Smith earned minimum wage. (Trial Tr., p. 242, ll:10-13; Exh. 19, Docket No. 261-1).

14.     During Smith's early years of employment, Smith had the opportunity to and often did work more than 40 hours per week. (Exh. 19, Docket No., 261-1, pp. 6-11). Smith testified at trial that he frequently worked overtime of 10, 15 or 25 hours a week and he was not paid time and a half. (Trial Tr., p. 61, ll:24-62, ll:17)

15.     Contrary to Smith's trial testimony, Rosebud Farmstand's business records show Smith always was paid overtime - at time and a half his applicable hourly rate – for all overtime hours worked. (*Id.*). (*See also,* Exh. A, hereto, which is Group Exhibit 47, pp. 1, 4, 7, 9, in

which includes Rosebud Farmstand's payroll journals and W-2s for Smith for 2004-2008.)[3]

16.     Smith essentially stopped working overtime for the last eighteen months of his employment.  (Exh. 19, 261-1, pp. 12-31).  Smith requested that his hours be reduced.  (Trial Tr. 1, Vol. 5-A, p. 1015, ll:8-1016:18).  Commencing the week ending October 14, 2006 though Smith's last week of employment in June, 2008, Smith only worked more than 40 hours during two weeks – the weeks ending January 6, 2007 and October 6, 2007.  (Exh. 19, 261-1, pp. 12-13). Minimum wage in Illinois during that time period was $6.50 per hour for the week in January and $7.50 per hour for the week in October. 820 ILCS §105/4 (a) (i).  Smith was paid time and a half for the minimal hours he worked in excess of 40 hours those weeks.  Specifically, for the week ending January 6, 2007, Smith worked 42.80 hours; 40 x $6.50 = $260, 2.80 x $9.75 = $27.30, totaling $287.50.  For the week ending October 6, 2007, Smith worked 40.27 hours; 40 x $7.50 = $300, .27 x $11.25 = $3.04, totaling $303.04.  (Exh. 19, 261-1, pp. 12-13).

17.     Smith testified his hours were reduced from an average of 34 to an average of 30 hours before he filed his Charge of Discrimination in January, 2008.  (Smith Dep., p. 203, ll:20 – 204, ll:1-12; *See also* Exh. 19, 261-1, p. 13 (December) and Exh. 1, Docket No. 227-1, p. 4).

18.     Smith's average weekly hours worked in 2008 were 27.72 based on the hours reported on his time record and his card punches.   (693.05 hours divided by 25 weeks). (Exh. 19, 261-1, pp. 14-15).

19.     When Smith quit Rosebud Farmstand, he was earning $7.50 per hour. (*Id*. at pp. 12-13).  820 ILCS §105/4 (a)(i).

20.     Smith earned $5,539 for the time he worked at Rosebud Farmstand in 2008 which

---

[3]     Smith claimed for the very first time during the Phase II proceedings for this case that he was not paid overtime for hours worked in excess of 40.  Defendants have filed a motion to supplement the record with Group Exhibit 47 contemporaneous with this filing to present evidence relevant to this new testimony presented.

was January through June. (Trial Tr., p. 305, ll:17-22; Exh. 47, pp. 12-13).

### C.     *Smith Maintained No Records*

21.    Since Smith filed his Charge in January, 2008, Smith maintained absolutely no records of his alleged on-line or handwritten applications for employment or any attempts or efforts to find employment (Exh. B, response no. 8); (Trial Tr., p. 129, ll: 3-15, 452, ll:3-8).[4]

22.    Smith testified that between the period of 2008 and 2012, he had during discovery no personal copies of his W-2s, 1099, or tax information for that period nor did he file returns. (Trial Tr., p. 407, ll:2-5, p. 408, ll:6; *See also* Smith Dep., p. 106, ll:18-107, ll:8).

23.    Smith did not produce during his case in chief for Phase II documents to support the damages he requested nor to substantiate the alleged efforts to find employment to which he testified. (Trial Tr., pp. 1-69).

24.    Although Rosebud Farmstand requested in writing prior to the damages trial Smith's tax and earnings records for 2013 forward, Smith never responded and failed to provide them prior to the hearing. (Exh. C). At the end of Phase II, Smith produced a few W-2s for that time period but still failed to produce the tax transcripts as requested before or during the hearing. (*See* Exhs. 44, 45, submitted to the Court under seal). Although counsel for Smith stated on the record it takes "months" to obtain transcripts from the IRS (Trial Tr., p. 17, ll:14-19), the transcripts were easily obtained April 6, 2016, the day after the trial ended. (*See* Exhs. 44, 45 submitted under seal).

### D.     *Smith's Discovery Responses Relating To Mitigation of Damages*

25.    Smith initially answered Defendant's Interrogatories on January 4, 2013. (Exh. 6,

---

[4]     Smith's responses to Defendants' Request for Production of Documents is attached as Exhibit B. Defendants' pretrial request for Smith tax transcripts and earning records for 2013 forward are attached as Exhibit C. Both Exhibits are part of Defendants' Motion to Supplement the Record.

Docket No. 251, pp. 4-5).  In response to Interrogatory No. 1 regarding Smith's employment since June 2008, Smith stated:

> The plaintiff is not currently employed.  In October 2011, the plaintiff was employed with Party City, Gilbert, AZ 85295.  The plaintiff does not have the exact address.  The plaintiff worked in customer service.  The plaintiff worked from 5 October 2011 until 31 October 2011.  The plaintiff averred $7.35 per hour.  The employer paid the plaintiff every two weeks.  The plaintiff received only two paychecks.

In response to Interrogatory No. 2 regarding job search efforts, Smith responded:

> Please see answer to Interrogatory # 1.  (*Id.*).

26.     Smith's Deposition took place on August 13, 2013.  (Smith Dep., Exh. 46).

27.     Eleven days prior to his Deposition, on August 2, 2013, Smith served First Supplemental Answers to Interrogatories and amended his answers to Interrogatories Nos. 1 and 2 and he listed places he claims he applied for work as of the date signed.  (Exh. 5, Docket No. 261, pp. 1-2).  With the exception of Phoenix Sky Harbor International Airport, all of the places listed were in Gilbert, Arizona. (*Id.*)

28.     On August 16, 2013, three days after his Deposition, Smith provided a second supplement to his answers to Interrogatory Nos. 1 and 2 stating that he worked at "Way to Go Transportation" "from approximately December 2011 until August 2012," earning "$977." (Exh. 22, Docket No. 261-1, p. 32).  Smith did not provide further additional places to which he claimed he applied to for work in this supplement. (*Id.*)

29.     On September 26, 2013, Smith supplemented his prior answers to Interrogatory No. 1 stating he worked for Washington Inventory in Arizona and was working at Citywide Janitorial Service in Chicago (Exh. 24, Docket No. 261-1, p. 34).  Smith did not supplement his response to Interrogatory No. 2 regarding job search efforts. (*Id.*)

30.     On January 22, 2105, Smith supplemented his interrogatory responses to include

jobs at 7-Eleven and Goodwill in Mesa, Arizona in 2014 and 2015. (Exh. 25, Docket No. 261-1, pp. 36-37). Smith did not provide any information concerning efforts to find employment. (*Id.*)

31. Smith testified that he failed to include in his answers and supplements jobs he obtained and places he allegedly applied because "he was just trying to hurry to get them turned in and not answering them to the fullest," he did not "figure it was relevant," he just rushed through it," he "skimmed through it … I had just rushed through answering these interrogatories." (Trial Tr., p. 115, ll:10-25, 116, ll:1, 119, ll:1-17, 123, ll:2-9, 123, ll:3-6).

32. Smith admitted there are no references whatsoever in his interrogatory responses at Exhs. 5, 6, 22, 24 and 25 to attempts by him to apply for work in Mesa, Arizona where he testified he lived with his aunt between July 2008 and August 2012. (Trial Tr., p. 303, ll:2-22).

### E. *Smith Moves Back and Forth Between Chicago and Arizona*

33. Smith testified he moved to Arizona in July 2008. (Trial Tr., p. 123, ll:17-18).

34. Smith started working at Washington Inventory Service ("WIS") on March 25, 2009. (Exhs. 5-6, Docket No. 261, pp. 1-10). At WIS, Smith needed his own vehicle to drive different places to count inventory. (Trial Tr., p. 29, ll:21-25, 30, ll:1-15). Smith testified at trial he used only his aunt's car for the job. (Trial Tr., p. 203, ll:2-8). At his deposition, Smith testified he quit the job WIS voluntarily due to car problems with his girlfriend's car. (Trial Tr., p. 207, ll:21, 208, ll:11, *quoting* Smith Dep.). Smith testified Rosebud Farmstand had nothing to do with his decision to quit WIS. (Trial Tr., p. 223, ll:15-18).

35. Although never disclosed by Smith before trial, Smith had a job at Labor Ready in 2010 that he quit to enroll in college. (Trial Tr., p. 31, ll:16-25). Smith testified he did not disclose the Labor Ready position before because he did not think it was relevant and he did not do too much work that year because he went to school (Trial Tr., p. 115, ll:15-22).

36.     Smith started working as a driver at his brother's transportation company Way to Go Transportation in November, 2011.  (Trial Tr., p. 109, ll:12-21, 252, ll:3-5, 255, ll:14-16).

37.     Smith quit voluntarily his job at Way to Go to move back to Chicago in August 2012.  (Trial Tr., p. 259, ll:19-25).

38.     Smith started working at Citywide Janitorial Service in September 2013. (Trial Tr., p. 50, ll:22-25, ll:1-8; Exh. 18, Docket No. 261, p. 65).  Smith testified he earned $980 in 2013.  *Id.*  Smith's tax records produced after trial shows he earned $2,553 at Citywide. (Exh. 44, submitted under seal).

39.     Smith quit voluntarily his job at Citywide Janitorial Service in June 2014 so he could move back to Arizona.  (Trial Tr., p. 52, ll:8-14, 123, ll:23-25, 259, ll:14-18).

40.     Smith has lived continuously in Arizona since June 2014.  (Trial Tr., p. 100, ll:21-25, 101, ll:1-5).

41.     At the time of the December 2015 trial, Smith was an Arizona resident.  (Trial Tr., p. 101, ll:6-14).

    **F.**     *Smith Goes to School*

42.     Smith testified he was a full-time student from September 2010 to the fall of 2011 taking classes six days a week for six hours a day.  (Trial Tr., p. 146, ll:1-5, 147, ll:4-12).

43.     Smith testified he stopped looking for work because he decided to go to school and he did not look for jobs while he was in school.  (Trial Tr., p. 145, ll:14-17, 147, ll:7-12).

    **G.**     *Statements by Party-Opponent at Smith's Deposition*

        **1.**  *Efforts to Find Work Prior to Smith's August 13, 2013 Deposition*

44.     At the beginning of Smith's Deposition, Smith was first sworn in and he represented he would tell the truth. (Smith Dep., p. 6)

45.     Smith also was sworn in and agreed to provide truthful testimony before the start of both phases of the trial.  (Trial Tr. 1, Vol. 3-A, p. 54, ll:20; Trial Tr., ll:7).

46.     At Smith's Deposition, he testified he did not have a single interview after he quit Rosebud Farmstand in 2008 and before he moved back to Chicago in August, 2012. (Smith Dep., p. 112, ll:8-13).

47.     Smith also testified that all of the employment applications he completed asked whether he had any felony convictions and that he answered truthfully on all of them. (Smith Dep., p. 112, ll:14-22).

48.     Smith testified further that he did not have any documents that show his efforts to find work and that no work was available to him.  (Smith Dep., p. 109, ll:1-9).

49.     At his Deposition, Smith testified that all of the applications he completed were on-line and that he used his girlfriend's computer to complete them.  (Smith Dep., p. 109, ll:24, 110; ll:1-5, 111, ll:14, 113: ll:1-24).  Smith also testified when being asked about the places listed in his interrogatory response, that when he was "living on Megan Court" and he "moved to Arizona on Megan Court," it was walking distance to Wal-Mart and Wendy's so he attempted to apply for work.  (Smith Dep., p. 345, 11:6-346, 11:21).

50.     Contrary to Smith's Phase II trial testimony, in neither Smith's Deposition nor his multiple supplements to his interrogatory responses did Smith state in response to questions about his efforts to find work that he looked for work in Chicago in June/July 2008 before he moved to Arizona, that he spent five hours each morning applying for jobs online, that he then walked the streets in Mesa, Arizona daily for three hours looking for work and after that he went to employment agencies in Mesa, Arizona for five hours a day three days a week to look at jobs. Smith also never disclosed in his interrogatory responses or at his deposition that he either

looked for or applied for jobs in Chicago after he quit Rosebud Farmstand and before he moved to Arizona in July 2008. (Compare Exhs. 5, 6, 22, 24, 25 with FOF ¶¶77-90, 54-58 below; *See also* Trial Tr., p. 428, ll:7-23-429, ll:5-430, ll:22).

### 2. *Smith's Driving Ability in Arizona and Places of Residence in Arizona*

51.     Smith testified he did not own a car in Arizona. (Smith Dep., p. 18, ll:13-14).

52.     Smith testified that his girlfriend had a car in Arizona that he did not drive. (Smith Dep., p. 20, ll:12-20).

53.     Smith testified his girlfriend did not get a car in Arizona until around 2011. (Smith Dep., p. 23, ll:11-13).

54.     Smith testified that he moved to Arizona before his girlfriend and that once she got there, he moved in with her. (Smith Dep., p. 18, ll:18, 19, ll:1-5).

55.     Smith testified that during the entire time both he and his girlfriend lived in Arizona at the same time, they lived together with their four children in three different places – on Megan Court, Ensueno and Oxford Lane. All three houses were in Gilbert, Arizona. (Smith Dep., p. 24, ll:1-21, 25, ll:6-11; Trial Tr. p. 390, 11:23-391:16).

56.      Conversely, at trial, Smith testified the whole time he lived in Arizona, he lived in Mesa with an aunt, he never lived or moved in with La Tonya, his girlfriend, and that he never lived with nor would he have been able to live at his girlfriend's. (Trial Tr., p.27, 270, ll:6-15).

57.     Smith testified at his deposition he could not use and never did use his girlfriend's home address when he lived in Arizona. (Smith Dep., p. 19, ll:6-9; Trial Tr., 275, ll:18, 276, ll:12).

58.     At trial, Smith testified he could and did use his girlfriend's address as his address. (Trial Tr., p.270, ll:6-17, 274, ll:7-15).

### H. *Rosebud Farmstand Subpoenas and Responses*

59.     Because Smith testified he had no records, Rosebud Farmstand issued subpoenas to the companies for which Smith provided information in his interrogatory responses.

60.     Only Walmart, Fry's, Target and AutoZone responded to the Subpoenas.

61.     Walmart produced four separate applications with a certification from its Discovery Specialist that the records produced were kept in the regular course of business and that compiling the records was a regularly conducted business activity. (See Exhs. 7, 8, 9, 10, Docket No. 261, pp. 11-34, 39.

62.     Fry's produced one application and a written communication that Smith was not interviewed. (Exh. 12, Docket No. 261, pp. 40-46 and Exhibit D attached hereto).[5]

63.     Target submitted a response that it had no application for Smith with a statement that applications are retained only for one year. (Exh. 14, Docket No. 261, pp. 52-60).

64.     AutoZone responded that it had no applications for Smith with a statement that "Robert Smith was not employed by AutoZone nor applied for employment and/or the employment record goes beyond seven (7) years" (Exh. 13, Docket No. 261, p. 51).

### 1. <u>*Walmart*</u>

65.     Although Walmart produced applications for Smith dated September 17, 2008, April 17, 2009, November 25, 2011, and September 8, 2012 (Exhs. 7-10, Docket No. 261, pp. 17-34), in response to Defendants' Subpoena, Smith testified he only prepared Exhibit 8 and not the others. (Trial Tr., pp. 152-157, 210, ll:18-25, 211, ll:1-2).

---

[5]     Exhibit D, part of Defendants' Motion to Supplement the Record, is a communication from Fry's that was produced during discovery that accompanied the subpoena response stating Smith was not interviewed.

66.     In Smith's September 17, 2008 application, Smith checked the box "yes" in response to the question "Will you now or in the future require work use sponsorship?" (Docket No. 261, p. 11). Although Smith last rate of pay at Rosebud Farmstand was minimum wage at $7.50 per hour, Smith indicated the minimum amount he would accept for pay was $10.00 per hour. (*Id.* at 16). The Walmart application did not ask for information regarding Smith's criminal background. (*Id.* at 11-16). Smith's application also contained the statement that "I certify that the information on this application is correct and I understand that any misrepresentation or omission of any information will result in my disqualification from consideration for employment …" (*Id.* at 16).

### 2. *Fry's*

67.     Fry's produced one application dated November 8, 2009, completed by Smith in response to Rosebud Farmstand's Subpoena. (Exh. 12, Docket No. 261, pp. 40-46; *See also*, Trial Tr., p. 172, ll:4-16). In the Fry's application, Smith stated "voluntarily quit" as to reason for leaving Rosebud Farmstand and that his answer was a truthful answer. (*Id.* at 41; Trial Tr., p.163, ll:8-10, 21-23). Smith listed "Azelea Hill" as his supervisor. (Exh. 12, Docket No. 261, pp. 41.). Hill is Smith's sister. She did not work at Rosebud Farmstand. (Trial Tr., ll:21-25, p. 165, ll:5-9) When asked the question, "Have you been convicted of a crime?", Smith answered "no" even though the application stated "*NOTE – THE EXISTENCE OF A CRIMINAL HISTORY WILL NOT AUTOMATICALLY DISQUALIFY YOU FOR THE JOB YOU ARE APPLYING FOR." (*Id.* at 42).

68.     When Smith submitted the application, he "AFFIRM[ED] THE INFORMATION PROVIDED BY ME IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT ANY FALSE INFORMATION, MISREPRESENTATION OR OMISSIONS MAY DISQUALIFY ME FROM FURTHER CONSIDERATION FOR EMPLOYMENT …" (*Id.* at 46).

### 3. *Washington Inventory Service ("WIS")*

69.     Although not disclosed in Smith's supplemental answers to interrogatories provided days before his deposition, Smith testified at his deposition about a job for which he was hired as an Inventory Counter at WIS in March 2009.  (*See* Exhs. 5, 6, Docket No. 261, pp. 1-10).  In response to Rosebud Farmstand's subpoena, WIS provided Smith's written job application and related documents from the company business records (Exhs. 15-17, Docket No. 261, pp. 61-66).  On Smith's WIS application, he represented he would drive a private vehicle for work.  Smith also disclosed he was African-American.  (*Id.* at 63).  Smith's hourly pay rate was $8.50 per hour, $1.00 more than he was earning at Rosebud Farmstand.  (*Id.*) In response to the question on the application **"Have you ever been convicted of a felony or serious misdemeanor?"** Smith checked the box "No."  (Exh. 15, Docket No. 261, p. 61).  The WIS application also stated that ("A conviction does not automatically disqualify an applicant. Each case will be evaluated on its own merit.").  (*Id.*)  In response to the question "reason for leaving" Rosebud Farmstand, Smith stated "moved to Arizona."  (*Id.*)

70.     The WIS application contained the following statement:   "Omission or misrepresentation of a material fact in this application may result in refusal or separation from employment."  (Exh. 15, Docket No. 261, p. 61).

### 4. *Citywide Janitorial Service ("Citywide")*

71.     Citywide produced one application prepared by Smith in response to Rosebud Farmstand's subpoena (Exh. 18, Docket No. 261, pp. 65-66).  On his application, Smith stated he was looking for part-time work at an hourly rate of $8.25 per hour.  (*Id.* at 65).  In response to the question on the application "Have you ever been convicted of a felony …," Smith responded "Yes, August of 1999 …."  (*Id.*)  Smith failed to disclose in his Citywide application his 2006

felony conviction.  (*Id.*)

72.     Smith certified that "all of the information provided on this employment application are true and complete to the best of my knowledge …. I understand that false or incomplete information may disqualify me from further consideration for employment and may result in my immediate discharge if discovered at a later date" even though his application was incomplete because his 2006 conviction was omitted.  (*Id.*; Trial Tr., p. 218, ll:1-5).

### I.     *Jobs Since Returning to Arizona in June 2014*

73.     Smith started working at 7-Eleven for $8.50 per hour, 40 hours per week in Mesa, Arizona in June 2014.  (Exh. 25, Docket No. 261-1, p. 36; Trial Tr., p. 260, ll:12-14, 262, ll:6-24). Smith was terminated from the 7-Eleven position in October 2014 because things got bad there with his manager.  (*Id.* at Exh. 25; Trial Tr., p. 260, ll:22, 261, ll:3).

74.     Smith started working at Goodwill in Mesa, Arizona for $8.50 per hour in November 2014.  (*Id.* at Exh. 25).  Smith got laid off from that position in February 2015, because Smith said he could no longer do the job because he allegedly hurt his back while "doing things at home."  (Trial Tr., p. 264, ll:18, 265, ll:18, 266, ll:5-7).

75.     Smith started working for Labor Ready in the beginning of March 2015 at an hourly rate of $8.05 for 39 hours per week.  (Trial Tr., p. 8-10, p. 269, ll:8-18,  125, 270, ll:1-4). At the time of the trial, Smith was employed at Labor Ready.  (*Id*).

76.     Smith's assignments at Labor Ready have included landscaping jobs, jobs removing carpet and throwing it in the trash and most recently, Odessa Auto Auction since April 2015.  (Trial Tr., p. 267, ll:15, 269, ll:12).

### J.     *Smith's Testimony About Alleged Job Search Efforts After He Quit Rosebud Farmstand*

77.     On direct examination, Smith testified he spent a total of five hours a day looking

for employment in 2008 relating to Mesa, Arizona. (Trial Tr., p. 24, ll:6-7, 27, ll:12-15).

78.     According to Smith, in 2008, he would get up in the morning, look at newspapers and online on job sites like Monster and Indeed and then travel a four-mile radius from "my address" looking for work. (Trial Tr., p. 23, ll:13-21, 248, ll:11-17).

79.     Smith described his activity as "walking around the surrounding area where I lived at." (Trial Tr., p. 28, ll:1-7). Smith testified he was looking for all types of jobs and any suitable work and not work limited to customer service as a meat butcher. (Trial Tr., p. 132,ll:3-135, ll:4).

80.     Smith testified on direct he took the same steps in Arizona in 2009, 2010 and 2011, about five hours a day. (Trial Tr., p. 27, ll:22, 29, ll:2, 30, ll:23, 31, ll:9, 32, ll:5-10). Smith testified he also looked at employment guides inside stores. (Trial Tr., p. 28, ll:21-24).

81.     During Smith's direct examination, Smith provided no testimony or other evidence to support job search efforts between June 28, 2008 and August 2012 in Chicago or efforts to apply for jobs at employment agencies in either Arizona or Chicago.

82.     Smith testified on direct examination that in 2008, he applied for "like about a good 10, 12 applications … about a good total of like out of that whole year, I could say probably a good 15." (Trial Tr., p. 68, ll:12, 69, ll:2). According to Smith, he would apply at the same places. He did not think to venture out. (Trial Tr., p. 69, ll:3-10).

83.     On cross-examination, Smith testified that in 2008 and 2009, he spent five hours each day from 7 a.m. – 12 p.m. looking online and applying for jobs and then he spent from 12 p.m., for another three hours, walking around a four-mile radius in Mesa, Arizona. (Trial Tr., p. 245, ll:17, 246, ll:5, 247, ll:17, 248, ll:3, 249, ll:6-8).

84.     Smith confirmed on cross-examination that he lied about his conviction history on

15

all of the applications he completed.  (Trial Tr., p. 124, ll:21, 125, ll:1-20, 127, ll:3-7).

85.     On cross-examination, Smith provided new information that he claims he went to employment agencies in 2008 in Arizona to look for jobs.  (Trial Tr., p. 403, ll:8-17).

86.     On redirect, Smith now testified he went to employment agencies in Mesa, Arizona three days a week for five hours a day.  (Trial Tr., p. 428, ll:4-23, 431, ll:1-8).

87.     Smith testified on redirect, that between 2008 and 2009, he applied on-line for 72 jobs a week for 78 weeks, resulting in 5,000 on-line applications.  (Trial Tr., p.101, ll:6-14).

88.     Smith testified on cross-examination that between July 2008 and December 2008 he was not applying for jobs in Illinois.  (Trial Tr., p. 499, ll:17, 450, ll:12).

89.     Smith changed his story on redirect and testified he spent 5 hours per day looking and that he applied for "a good 20, 20 jobs" in Chicago after he quit employment at Rosebud Farmstand on June 28, 2008 and during the first two weeks in July 2008.  (Trial Tr., p. 426, ll:5, p. 427, ll:8, 429, ll:5-25).

90.     Nowhere in any of Smith's answers to interrogatories (Exhs. 5, 6, 22, 24, 26) or at his deposition (Smith Dep., Exh. 46) did Smith identify a single place he applied for work in Chicago between July 2008 and December 2008 or at any other time thereafter except Citywide in July 2013.

91.     Smith testified at his deposition, which he confirmed on cross-examination, that he did not have a single job interview between when he quit Rosebud Farmstand in 2008 and he moved back to Chicago in August 2012.  (Smith Dep., p. 112, ll:8-13; Trial Tr., 124, ll:16-19).

92.     On redirect, Smith testified he had a job interview at Fry's in 2009 at which he discussed his criminal background and was not hired.  (Trial Tr., p. 439, ll:3-21).

16

### K. *Smith's Receipt of Unemployment Compensation*

93.    After Smith quit Rosebud Farmstand in June 2008, he applied for and received $3,956.00 in unemployment benefits in 2008 from the Illinois Department of Employment Security.  (Exh. 26, p. 2, submitted to the Court under seal).

94.    Although Smith obtained employment at WIS in March 2009 for more than he was earning at Rosebud Farmstand and he quit voluntarily that job, Smith nonetheless received $10,019.00 from IDES in unemployment compensation in 2009. (Exh. 36, p. 2, submitted to the Court under seal).

95.    Smith also received unemployment compensation from IDES in the amount of $4,728.00 in 2010 (Exh. 37, p. 2, submitted to the Court under seal).

96.    Smith testified he did not receive any unemployment compensation from IDES after January or February 2009.  (Trial Tr., p. 394, ll:3-7, 395. 11:13-15, 397, 11:20-, 398, 11:1).

97.    Smith testified at trial he did not have any evidence to conflict with the IDES numbers reported by the IRS.  (Trial Tr., p. 306, ll:7-9).

98.    Smith testified that he did not tell IDES he moved from Chicago to Arizona (Trial Tr., p. 306, ll:10-16).

99.    Smith testified he provided to IDES records of his job search efforts while he received benefits but that he did not keep copies before he sent the documents in.  (Trial Tr., p. 307, ll:2-4; Trial Tr., p. 306, ll:18-20).

100.    The Court directed Smith to obtain copies of his tax records and IDES records to support his testimony (Trial Tr., p. 409-412).

101.    Smith has not provided any documentation to Defendants or the Court relating to the funds he received from or the documents he submitted to IDES between 2008 and 2010.

## L.    *Defendants' Expert Dr. Malcolm Cohen*

102.    Defendants' expert, Dr. Malcolm Cohen, issued his report on December 31, 2013, four months after Smith's Deposition (Exh. 27, Docket No. 261-1, pp. 38-58).  Dr. Cohen is the President of Employment Research Corporation in Ann Arbor, Michigan.  (Trial Tr., p. 312, ll:24, p. 313, ll:4).  Dr. Cohen is a labor economist with a Ph.D. in Economics from MIT.  (Trial Tr., p. 312, ll:15-18, p. 313, ll:11-14).  After graduating from MIT, Dr. Cohen worked for the U.S. Bureau of Labor Statistics in Washington, D.C.  (Trial Tr., p. 313, ll:15-25).  Dr. Cohen has done extensive research in employee job search and mitigation.  (Trial Tr., p. 314, ll:21-315, ll:11).  Dr. Cohen's Curriculum Vitae is attached as Appendix A to his Report. (Exh. 27, Docket No. 261-1, pp. 43-56).  Dr. Cohen has performed at least 100 times, help wanted advertisement analyses.  (Trial Tr., p. 316, ll:5-17).  Dr. Cohen has been engaged in about 1,000 assignments, and has testified 50/50 on behalf of plaintiffs and defendants 150-200 times.  (Trial Tr., p. 315, ll:12-21).

103.    According to the evidence available preceding Dr. Cohen's report, (1) Smith did not have a single interview between the date he quit Rosebud Farmstand and when he moved back to Chicago in August 2012 (FOF No. 91); (2) Although Smith testified at this August 13, 2103 Deposition that he told the truth about his 2006 felony conviction on his on-line job applications, his applications submitted to WIS, Fry's and Citywide Janitorial Service failed to disclose his 2006 felony conviction (FOF Nos. 67, 69, 71); (3) Smith had no records to substantiate any of his efforts to find employment in either Arizona or Chicago; (FOF Nos. 21-24, 48); and (4) Smith, based on his sworn deposition testimony and interrogatory responses, was applying for entry-level jobs not limited to customer service in a grocery store (FOF Nos. 25-32, 79).

104.    Dr. Cohen described in his report and testified about a help wanted advertisement database he accessed called WANTED Technologies that was created in 2005 and incorporates 25,000 help wanted advertisement sources.   (Trial Tr., p. 317, ll:18, 318, ll:25).   Dr. Cohen testified that WANTED Technologies is used by 26 state governments and is a highly regarded database.   (Trial Tr., p. 318, ll:7-10).   WANTED Technologies meets the definition of a generally accepted data source for labor economists doing expert work in the areas of employee job search and mitigation based upon Dr. Cohen's testimony that he has presented the data in WANTED Technologies to the National Association of Forensic Economists, at Inns of the Courts, at bar associations almost 100 times and it never has been challenged.  (Trial Tr., p. 319, ll:19, 320, ll:4).

105.    Dr. Cohen testified that he picked occupations that a minimum wage worker would be looking for to get work to find open positions and that the best indicator to do so is help wanted advertising.  (Trial Tr., 316, ll:19, 317, ll:15).

106.    The occupational categories and the market areas Dr. Cohen analyzed in his report in terms of help wanted ads for which Smith could be qualified were reasonable category selections based upon Dr. Cohen's testimony that with minimum wage, there are no special requirements, people will move from occupation to occupation without special training and the Court's acknowledgment that the places Smith testified he applied for jobs and the kinds of jobs which he testified he applied for and obtained were similar to the occupation categories Dr. Cohen analyzed.  (Trial Tr., p. 323, ll:6-8, 339, ll:12-21, 382, ll:4-17).

107.    Dr. Cohen's report referenced Appendices B and C which included examples of the ads that had been available in the selected occupations in 2008 to December 31, 2012.  (Trial Tr., p. 321, ll18, 323, ll:9.)  Dr. Cohen testified that he did not recall the exact number of pages

in Appendices B and C, which he thought "was like 7,000 pages" (Trial Tr., p. 323, ll:10-13) (actually it was 7824, *see* Exhibit E attached hereto), and that typically, with appendices of this size, if the plaintiff wants to see it, the plaintiff can request it. (Trial Tr., p. 323, ll:14-15, 324, ll:1-6).

108.    Dr. Cohen's report at Table 1 contained summaries of the position advertisements by year, by occupation and by city. (Trial Tr., p. 324, ll:7-23). In addition, for demonstrative purposes at trial, Dr. Cohen made some summaries from the same database where one could see, for example, more detail. (*Id.*)

109.    Dr. Cohen's testimony about the number of advertisements for job openings in Maricopa County, Arizona and Chicago based upon Tables 1 and 2 in his report, which are summarized and aggregated by various categories and occupations as set forth on page 2 of his report, revealed a total of 56,275 help wanted ads in Chicago between 1/1/2008 and 11/23/2013, and an aggregate of 55,599 help wanted ads in Maricopa County, Arizona between 7/1/2008 and 12/31/2008. (*Id.*)

110.    Dr. Cohen also analyzed the published unemployment rates and the duration of unemployment for Chicago and Maricopa County, Arizona in his report at Table 3. (Trial Tr., p. 339, ll:22, 342, ll:23).

111.    Dr. Cohen testified that the unemployment rate was lower in Maricopa County, Arizona than the national average, that the duration of unemployment for the top 25% in Maricopa County listed 3.3 weeks and that the duration of unemployment for the top 75% in Maricopa County is 26 weeks. (Trial Tr., p. 341, ll:3, p. 342, ll:23).

IV.      **CONCLUSION OF LAW**

   A. *Overview of the Phase II Evidence*

112. Where, as here, the Court is the trier of fact, the Court is obligated to acknowledge discrepancies in Plaintiff's testimony and assess their impact on Plaintiff's credibility and any potential equitable damages award. Because equity matters during this phase of the case, this Court cannot overlook the discrepancies in Plaintiff's Phase II testimony from the testimony he gave in Phase I. Nor can the Court disregard the contradictions in the evidence he presented to the Court from the evidence (or lack thereof), he provided to Defendants throughout discovery, evidence which the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of this District mandate be produced well in advance of trial. Before addressing the legal precedent that guides the Court's disposition of the issues in Phase II, the Court believes an overview of Plaintiff's conflicting testimony, given under oath, will underscore the rationale behind the Court's analysis and the ruling that follows.

113. While the burden to prove their affirmative defense of failure to mitigate damages is on Defendants, Plaintiff bears the initial burden to present evidence of damages. Based upon the evidence submitted by both parties, the Court is left with the conclusion that Plaintiff was neither a credible nor truthful witness. Plaintiff's testimony concerning the hours he allegedly worked at Rosebud Farmstand immediately preceding his decision to quit, the timing of his decision to quit, how he was paid, where he lived in Arizona while allegedly looking for work and his job search efforts all are material to the Court's Phase II determination. The burdens placed on Defendants to comb the record to aid the trier of fact to uncover the truth tips the equities in Defendants' favor for this phase of the case. The key evidence that supports this conclusion – evidence that consists of Smith's sworn testimony as statements by a party

opponent and not mere forgetfulness or lapses in memory – includes, but is not limited to:

* Plaintiff admits he discussed moving to Arizona with his girlfriend and family *before* he quit Rosebud Farmstand (FOF No. 10);

* Plaintiff's testimony that he was not paid overtime when he did work more than 40 hours per week at Rosebud Farmstand is false; (FOF Nos. 14-16);

* Plaintiff's testimony that he would have worked 70 hours per week if he remained employed at Rosebud Farmstand when he never worked 70 hours per week and was working significantly less than 40 hours per week for a substantial period before he quit (FOF Nos. 9, 16-18);

* Plaintiff's trial testimony that he lived with an Aunt or two in Mesa, Arizona from July 2008 through June 2012 before he returned to Chicago when he testified at his deposition he lived with his girlfriend in Gilbert the whole time (FOF Nos. 54-58);

* Plaintiff's deposition testimony he used his girlfriend's computer to do his on-line applications from where he was living (FOF Nos. 49, 78-79).

* Plaintiff's testimony that he could not live with his girlfriend nor use her address as his own, (FOF Nos. 54-58);

* Plaintiff's testimony that he did not use his girlfriend's car when he lived in Arizona yet he quit voluntarily his job at WIS because his girlfriend's car broke. (FOF Nos. 34, 52-53, 69);

* Plaintiff's testimony that in 2008-2009 that he (1) spent 5 hours each day on-line looking for jobs and completing applications from Mesa where he was living (2) spent another three hours each day walking a four-mile radius in Mesa looking for jobs and (3) spent another five hours three days a week going to employment agencies in Mesa to fill out applications, notwithstanding Plaintiff's discovery responses that fail to list a single application for employment in Mesa. (FOF Nos. 77-90);

* Plaintiff's testimony that he submitted 5,000 on-line job applications, (FOF No. 87);

* Plaintiff's testimony at his deposition that he told the truth about his criminal history on every job application he filled out and his testimony at trial that he lied on every job application about his criminal history (FOF Nos. 47, 67, 69, 71, 84);

* Plaintiff's deposition testimony that he did not have a single interview in Arizona between July 2008 and June 2012, the date he moved back to Chicago, and his trial testimony on redirect that he had an interview with Fry's during which he disclosed that he lied on his job application about his criminal history and was not

hired (FOF Nos. 91-92);

\* Plaintiff's testimony denying he received the unemployment compensation reported in Plaintiff's IRS tax transcripts (FOF No. 96);

\* Plaintiff's statements on job applications that he "voluntarily quit" from Rosebud Farmstand because he "moved to Arizona" that he testified were truthful, after telling the jury he felt forced to quit (FOF Nos. 67, 69);

\* Plaintiff's statement on a job application that his sister Azalea Hill was his supervisor at Rosebud Farmstand when she never worked there (FOF No. 67);

\* Plaintiff's testimony before the jury that he did not put down he was a convicted felon on only two or three job applications and his Phase II trial testimony that he lied on all of the applications he completed (i.e., 5,000) about his felony conviction. (Trial Tr., p. 350, ll:13, 351, ll:3; Plaintiff's testimony he looked for jobs in Chicago between June 28 and July 2008 before he moved to Arizona while <u>never</u> stating that during discovery (FOF Nos. 89-90);

\* Plaintiff's repeated testimony he rushed through his answers to interrogatories about his alleged job search efforts and amendments so they were "incomplete" without supplementing his answers with additional information before trial (FOF No. 31);

\* Smith testified he kept job search records that he submitted to IDES but failed to obtain them notwithstanding the Court's directive (FOF Nos. 99-101).

### B. *False Testimony/Fraud on the Court*

114. 18 U.S.C. §1621 sets forth the general federal perjury statute. The Supreme Court has reiterated that "[a] witness testifying under oath or affirmation violates this statute if [he] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *U.S. v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111 (1993).

115. The Supreme Court has delegated to the district courts broad authority and discretion to address the remedies provided to plaintiffs who provide false testimony in court proceedings. In the Court's view, "[f]alse testimony in a formal proceeding is intolerable. We must neither reward nor condone such a "flagrant affront" to the truth-seeking function of

adversary proceedings." *ABF Freight Systems, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 114 S.Ct. 835 (1994) (citation omitted).

116.   The Court recognized the impact false testimony has on the integrity of proceedings before it. "In any proceeding, whether judicial or administrative, deliberate falsehoods 'may well affect the dearest concerns of the parties before a tribunal, and may put the fact finder and parties 'to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means….'  Perjury should be severely sanctioned in appropriate cases." *Id.* (citation omitted)

117.   Justices Scalia and O'Conner, in their concurring opinion in *ABF Freight*, emphasized the importance of the oath administered to a witness before providing evidentiary testimony and the consequences of violating that oath – perjury, fines and potential imprisonment.  *Id.* at 329. "The principle that a perjurer should not be rewarded with a judgment – even a judgment otherwise deserved – while there is discretion to deny it, has a long and sensible tradition in the common law.  The "unclean hands" doctrine closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* at 329-330.

### C.   *Application of Dunnigan and ABF Freight*

118.   Smith was administered on three separate occasions an oath to tell the truth.

119.   Repeatedly, Smith provided false testimony concerning material matters in the case.  Portions of that false testimony were presented to the jury – a topic for another day that is outside the scope of this opinion.  This court cannot award Smith an equitable judgment or damages in any amount based upon his violating the oaths he gave and the flagrant affront to the truth-seeking function of these proceedings.

24

### D. *Relevance of Post-Termination Evidence*

120.    The analysis of an employer's mitigation of damages affirmative defense often involves the legal argument that after-acquired evidence of an employee's pre-termination misconduct is an appropriate consideration to limit equitable relief.  *See, e.g.*, *Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997) (after-acquired evidence affects a plaintiff's remedy).

121.    The Supreme Court's decision in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362, 115 S.Ct. 879 (1995), is the leading case relevant to the determination of after-acquired evidence to equitable remedies.  In *McKennon*, the Court explained:

> The proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case. (*Id.* at 361).

Although *McKennon* was an ADEA case, the Court made clear its analysis applies with equal force to Title VII claims because the two statutes "share common substantive features."  *Id.* at 358, 361-62.

122.    *McKennon* involved the issue of the impact of after-acquired evidence of an employee's misconduct prior to termination.  Notwithstanding, courts in other circuits have applied *McKennon* to limit both back pay and equitable remedies based on post-termination misconduct.  Because neither the Seventh Circuit nor the District Courts in the Northern District of Illinois have addressed this scenario involving a record like the one before this Court, the decisions from other Circuits that have confronted the issue are instructive.

123.    In *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir. 1999), the Tenth Circuit analyzed *McKennon* and concluded that the "logic of *McKennon* may permit certain limitations on relief based on post-termination misconduct."  *Id.* at 555. In so doing, it reiterated

*McKennon's* directive that "[i]n determining appropriate relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *Id.* at 555 (quoting *McKennon*, 513 U.S. at 362).

124.    The Eighth Circuit, in *Sellers v. Mineta*, 358 F.3d 1058 (8th Cir. 2004) similarly has confirmed the relevance of post-termination misconduct in Title VII cases.   The court in *Sellers* interpreted *McKennon* as "instructing lower courts to treat each case on a case by case basis considering all the 'factual permutations and the equitable considerations they raise.'"  *Id.* at 1063 (quoting *McKennon*, 513 U.S. at 361).  Embracing the Tenth Circuit's logic in *Medlock*, the *Sellers* court explained that it "cannot establish a bright-line rule and foreclose the possibility that a Title VII plaintiff's post-termination conduct may, under certain circumstances, limit the remedial relief available to the plaintiff." *Sellers*, 358 F.3d at 1063.  *See*, to the same effect, Holly G. Eubanks, *Expanding the After-Acquired Evidence Defense to Include Post-Termination Misconduct*, 89 CHI-KENT L.Rev. 823 (2014).

## E.    *Application of McKennon, Medlock and Sellers Here*

125.    Even if the Court were to consider an award of equitable damages, the evidence in the record makes it almost impossible to justify such an award based upon Smith's conduct which cannot be attributed to Rosebud Farmstand or the reasons that Smith claims he quit.

126.    Smith admits he lied on every job application he completed about his criminal history and he testified every application he completed asked about it.  On the four applications the parties agree should be admitted as evidence, Smith acknowledged on them all that omitting or falsifying information was grounds for rejection for hire.  To the extent Smith claims he submitted 5,000 applications and lied on them all about his conviction record, *McKennon*, *Medlock* and *Sellers* support the conclusion that the facts and circumstances surrounding Smith's

post-termination wrongdoing – lying repeatedly on job applications – is a viable, common sense reason Smith might have had trouble getting hired through no fault attributable to Defendants. Even if his testimony is credited with respect to the Walmart 2008 application - the only one Smith agrees he completed – Smith's wage demand of $10 per hour and his statement he required sponsorship – most likely led to his rejection from employment, not conduct for which Rosebud Farmstand is responsible.

127.    Moreover, WIS, Citywide, 7-11, Goodwill, Party City, and Labor Ready hired Smith notwithstanding that he lied on applications and notwithstanding his race.  These facts undercut Smith's explanation about his alleged difficulties finding work at the few places that could be substantiated he applied.

## F.    *The Parties' Burdens Where Failure to Mitigate Is Pled*

128.    "The principle of mitigation of damages … requires that a person to whom a wrong has been done take reasonable steps to minimize the harm, on pain of having his award of damages cut down if he does not." *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1427 (7th Cir. 1986).

129.    The duty to mitigate falls on the plaintiff.  *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231, 102 S.Ct. 3057 (1982).

130.    Once the jury has found there has been employment discrimination, there is a rebuttable presumption the employee is entitled to back pay.  *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990).

131.    Smith bears the burden of providing adequate evidence to support his damages claim. *Taylor v. Phillips Indus., Inc*. 593 F.2d 783, 787 (7th Cir. 1979).

132.    Generally, "a discharged employee must mitigate damages by using reasonable

27

diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989).

133. As stated above, a plaintiff has the initial burden of establishing the amount of damages. *Fleming v. County of Kane, State of Ill.*, 898 F.2d 553, 560 (7th Cir. 1990). Under Seventh Circuit precedent, however, it is "[n]ot until the plaintiff establishes what [he] contends are his damages [that] the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant." *Taylor,* 593 F.2d at 787.

134. "Once a plaintiff has established the amount of damages [he] claims resulted from [his] employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).

135. To establish the affirmative defense of Smith's failure to mitigate damages, Rosebud must show that: "(1) [Smith] failed to exercise reasonable diligence to mitigate [his] damages, and (2) there was a reasonable likelihood [Smith] might have found comparable work by exercising reasonable diligence." *Hutchison,* 42 F.3d at 1044. The Seventh Circuit has also construed the second component of the failure to mitigate defense as a "reasonable chance the [plaintiff] might have found comparable employment." *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990).

136. Rosebud "should not be liable for any damages which are not the result of discrimination but instead may be the result of losses willfully incurred by the plaintiff." *Meyer v. United* Airlines*, Inc.*, 950 F. Supp. 874, 877 (N.D. Ill. 1997).

137. Smith had a duty to exercise reasonable diligence in attempting to mitigate damages by finding comparable work. *Williams v. Imperial Eastman Acquisition Corp.*, 994 F.

Supp. 926, 931 (N.D. Ill. 1998) (citing *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992).

138.    Smith was obligated to remain active in the labor force seeking comparable work. *Williams*, 994 F. Supp. at 932.

139.    A plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment." *Hutchison*, 42 F.3d at 1044.

140.    A lack of job seeking success will not excuse Smith from the duty to mitigate. While a plaintiff's "discouragement [may be] understandable, and the lack of his success [may be] regrettable, but his duty to mitigate [does] not evaporate in the face of his difficulties." *Payne v. Security Savings and Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991).

141.    "Damages in employment discrimination cases are not intended to insure a plaintiff's future financial success." *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992).

142.    The purpose of a back pay remedy, if awarded at all, should not be speculative and is not intended to put a plaintiff in a better position than he was at the time of termination. *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997); *Harper v. Godfrey Co.*, 45 F.3d 143, 149 (7th Cir. 1995).

143.    Damages should extend only to the date upon which "the sting" of any discriminatory conduct has ended (*Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 439 (7th Cir. 1992), or "the day when the wounds of discrimination should have healed." *Syvock v. Milwaukee Boiler Manufacturing Co., Inc.*, 665 F.2d 149, 160 n. 14 (7th Cir. 1981).

144.    When a plaintiff obtains a comparable or higher paying employment, back pay terminates. *Smith v. America Service Co. of Atlanta, Inc.*, 796 F.2d 1430 (11th Cir. 1986).

145.    An employee who planned to quit prior to being discharged is not entitled to back pay. *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1996).

146.    Any back pay award to Smith must be reduced by interim earnings and amounts earnable by Smith with reasonable diligence. 42 U.S.C. §2000e-5(g)(1).

147.    An employee should not be compensated after voluntarily resigning after only two months from a replacement job. *Woods v. Von Maur, Inc.*, 2012 WL 2062400 at *7 (N.D. Ill. June 7, 2012).

148.    A claimant fails to mitigate damages by voluntarily quitting comparable employment. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985) (citing *Ford Motor Co. v. E.E.O.C.*, 458 U.S. at 232). *See also*, *Dreger v. Mid-America Club*, 1998 WL 102927 at 3 (N.D. Ill. Mar. 5, 1998) (courts will exclude from back pay period after plaintiff quits).

149.    "The back pay provision (of Title VII) was expressly modeled on the back pay provision of the National Labor Relations Act. ". . . Under the NLRA, courts have long held that back pay is not awarded when the evidence shows a willful loss of earnings." *Sangster v. United Airlines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980) (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 198, 61 S.Ct. 845 (1941).

150.    Leaving the labor market and voluntarily quitting alternate employment are willful conduct that cut off back pay. *Sangster*, 633 F.2d at 868.

151.    A claimant who elects to leave the labor market to attend school full time is not entitled to backpay for the period while he or she is a student. *Washington v. Kroger Co.*, 671 F.2d 1072, 1079 (8th Cir. 1982); *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir. 1975).

152.     A front pay award is limited in duration to "a reasonable period of time until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Williams v. Pharmacia*, 137 F.3d 944, 954 (7th Cir. 1998). *See also*, *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004).

### G.     *Assessment of the Parties' Satisfaction of Their Respective Burdens*

153.     Although an award of equitable relief is not supported by the record in this case, the Court's analysis of the parties' respective burdens further bolsters the Court's decision. Smith failed to provide the Court with a single piece of record evidence in his case in chief in Phase II beyond Smith's own testimony. This shortcoming in Smith's presentation of evidence was excessively burdensome to both Defendants and the Court to develop on evidentiary record upon which the Court could apply the law if equitable relief somehow was justified. This deficiency in Smith's presentation in and of itself justifies ending the analysis here because Smith has not carried his initial burden.

154.     Conversely, Defendants have done what Fed. R. Civ. P. 52 contemplates and what the Court requested in terms of presenting an appropriate record with presentation of evidence and precedent to guide this Court to a reasonable and justifiable judgment on the issues presented in Phase II. In the Court's judgment, Defendants have established their affirmative defense that Plaintiff failed to mitigate damages even if the Court considers this issue.

155.     More particularly, Smith admitted he discussed moving to Arizona with his girlfriend and children before he quit. That Smith filed his only charge in January 2008, that Smith's probation had just ended in January 2008 allowing him to leave Illinois for the first time since his conviction and that his children were in school supports the inference he thoughtfully prepared his decision to quit while still employed. Under *Ilona of Hungary*, Smith is not entitled

to back pay.

156.    That Smith produced not a single record to support his alleged efforts to find and apply for employment is particularly troubling, where, as here, Smith moved immediately out of state across the country.  Smith's failure to maintain or produce a single record – particularly after receiving unemployment compensation between 2008-2010 and retaining his attorney in 2010 (Smith Dep., p. 277, ll:9-13) does not enable the Court to validate any of Smith's testimony, where, as here, Smith had obligations to maintain records which he failed to do without a plausible excuse.

157.    The only written record evidence of Smith's applying for employment prior to March 2009 is one Walmart application.  How Smith completed that application, as discussed above, likely led to his rejection for employment.

158.    Smith obtained a job in March 2009 at WIS earning more than he was earning when he quit Rosebud Farmstand that he voluntarily quit, and he admits his decision to quit was not attributable to Rosebud Farmstand.  Smith obtained that job notwithstanding he lied on his application about his criminal background and irrespective of his race, *Woods* and *Smith* discussed above cut off damages under the circumstances, if any were to be awarded at all.

159.    Smith testified he was a full-time student between fall 2010 and fall 2011.  The only contemporaneous evidence that Smith applied for work between March 2009 and fall 2010 was the Fry's application on which he lied about his criminal history.  There is insufficient record evidence Smith was attempting to mitigate his damages during this period.

160.    Smith started working in 2011 at Way to Go Transportation and continued there until he voluntarily quit to move back to Chicago in June 2012 without another job.  Smith presented no competent evidence he was continuing to search for work while employed at Way

to Go.

161. Smith started working at Citywide in September 2013 and remained employed there until he quit voluntarily in August 2014 to move back to Arizona. Smith presented no evidence in any answers to interrogatories or at his deposition about job search efforts or places he applied for work in Chicago between June 2012 when he moved back and September 2013 when he started at Citywide.

162. Smith has been continuously employed in Arizona since August 2014 according to his testimony. There is no basis for an award of front pay.

163. Dr. Cohen testified to over 100,000 help wanted advertisements between July 2008 and December 2012 in Chicago and Maricopa County, Arizona collectively for entry level positions.

164. Rosebud Farmstand demonstrated through Dr. Cohen, that there were an abundance of help wanted advertisements in both Chicago and Maricopa County for which Smith could have applied. The paucity of evidence Smith produced to support he actually was completing help wanted ads does not support the conclusion he exercised reasonable diligence.

165. Smith's complete absence of any records to support his alleged efforts to find work do not overcome Dr. Cohen's testimony about help wanted advertisement availability.

166. The evidence adduced supports the conclusion there was a reasonable likelihood Smith would have found comparable work by exercising reasonable diligence. WIS and Citywide hired Smith notwithstanding that he lied on the application and notwithstanding his race. Smith obtained jobs at 7-Eleven, Goodwill, Labor Ready, party City and Fairplay Foods notwithstanding his criminal history or his race. These facts underscore that Smith could have found work during the gaps in his employment record (July 2008 – March 2009; March 2009 –

33

Fall 2010 before he enrolled in school) and thereafter.

167.     The jobs Smith obtained and then voluntarily quit to move back and forth between Arizona and Chicago, the absence of any records on his part to substantiate his alleged job search, and the inconsistencies set forth at proposed COL No. 113, support the conclusion that Smith could have found suitable employment had he been diligent in searching for it.

### H.     *Federal Rule of Civil Procedure 26(e)*

168.     Fed. R. Civ. P. 26(e) requires that "[a] party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material response the disclosure or response if incomplete or incorrect…"  Smith's discovery responses and supplements fall inexcusably short of Smith's disclosure obligations.  The Court cannot, in good conscience, credit Smith's testimony about places he claims he applied for work that never was properly supplemented.

### I.     *Duty to Preserve Evidence*

169.     A party has a duty to preserve evidence over which it has control and which it reasonably knows or can foresee would be material (and thus relevant) to a potential legal action. *Bryant v. Gardner*, 587 F.Supp.2d 951, 967-68 (N.D. Ill. 2008).  This duty arises when a reasonable person would anticipate litigation and does not depend on a court order. *Trask – Morton v. Motel 6 Operating L.P.*, 534 F.3d 672 (7th Cir., 2008).

170.     Smith's filing of his charge of discrimination in January 2008 triggered Smith's duty to preserve documents relevant to the legal action he filed and he breached that duty, particularly, where as  here, he was represented by counsel since 2010.

34

## J.  *Daubert, Federal Rules of Evidence 702 and 703*

171.    The admissibility of expert testimony is governed by Fed. R. Evid. 702 and *Daubert v. Merrell Down Pharma., Inc.*, 509 U.S. 579, 113 S. Ct. 2766 (1983).

172.    Federal Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."

173.    This Court serves as the gatekeeper on expert testimony, ensuring that such testimony is both relevant and reliable.  *Daubert*, 509 U.S. at 589.  "Expert testimony is admissible if (1) the expert is qualified, (2) the expert's reasoning or methodology is reliable, and (3) the expert's testimony will assist the trier of fact."  *Midwest Fence Corp. v. U.S. Dept. of Transportation*, 84 F.Supp.3d 705, 723-24 (N.D. Ill. 2015) (citing *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014).  In a bench trial, this Court is obligated "to ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Metavante Corp. v. Emigrant Serv. Bank,* 619 F.3d 748, 760 (7th Cir. 2010) (citation omitted). *See also Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline.")

174.    Although the Supreme Court's focal point in *Daubert* was the reliability of scientific evidence, the Court subsequent to *Daubert* explained that the *Daubert* analysis similarly should be applied to other specialized matters or technical knowledge that may be presented through expert testimony.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48, 119 S.Ct. 1167 (1999).  The *Kumho* Court reiterated that a district court's inquiry under *Daubert*

35

is a flexible one and that district courts have wide latitude in performing their gate-keeping function. *Kumho*, 526 U.S. at 141. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the exert arrived at [his] opinion[.]'" *C.W. ex. Rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citation omitted).

### K.    *Application of Daubert and Fed. R. Evid. 702 and 703*

175.    Because Smith testified he did not have a single interview and the few applications that were produced in response to subpoenas indicated Smith lied about his criminal background if the question was asked, it was reasonable and logical for Defendants to retain Dr. Cohen to undertake a labor market job analysis for help wanted advertisements for entry-level positions for Chicago and Maricopa County, Arizona (where Smith testified he lived when he lived in Arizona) and to evaluate unemployment rates and statistics for those areas (Exh. 27, Docket No. 261-1, pp. 38-49).

176.    Because Smith testified he had no interviews preceding the expert discovery cut-off, and Smith's job applications obtained by subpoena showed Smith did not disclose his recent conviction status, not requesting an analysis of job market availability, hiring statistics, and unemployment rates for African-Americans in particular, and applicants with felony convictions did not compromise or render unreliable Dr. Cohen's analysis.

177.    If Smith had no interviews as he testified, then any potential employer to which he applied logically would not be aware of Smith's race. If Smith lied on his applications about his criminal background, common sense supports the conclusion that lying in and of itself, is a reason not to hire someone as stated in the applications that Defendants could obtain that Smith completed.

178.    Dr. Cohen's report reflects that the data and information he reviewed from the U.S. Bureau of Labor statistics on unemployment rates and average duration of unemployment were reliable sources of data publically available and regularly cited in the area of labor economic analysis.  These were reasonable and reliable scientific and technical sources that helped the trier of fact evaluate issues before it.

179.    Dr. Cohen's testimony adequately described the functionality and reliability of WANTED Technologies as a data source for labor economists doing expert work in the areas of employee job search and mitigation and was helpful to the Court as the trier of fact evaluating the evidence presented in record.

180.    Dr. Cohen's testimony about his background and qualifications support the conclusion that he has the requisite experience and expertise to provide the trier of fact with relevant information about job position availability and unemployment information that was helpful to the trier of fact in evaluating the evidence presented in the record.

## L.    *Federal Rules of Civil Procedure 26(a)(2)(B)*

181.    Federal Rule of Civil Procedure 26(a)(2)(B) sets forth the information that should be included in an expert's written report and need not be repeated here.

182.    Dr. Cohen's report complied with Fed. R. Civ. P. 26(a)(2)(B).  The opinions Dr. Cohen expressed about the number of help wanted advertisements in Chicago and Maricopa County for entry level positions in various occupations and unemployment rates for 2008 to 2012 for both areas are set forth at pages 1-5 of his report.  (Exh. 27, Docket No. 261-1 at pp. 38-42).  Dr. Cohen's testimony at trial was consistent with his report and Smith offered no evidence that contradicted Dr. Cohen's testimony.

183.    Dr. Cohen set forth both the facts and the data upon which he relied in his report.

37

Although referenced in Dr. Cohen's report (p. 4) and not requested by Plaintiff, Defendants also provided to Plaintiff copies of the Appendices referenced in his report that contained the data that supported his opinions. (*See* Exhibit E attached hereto (as referenced in Defendants' Motion to Supplement the Record).

184.     Dr. Cohen presented at trial demonstrative exhibits that showed how the database could be utilized in various ways to present differently or in more detail the same information in the report. Dr. Cohen's testimony established that none of the demonstrative exhibits contained opinions or evidence not contained within Dr. Cohen's report. The opinions in Dr. Cohen's report and his in Court testimony provide a sufficient basis for this Court's analysis and aid the trier of fact in evaluating the issues presented.

185.     The charts Dr. Cohen created at Exhibits 28, 29, 30, 31, 32 and 33 were used to aid Dr. Cohen's testimony and did not contain information beyond the scope of the opinions in his report. (Trial Tr., p. 326, ll:4-24, 326, ll:1-6). Exhibits 30, 31 and 32 add up to the same data as Table 1 in the reports. Exhibits 28, 29 and 33 compared to Table 2 in his report (Trial Tr., p. 333, ll:15, 334, ll:24).

186.     Appendix A to Dr. Cohen's report contains the Fed. R. Civ. P. 26(a)(2)(B) required list of publications, list of guidelines, list of other cases and statement of compensation.

## M.     *Illinois Department of Employment Security ("IDES") Recordkeeping Requirements*

187.     It is within this Court's discretion to offset unemployment awards from an award of equitable damages. *E.E.O.C. v. Grady*, 857 F.2d 383, 390 (7th Cir. 1988).

188.     Under the Illinois Administrative Code provisions applicable to eligibility and continuing eligibility to receive unemployment compensation benefits, "[a] claimant certifying for benefits … as a telephone filer or mail filer shall maintain a work service record for each

week he or she is claiming benefits … The work search record shall include the names and addresses of the employing units contacted, as well as the names of specific persons contacted, if possible; the dates and methods of the contacts; the type of work sought, including wages and hours requested or desired; and the results of the contacts. (56 Ill.Admin.Code, Section 2720.115(c), attached within Exhibit F).

189. Claimants are required to notify IDES of any address changes. (Exh. G, IDES Handbook, p. 12).

### N. *Application of IDES Rules Here*

190. Smith was required to maintain copies of any records he submitted to IDES relating to his alleged job search efforts and to notify IDES of any address change. This Court directed Smith to obtain these records since he disputes his IRS tax transcript. Smith failed to do what the Court requested. If the Court would have awarded Smith damages, it would have exercised its discretion to offset any equitable award to Smith by the amounts listed on Smith's IRS tax transcripts as IDES payments to him for unemployment benefits.

## V.  <u>CONCLUSION</u>

Consistent with the Court's findings of Fact and Conclusions of Law, the record in this case, where equity matters, does not support an award of equitable relief to Plaintiff in any amount.

Dated: June 24, 2016                                         Respectfully submitted,

                                                             /s/ Davi L. Hirsch

JOSHUA D. HOLLEB (ARDC #6185409)
DAVI L. HIRSCH (ARDC #6182757)
KLEIN DUB & HOLLEB, LTD.
660 LaSalle Place, Suite 100
Highland Park, IL 60035
(847) 681-9100 phone
jdh@labor-law.com
dhirsch@labor-law.com

*Attorneys for Defendants Rosebud Farmstand, Inc.*
*d/b/a Rosebud Farmstand, Carlos Castaneda, Roque Mendoza*

40

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing **Defendants' Phase II Proposed Findings of Fact and Proposed Conclusions of Law** was served upon:

> Joseph A. Longo
> Longo and Associates, Ltd.
> 2100 West Haven
> Mt. Prospect, IL 60056
> (847) 640-9490

*via* the Court's ECF system, this 24th day of June, 2016.

/s/ Davi L. Hirsch