**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-9147 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ROSEBUD FARMSTAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Smith sued Defendants Rosebud Farmstand, Carlos Castaneda, and Roque Mendoza, alleging claims of sexual harassment in violation of Title VII, racial discrimination in violation of 42 U.S.C. § 1981, retaliation in violation of Title VII and § 1981, and gender violence in violation of the Illinois Gender Violence Act. On December 15, 2015, a jury returned a verdict in favor of Plaintiff on all claims, awarding him a combined $2,407,500 in compensatory and punitive damages. Now before the Court are Defendants' motion for judgment as a matter of law and renewed motion for judgment as a matter of law regarding Plaintiff's federal discrimination claims [237, 242], and Plaintiff's motion for judgment as a matter of law and renewed motion for judgment as a matter of law regarding Plaintiff's Illinois Gender Violence Act claims [238, 243]. For the reasons set forth below, Defendants' motions [237, 238, 242, 243] are denied.

Following the jury trial on liability, the Court held a two-day bench trial on the issue of equitable damages. Upon review of the parties' presentations at trial and their post-trial briefing, the Court awards Plaintiff $69,761.80 in back pay and $19,894.77 in prejudgment interest. All other requested forms of equitable relief are denied.

Also before the Court are several motions that arose during post-trial briefing. Upon review of the parties' respective arguments, Defendants' motion to supplement the Phase II record [272] is granted, Defendants' motion to amend their answer [274] is granted, and Plaintiff's motion to strike [288] is denied.

With these matters decided, final judgment will be entered in favor of Plaintiff. The parties have until October 7, 2016 to file any Rule 59 motions, responses are due November 4, 2016, and replies are due November 18, 2016.

## I.     Background

Defendant Rosebud Farmstand operates a grocery store on Chicago's south side, and Plaintiff Robert Smith worked as a butcher in Rosebud's meat department from 2003 to 2008.[1] In 2011, Plaintiff sued Rosebud Farmstand, alleging that Rosebud employees sexually harassed him and discriminated against him on the basis of race throughout his employment. Plaintiff also alleged that Rosebud employees retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), forcing him to quit his job. Plaintiff further alleged that Defendants Carlos Castaneda and Roque Mendoza committed acts of gender violence against him. Plaintiff sought compensatory and punitive damages for these alleged wrongs, as well as equitable relief in the form of back pay, overtime pay, front pay, prejudgment interest, and tax compensation. The Court bifurcated the trial such that Phase I would be a jury trial covering liability on all claims as well as compensatory and punitive damages, and Phase II would be a bench trial covering equitable relief.

---

[1] Plaintiff also worked at Rosebud Farmstand for a four-month period spanning from September 2, 2001, until he voluntarily quit on January 12, 2002.

2

In December 2015, Plaintiff went to trial on four claims: sexual harassment in violation of Title VII against Defendant Rosebud Farmstand, racial discrimination in violation of 42 U.S.C. § 1981 against Defendant Rosebud Farmstand, retaliation in violation of Title VII and § 1981 against Defendant Rosebud Farmstand, and gender violence in violation of the Illinois Gender Violence Act ("IGVA") against Defendants Castaneda and Mendoza. The jury returned a verdict in favor of Plaintiff on all counts, awarding a total of $2,407,500.00 in compensatory and punitive damages, broken down as follows:

|  | Compensatory | Punitive |
|---|---|---|
| **Sexual Harassment** | $250,000.00 | $500,000.00 |
| **Racial Discrimination** | $250,000.00 | $500,000.00 |
| **Retaliation** | $250,000.00 | $500,000.00 |
| **IGVA Claim - Castaneda** | $50,000.00 | $100,000.00 |
| **IGVA Claim - Mendoza** | $2,500.00 | $5,000.00 |
| **Subtotals** | **$802,500.00** | **$1,605,000.00** |
| **Grand Total** | **$2,407,500.00[2]** | |

At the close of Plaintiff's case in chief, Defendants filed motions for judgment as a matter of law on all claims. [237, 238.] Defendants renewed those motions before the case was submitted to the jury. [242, 243.] The Court deferred setting a briefing schedule on Defendants' motions until the conclusion of Phase II.

In April 2016, the Court held a two-day bench trial on Plaintiff's claim for equitable relief and Defendants' affirmative defense that Plaintiff failed to mitigate his damages. Afterward, the Court set a briefing schedule that covered all post-trial briefing, including Defendants' motions for judgment as a matter of law and the parties' Phase II proposed findings of fact and conclusions of law [see 270]. All motions are now fully briefed.

---

[2] The verdict form separated compensatory and punitive damages by claim because compensatory and punitive damages are subject to "caps" under Title VII, but not under § 1981. See 42 U.S.C. § 1981a(b)(3), (4). The Court anticipates that the parties will brief the effect of the caps on the overall verdict once judgment is entered.

## II.     Judgment as a Matter of Law

On a motion for judgment as a matter of law under Fed. R. Civ. P. 50, a court must determine whether the evidence presented at trial, when viewed in the light most favorable to the non-moving party, is sufficient to support the verdict. *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000); see also *Hall v. Gary Cmty. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). A jury verdict is not to be set aside if, viewing the evidence presented at trial in the light most favorable to the prevailing party, there is any reasonable basis to support the verdict. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (citation omitted). In other words, the test is whether "no rational juror could have found for the prevailing party." *Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002); see also *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir. 1996) (the court is limited to assessing whether no rational jury could have found for the plaintiff).

### A.     Plaintiff's Motion to Strike

Before addressing Defendants' Rule 50 motions, the Court notes that Plaintiff has moved to strike Defendants' reply briefs in support of their motions, arguing that Defendants improperly included testimonial excerpts in those briefs that were not included in Defendants' opening briefs. [See 288.] Alternatively, Plaintiff requests that the Court strike from Defendants' reply briefs all references to evidence that was not including in Defendants' opening briefs, or allow Plaintiff leave to file a surreply. Plaintiff's motion [288] is denied.

Parties are prohibited from raising *arguments* for the first time in a reply brief, see *Richardson v. United States*, 379 F.3d 485, 487 n.1 (7th Cir. 2004), and to the extent that Defendants have done so, the Court will ignore those arguments. But Plaintiff's objection relates to Defendants' inclusion of new transcript citations, not new arguments. And as Defendants

4

rightly note, the trial transcript was not available when Defendants filed their opening briefs, which was during the Phase I trial in December 2015. The trial transcript became available to *both* parties on May 20, 2016—more than a month before Plaintiff's responses to Defendants' motions for judgment as a matter of law were due. Plaintiff did not obtain copies of the trial transcript or include citations to the trial transcript in his response. By contrast, Defendants *did* obtain copies of the trial transcripts and, as expected, *did* include citations to the trial transcripts in their reply briefs, buttressing the arguments that they raised in their opening briefs. Not only are Defendants' actions appropriate, they are expected. But regardless of whether either party cited specific excerpts from the trial transcript, the Court is entitled to refer to that transcript in ruling on the parties' post-trial motions, meaning that the entire transcript is fair game. See *Cygnar v. City of Chicago*, 865 F.2d 827, 834 & n.6 (7th Cir. 1989) (district court's decision to rule on post-trial motions "without the benefit of a trial transcript" was "surprising[]"); *LaFollette v. Savage*, 63 F.3d 540, 545 (7th Cir. 1995) (requiring a full trial transcript in order to properly rule on the merits of a motion for judgment as a matter of law). And upon review of the hundreds of pages in the parties' post-trial briefing, the Court concludes that a surreply from Plaintiff is both unnecessary and unwarranted. Thus, Plaintiff's motion [288] is denied, and the Court will rule on Defendants' motions for judgment as a matter of law based on the parties' current submissions.

### B. Federal Discrimination Claims

### 1. Sexual Harassment in Violation of Title VII

Plaintiff alleged that Defendant Rosebud violated Title VII by subjecting him to a hostile work environment based on sexual harassment. Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment: "It shall be an unlawful employment practice

for an employer * * * to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The purpose of this provision as it relates to discrimination on the basis of sex is to prevent "'disparate treatment of men and women in employment,'" regardless of its form. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Therefore, whenever "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

To establish a *prima facie* case of hostile work environment sexual harassment, an employee must establish that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of his employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)). The third prong of this test—the severity or pervasiveness of the harassment—has both an objective and a subjective component. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002)). The plaintiff may satisfy the subjective prong by presenting evidence that he in fact perceived his workplace as hostile or abusive. *Hilt-Dyson*, 282 F.3d at 463. In determining whether a workplace is objectively hostile, the court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interferes with an employee's work performance.'" See *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness per se but only * * * against discrimination in the conditions of employment." (quoting *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994))).

Defendants argue that Plaintiff failed to present sufficient evidence to support each of these four elements. The Court disagrees.

First, Plaintiff presented sufficient evidence to show that he was subjected to unwelcome harassment. Plaintiff testified for two days regarding countless incidences in which his coworkers touched, grabbed, and fondled his private parts during work hours. He testified about how these touches were unwelcome, about how they affected him physically and emotionally, and about how his complaints and protestations regarding this harassment fell on deaf ears. The evidence was vast. Despite Defendants' attempts to impeach the credibility of Plaintiff's testimony and to minimize the alleged severity of this constant touching by categorizing it as "horseplay or goofing around," Defendants' argument that no reasonable jury could conclude that Plaintiff was subjected to unwelcome harassment is a nonstarter.

Second, Plaintiff presented sufficient evidence to show that the harassment was based on his sex. There was sufficient evidence for a jury to conclude that the touching in question occurred because of Plaintiff's sex (*e.g.*, female employees were not subject to this sort of touching), and that the touching itself was sexual in nature, as it involved the unwanted touching of Plaintiff's intimate body parts. See *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are

exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." (citation omitted)); *id.* ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."); *Hamm v. Weyauwega Milk Prods. Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003) (harassment not based on sex where the plaintiff's "complaints about the actions of his coworkers inescapably relate[d] to either [his] coworkers' disapproval of his work performance or their perceptions of [his] sexual orientation," not his sex generally); *Gabrielle M. v. Park Forest-Chicago Heights, IL Sch. Dist. 163*, 315 F.3d 817, 827 (7th Cir. 2003) (concluding that "the record readily supports the inference that [defendant's] acts were based on sex" because they involved "touching [plaintiff's] genitals").

Third, there was sufficient evidence to allow the jury to conclude that the harassment was sufficiently severe or pervasive so as to alter the condition of Plaintiff's employment and create a hostile or abusive atmosphere. Plaintiff testified about the physical and emotional impact of the harassment, as well as the impact of his failed attempts to address the workplace harassment, which ultimately led to his constructive termination. Defendants' argument that "[a]lthough Plaintiff claimed his environment became 'intolerable' leading him to quit, there was no evidence to support that claim" is untenable. [237, at 4.] Again, Plaintiff testified at length about daily instances of harassment that continued for years despite his complaints. This evidence, when viewed in the light most favorable to Plaintiff, is sufficient to support the jury's verdict.

Fourth, Plaintiff presented sufficient evidence to establish a basis for employer liability. Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. An employer is strictly liable for harassment by a supervisor. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (citing

8

*Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006)). A "supervisor" for Title VII purposes is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.* (citation omitted). This power includes generally "the authority to hire, fire, promote, demote, discipline or transfer * * *." *Id.* (citing *Rhodes v. Illinois Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)). An employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) ("Put differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.").

Regarding supervisor harassment, the evidence presented at trial establishes that Defendant Castaneda was Plaintiff's supervisor (*e.g.*, he oversaw Plaintiff's performance, had the authority to hire and fire, etc.), and Plaintiff testified about an incident in "2005 or 2006" where Defendant Castaneda "grabbed [his] ass." [Tr. Dec. 9, 2015, at 513–15.] A reasonable jury could conclude that this was an act of supervisor harassment for which Defendant Rosebud is strictly liable. Arguably, however, this one incident might not have risen to the "severe or pervasive" standard required of actionable harassment. See *Mercer v. Cook County, Ill.*, 527 F. App'x 515, 521–22 (7th Cir. 2013) (citing cases where single incidents were not considered severe or pervasive); *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (recognizing that, in some instances, "a single incident might qualify for a hostile environment claim"). But the Court need not resolve that issue here because Plaintiff presented sufficient evidence to show that

Rosebud knew of coworker harassment but failed to address it. Specifically, Plaintiff testified that his coworkers openly harassed him in public areas of the market from 2003 to 2008, and that he repeatedly complained to management about this harassment but Defendant Rosebud did nothing in response. See *Wilson v. Chrysler Corp.,* 172 F.3d 500, 509 (7th Cir. 1999) (employer had constructive knowledge of harassment that occurred in common areas); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (explaining that "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability," including acts that occurred outside of the statutory filing period). This is sufficient to allow a jury to conclude that Rosebud knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice.

### 2. Retaliation in Violation of Title VII

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Brown v. Ill. Dep't of Nat. Resources*, 499 F.3d 675, 684 (7th Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)). To prove his retaliation claim, Plaintiff must present evidence that, when considered as a whole, would allow a reasonable factfinder to conclude that his filing of a charge of discrimination caused the adverse employment action (here, constructive discharge). *Ortiz v. Werner Enters.*, ––– F.3d –––, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016).

Defendants argue that Plaintiff failed to demonstrate that he suffered continued harassment that led him to quit after he filed his charge of discrimination with the EEOC, or that there was a causal connection between his filing of an EEOC charge and his decision to quit. The Court disagrees.

Plaintiff filed his charge of discrimination with the EEOC on January 7, 2008, and he quit his job six months later, in June 2008. At trial, Plaintiff testified that during this six-month period Rosebud employees stopped harassing him sexually, but began harassing him in new and different ways. For example, Plaintiff testified that his coworkers told him that he was no longer welcome at Rosebud; they would slam knives on cutting boards when Plaintiff was nearby; they broke a portable television that Plaintiff brought to work; they scratched his car, cracked his windshield, and slashed his tires; and they walked past him carrying trays of meat that had knives sticking out of them such that Plaintiff had to move out of the way to avoid getting cut. [Tr. Dec. 10, 2015, at 759–81.] Plaintiff then testified that these actions made him feel "unwelcome," "disrespected," "nervous," and "scared," leading him to quit his job. [*Id.* at 782–83.] Plaintiff's testimony is sufficient to allow a reasonable jury to conclude that Plaintiff suffered an adverse employment action because he filed his EEOC charge. Defendants' argument that Plaintiff's allegations are uncorroborated and "too vague and unspecific" is unavailing—a reasonable jury could credit Plaintiff's testimony absent any corroboration, and Plaintiff's testimony was neither vague nor unspecific, certainly not to the degree that would justify judgment as a matter of law in Defendants' favor.

### 3. Racial Discrimination in Violation of § 1981

The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981. See *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Thus, to succeed on his § 1981 claim, Plaintiff had to satisfy four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis

for employer liability." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Claims brought under § 1981 do not require exhaustion of administrative remedies, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007), and are subject to a four-year statute of limitations. See *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).

Plaintiff testified at trial that he was subjected to racial harassment throughout his employment at Rosebud Farmstand (*i.e.*, from 2003 to 2008). Plaintiff testified that his coworkers frequently referred to him "nigger" and "monkey," and told him to "go back to Africa." [Tr. Dec. 9, 2015, at 676–86.] He estimated that his coworkers made racial remarks 20 times in 2004, 30 times in 2005, and over 70 times in 2006. [Tr. Dec. 9, 2015, at 685.] Plaintiff said that during 2008, he was subjected to racial harassment approximately five times per week, including comments from coworkers telling him to "go back to Africa," calling him a "monkey," a "nigger," and a "slave." [Tr. Dec. 10, 2015, at 754–58.] He testified that Defendant Castaneda did not make racial remarks in 2008, although in 2005 or 2006 Defendant Castaneda said something to Plaintiff "about how black guys have big dicks and big asses." [Tr. Dec. 9, 2015, at 515.]

Defendants' primary argument is that the bulk of the alleged racial harassment occurred outside of the relevant "evidentiary period," and that the only evidence of racial harassment within the evidentiary period is "a few isolated, stray remarks," which is insufficient to support a hostile work environment claim. [See 237, at 7.] Plaintiff filed his complaint on December 23, 2011, meaning that the limitations period for Plaintiff's § 1981 claim goes back to December 23, 2007, approximately six months before Plaintiff quit Rosebud. Defendants argue that this six-month period is the only relevant "evidentiary period" for assessing Plaintiff's § 1981 claim, and

12

that all acts of racial harassment that pre-date December 23, 2007 are irrelevant. But Defendants

ignore the fact that Plaintiff's § 1981 claim, like his Title VII claim, is based on a hostile work

environment theory of liability. And both the Supreme Court and the Seventh Circuit have

explained that the so-called "evidentiary period" relevant to such claims extends to include pre-

limitations conduct:

> A hostile work environment claim is composed of a series of separate acts that
> collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-
> 5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a
> charge within a certain number of days after the unlawful practice happened. It
> does not matter, for purposes of the statute, that some of the component acts of
> the hostile work environment fall outside the statutory time period. Provided that
> an act contributing to the claim occurs within the filing period, the entire time
> period of the hostile environment may be considered by a court for the purposes
> of determining liability.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); see also *Pruitt v. City of*

*Chicago, Ill.*, 472 F.3d 925, 927 (7th Cir. 2006) (explaining that the inclusion of pre-limitations

conduct for hostile work environment claims applies equally to Title VII and § 1981 claims);

*Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004) (explaining that the

continuing violation doctrine described in *Morgan* "applies to Title VII as well as § 1981

claims"). Thus, *all* of Defendants' acts of racial discrimination, including those pre-dating the

limitations period, are relevant for determining Defendants' liability for creating a hostile work

environment. Defendants' argument that there was insufficient evidence (or *no* evidence [287, at

10]) to substantiate Plaintiff's § 1981 claim is unpersuasive.

Defendants also argue—generally, without tying the argument to any specific element of

a § 1981 claim—that Plaintiff's evidence of racial harassment should be discredited because, for

the most part, Plaintiff's witnesses did not corroborate his testimony. [237, at 7; 287, at 10–11.]

This argument is unavailing for two reasons. First, while Plaintiff testified about repeated acts of

*sexual* harassment that occurred openly in public areas of the market, Plaintiff said that his

13

coworkers would make racial remarks as they were walking past Plaintiff, that "[t]hey wouldn't say [them] loud," and that they would say the comments "so [Plaintiff] could hear [them]." [Tr. Dec. 10, 2015, at 753–58.] Based on this testimony, a lack of corroborating evidence might have come as no surprise to the jury (*i.e.*, perhaps other employees did not overhear these racial comments). Second, even if the witnesses flatly contradicted Plaintiff's testimony, it is still the province of the jury to assess witness credibility, and Plaintiff's testimony, if credited, provided a sufficient evidentiary basis to find in his favor.

Defendants also argue that Plaintiff failed to present any basis for employer liability. Again, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. An employer is strictly liable for harassment by a supervisor, and an employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger*, 361 F.3d at 976.

Plaintiff's only evidence of supervisor harassment is that in 2005 or 2006, Defendant Castaneda said something to Plaintiff "about how black guys have big dicks and big asses." [Tr. Dec. 9, 2015, at 515.] While this is only a single incident, the Seventh Circuit has said that "in the case of racial and ethnic slurs, some words are so outrageous that a single incident might qualify for a hostile environment claim." *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (recognizing that, in some instances, "a single incident might qualify for a hostile environment claim"). But again, the Court need not decide whether Defendant Castaneda's comment qualifies as a severe or pervasive instance of racial harassment because Plaintiff can establish that Rosebud knew of coworker harassment but failed to address it. Specifically, Plaintiff testified

that his coworkers racially harassed him 2003 to 2008, and that he repeatedly complained to management about this harassment but Defendant Rosebud did nothing in response. This is sufficient to allow a jury to conclude that Rosebud knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice.

Defendants also argue that "[t]here is insufficient evidence to show [that Plaintiff] suffered an adverse action as a result of [the] alleged racial harassment." [287, at 10.] But this is not an element of a § 1981 hostile work environment claim, and thus Defendants' argument is misplaced. The Court addresses this "adverse action" argument in reviewing Plaintiff's retaliation claim.

### 4.    Retaliation in Violation of § 1981

The retaliation standard for § 1981 claims is identical to standard for Title VII claims, which, as explained above, requires Plaintiff to present evidence that, when considered as a whole, would allow a reasonable factfinder to conclude that his filing of a charge of discrimination caused his constructive discharge. *Ortiz*, 2016 WL 4411434, at *4.

Similar to his allegations for his Title VII retaliation claim, Plaintiff alleges that after he filed his charge of discrimination with the EEOC on January 7, 2008, Defendant Rosebud retaliated against him in a variety of ways, ultimately causing his resignation six months later.[3]

Defendants argue that "Plaintiff failed to offer any evidence beyond his own testimony to establish he allegedly was subjected to racial harassment after January 2008 that was worse, different or retaliatory alleged [sic] in any way." [237, at 8.] But as mentioned throughout this opinion, the jury, as the arbiter of witness credibility, was entitled to credit Plaintiff's testimony

---

[3] To be clear, although Plaintiff did not include any allegations of *verbal* racial harassment in his charge of discrimination with the EEOC (*i.e.*, he did not complain about the years of racial comments that comprise his § 1981 hostile work environment claim), he did allege that Rosebud Farmstand discriminated against him on the basis of race in ways that were not at issue in this lawsuit (*i.e.*, that he was sent home from work and his hours were reduced because of his race). [See 228-1.]

in assessing Defendants' liability, regardless of whether Plaintiff offered any corroborating testimony from other witnesses.

Defendants also argue that Plaintiff failed to show any material change in his work environment because he filed his charge of discrimination. It is unclear whether Defendants are arguing that Plaintiff failed to establish that he was subject to an adverse action, or whether the adverse action was causally linked to the filing of the charge of discrimination. Regardless, both arguments are unconvincing. As discussed above, Plaintiff testified that his coworkers' threatening and intimidating actions following his filing of his charge of discrimination made him feel "unwelcome," "disrespected," "nervous," and "scared," causing him to quit his job (*i.e.*, his constructive discharge). [Tr. Dec. 10, 2015, at 782–83.] Plaintiff's testimony is sufficient to allow a reasonable jury to conclude that Plaintiff suffered an adverse employment action because he filed his EEOC charge, and thus sufficient to sustain a jury verdict for retaliation in violation of § 1981.

### C.    Illinois Gender Violence Act Claims

The Illinois Gender Violence Act says that "[a]ny person who has been subjected to gender-related violence as defined in Section 5 may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence." 740 ILCS 82/10. The Act defines "gender-related violence" to include:

> (1) One or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois[4] that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

---

[4] In Illinois, a battery is committed by an individual if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results. *Flores v. Santiago*, 986 N.E.2d 1216, 1219 (Ill. App. Ct. 2013) (citations omitted). "[T]he gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff." *Id.* (citations and internal quotation marks omitted).

(2) A physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois, whether or not the act or acts resulted in criminal charges, prosecution, or conviction.

(3) A threat of an act described in item (1) or (2) causing a realistic apprehension that the originator of the threat will commit the act.

740 ILCS 82/5. Liability only can be imposed against a person who perpetrated gender-related violence, where "perpetrated" means either personally committing the gender-related violence or personally encouraging or assisting the act or acts of gender-related violence. 740 ILCS 82/10.

The statute of limitations for IGVA claims is seven years for actions based on gender-related violence as defined in paragraphs (1) or (2) of Section 5, and two years for actions based on gender-related violence as defined in paragraph (3). 740 ILCS 82/20. Plaintiff filed his lawsuit on December 23, 2011. Because Plaintiff left Rosebud Farmstand in 2008, any claim of gender-related violence under paragraph (3) of Section 5 would be barred by the two-year statute of limitations applicable to such claims, which dates back to December 23, 2009. Any claims pursuant to paragraphs (1) or (2) of Section 5 would have to involve incidents occurring after December 23, 2004 to avoid the seven-year statute of limitations applicable to those claims. The relevant inquiry, then, is whether Plaintiff presented sufficient evidence for the jury to conclude that Defendants Castaneda or Mendoza committed an act of gender violence as defined in paragraph (1) or (2) of Section 5 of the IGVA against Plaintiff on or after December 23, 2004.

### 1.    Defendant Castaneda

Defendant Castaneda's primary argument is that he is entitled to judgment as a matter of law because the only times that he purportedly touched Plaintiff in an offensive manner were outside of the applicable limitations period. Defendant points to the following testimony from Plaintiff's cross-examination in support:

> Q.  Now, Mr. Smith, you testified yesterday that the second time Mr. Castaneda touched you was in December of 2003, correct?[5]
>
> A.  Correct.
>
> *  *  *
>
> Q.  And after December of 2003, Mr. Castaneda didn't touch you again; is that correct?
>
> A.  Correct.

[Tr. Dec. 10, 2015, at 853–54.] However, Defendant Castaneda acknowledges that Plaintiff testified the day before that "Castaneda continued to slap his butt until October 2006 or until a few months before Castaneda pulled his time card in December 2007." [238, at 3.] More specifically, when asked whether Defendant Castaneda touched him after the two incidents in 2003, Plaintiff said, "I would say it happened frequent—a couple more times prior to—from 2003 to 2008," and then went on to testify regarding an incident from March 2004 (outside of the limitations period), and, importantly, one final incident in "2005 or 2006" where Defendant Castaneda "grabbed [his] ass." [Tr. Dec. 9, 2015, at 513–15.]

Defendant Castaneda argues that Plaintiff's testimony regarding the 2005/2006 touching—the only physical touching within the limitations period—is "too vague" to substantiate an IGVA claim, especially considering that this testimony is contradicted by Plaintiff's testimony the following day that Defendant Castaneda never touched him after 2003. While the Court agrees that Plaintiff contradicted himself on this issue, it was within the discretion of the jury to credit Plaintiff's initial testimony that Defendant Castaneda touched him in 2005 or 2006. And if the jury did credit Plaintiff's earlier testimony, there is nothing within the IGVA standard that would preclude a finding of liability based on that single incident.

---

[5] In his direct testimony on December 9, 2015, Plaintiff testified regarding two incidents, in November and December 2003, when Defendant Castaneda touched him.

Defendant Castaneda also argues that Plaintiff failed to present any evidence that the action in question was based upon Plaintiff's sex. The Court disagrees. There was sufficient evidence for a jury to conclude that the touching in question occurred because of Plaintiff's sex: female employees were not subject to this sort of touching, and that the touching itself was sexual in nature, as it involved the unwanted touching of Plaintiff's intimate body parts. See *Oncale*, 523 U.S. at 80; *Hamm*, 332 F.3d at 1062; *Gabrielle M.*, 315 F.3d at 827. While the jury could have interpreted Defendant Castaneda's actions as "simply expressions of animosity or juvenile provocation," as opposed to actions based on Plaintiff's sex, *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997), the Court cannot say that no rational juror could have found for Plaintiff based on the evidence presented. Defendant Castaneda's motions therefore must be denied.

### 2. Defendant Mendoza

Defendant Mendoza argues that the jury lacked a sufficient evidentiary basis to convict him of gender violence because Plaintiff's testimony about improper touching was not corroborated by Plaintiff's witnesses, and because the only corroborated incidents involved butt slapping, which was not based on Plaintiff's sex and was not an act of gender violence. The Court is not persuaded.

Plaintiff described in detail how Defendant Mendoza touched, grabbed, pulled, and flicked his private parts "numerous" times each year from 2003 until the end of 2007. [Tr. Dec. 9, 2015, at 521–23, 526–29.] Based on this testimony alone, regardless of whether it was corroborated by other witnesses, the jury had sufficient evidence to find Defendant Mendoza liable for violating the IGVA. Thus, Defendant Mendoza's motions must be denied as well.

### III.     Phase II – Equitable Damages

#### A.     Miscellaneous Motions

Before addressing the merits of the parties' Phase II arguments, the Court addresses two motions [272, 274] that arose during post-trial briefing that impact the scope of reviewable material regarding the Phase II issues.

First, Defendants filed a motion to supplement the Phase II record to include certain payroll records to rebut Plaintiff's allegedly new contention that Defendants denied him overtime pay, as well as a series of other documents that Defendants contend are appropriate in light of unexpected Phase II testimony. [See 272.] Upon review of the documents in question, the Court agrees that the documents relate to matters that Defendants arguably could not have anticipated during trial and are relevant to the Court's assessment of Plaintiff's entitlement to equitable relief. Plaintiff's objections to the admission of these exhibits include a series of attacks on the affidavit of Norman Brucer and an argument that Defendants should have sought permission from the Court earlier [see 283, at 8–9.]. As to Plaintiff's first objection, the Court will consider Norman Brucer's affidavit subject to Plaintiff's objections. As to Plaintiff's second objection, the timing of Defendants' submissions has not resulted in any undue prejudice to Plaintiff, who was able to review the documents and respond to them as part of his response and reply briefs. Accordingly, Defendants' motion [272] is granted, and the Court will consider these records in making its Phase II findings of fact and conclusions of law.

Second, Defendants filed a motion to amend their answer to add an affirmative defense of unclean hands. [See 274.] Federal Rule of Civil Procedure 15(b)(2) says that leave to amend should be "freely give[n] when justice so requires." Defendants argue that their basis for making this unclean hands defense arose from unexpected Phase II testimony from Plaintiff regarding

20

mitigation of damages that allegedly conflicts with his pre-testimonial representations. See *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 875 (7th Cir. 2011). The Court agrees that Defendants' unclean hands defense relates to matters that Defendants arguably could not have anticipated before trial, and the parties' arguments on the issue could assist the Court in assessing Plaintiff's entitlement to equitable relief. Further, there is no concern of undue prejudice in allowing Defendants to raise this defense at this stage in the proceeding because Plaintiff was given the opportunity to present his arguments on the issue in his post-trial briefing [see, *e.g.*, 283, at 19 n.1]. Without weighing in on the merits of Defendants' affirmative defense, the Court grants Defendants' motion to amend [274] its answer to add the affirmative defense of unclean hands. Defendants need not file an amended answer on the Court's docket because Plaintiff is aware of the defense and the parties have addressed the defense in their post-trial briefing.

### B. Equitable Relief

The purpose of the Phase II proceedings in this matter is to adjudicate Plaintiff's entitlement, if any, to equitable relief pursuant to Title VII and § 1981.[6] "A Title VII victim is presumptively entitled to full relief." *Hutchison v. Amateur Elec. Supp., Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004). Under Title VII, if an employer has been found to have intentionally engaged in an unlawful employment practice, a district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1); see also *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975) ("An individual who establishes a cause of action under § 1981 is

---

[6] Plaintiff suggests that the Court should enter judgment against the individual Defendants for any award of equitable relief pursuant to the Illinois Gender Violence Act. Plaintiff has not provided any authority for this request. While the IGVA does allow a court to award "other appropriate relief," 740 ILCS 82/15, which in theory could include equitable relief, the Court sees no basis for doing so here. Any award of equitable relief shall be entered against Defendant Rosebud Farmstand only, and not against either Defendant Castaneda or Defendant Mendoza.

entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages."). "Front pay represents the wages the plaintiff would have earned had [he] not been fired measured from the date of the judgment to some reasonable point in the future." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1255 (N.D. Ill. 2015) (citing *McKnight v. General Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990)). "Back pay, on the other hand, represents the wages the plaintiff would have earned had [he] not been fired between the time of the firing and the date of judgment." *Id.* (citing Seventh Circuit Pattern Civil Jury Instruction 3.11). District courts have "broad equitable discretion to fashion back pay awards to make the Title VII victim whole." *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003); see also *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499–501 (7th Cir. 2000) ("Back pay and front pay are equitable remedies * * * and therefore matters for the judge.").

### 1. Back Pay

Employees who succeed in proving employment discrimination are presumptively entitled to back pay. *David*, 324 F.3d at 865. The plaintiff bears the initial burden of establishing the amount of back pay, and then the burden "shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044; see also *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) ("Not until the plaintiff establishes what she contends are her damages does the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant.").

### a. Plaintiff's Burden

The first step to determining Plaintiff's entitlement to back pay is to calculate the wages Plaintiff would have earned had he continued working at Rosebud Farmstand from the date he

left up until the judgment in his favor at trial. Plaintiff worked at Rosebud Farmstand until his constructive discharge on June 28, 2008, and the jury returned a verdict in Plaintiff's favor on December 15, 2015. So the relevant question is what Plaintiff would have earned in the seven-and-a-half year period between June 28, 2008 and December 15, 2015.[7]

Throughout his employment at Rosebud, Plaintiff held an entry-level position in the meat department and was paid minimum wage. Plaintiff's yearly earnings are represented in the following chart, based on business records produced by Defendants [see 272-1, at 2–9]:

| Year | Regular Time Hours | Overtime Hours | Total Hours | Regular Time Pay | Overtime Pay | Total Pay |
|------|--------------------|----------------|-------------|------------------|--------------|-----------|
| 2004 | 2100.09 | 750.95 | 2851.04 | $12,075.53 | $6,477.00 | $18,552.53 |
| 2005 | 1975.75 | 738.73 | 2714.48 | $12,842.57 | $7,202.67 | $20,045.24 |
| 2006 | 1933.42 | 397.33 | 2370.75 | $12,567.27 | $3,874.03 | $16,701.30 |
| 2007 | 1760.53 | 3.07 | 1803.6 | $12,308.50 | $30.34 | $12,338.84 |
| 2008 | 738.65 | 0 | 738.65 | $5,539.92 | $0.00 | $5,539.92 |

Because Plaintiff was always paid minimum wage, it is fair to say that Plaintiff would have continued making minimum wage had he continued working at Rosebud Farmstand. What is unclear are the number of hours Plaintiff would have worked and whether that number would have included any overtime hours.

Plaintiff's hours decreased year by year throughout the five years that he worked at Rosebud Farmstand, going from approximately 55 hours per week in 2004 down to approximately 28 hours per week in 2008. At trial, Defendant Castaneda—Plaintiff's supervisor at Rosebud Farmstand—said that around 2005 or 2006 Plaintiff requested to work fewer hours because "he didn't want to pay that much child support." [Tr. Dec. 11, 2015, at 1015–16.] The data support this testimony. For example, while Plaintiff's regular-time hours stayed about the

---

[7] Technically judgment has not yet been entered, due to the delay in adjudicating Phase II of the trial. However, the Court exercises its discretion in setting the cut-off point for pre-judgment interest at the date of verdict.

same in 2005 and 2006 (1,976 hours and 1,933 hours, respectively), his overtime hours dropped by nearly 50 percent during this time (from 739 hours to 397 hours). Notably, the majority of the overtime hours that Plaintiff worked in 2006 were in the first half of the year, and Plaintiff worked only 6.82 overtime hours in the fourth quarter of 2006. [261-1, at 10–11.] By 2007, Plaintiff's overtime hours had disappeared completely, and his regular-time hours dropped to approximately 34 hours per week.

Plaintiff does not provide any credible evidence refuting Defendants' contention that he voluntarily requested the reduction in hours that began in the second half of 2006, which reduced Plaintiff's workload to approximately 34 hours per week. Plaintiff does claim (as articulated in his charge of discrimination) that in July 2007, Defendant Rosebud *further* reduced his hours from 34 hours per week to 30 hours per week in retaliation for Plaintiff complaining about harassment. But this claim is not supported by the data. According to Plaintiff's weekly time sheets,[8] his hours actually *increased* in the second half of 2007, going from 33.23 hours per week in the first half of the year to 33.88 hours per week in the latter half. [See 261-1, at 12–13.] In fact, excluding December 2007 (where Plaintiff's hours dropped significantly to 21.85 hours per week), Plaintiff was averaging 36.74 hours per week in the second half of 2007. Thus, the data do not reflect any recognizable drop in hours in or around July 2007.

However, Plaintiff's hours did drop slightly in 2008 to an average 28.92 hours per week.[9] The timing of this reduction in hours corresponds with Plaintiff's filing of his EEOC charge of discrimination in January 2008, which forms the basis of Plaintiff's retaliation claim as

---

[8] The Court recognizes the minor discrepancy between Rosebud's weekly time sheets and its year-end reports concerning Plaintiff's total hours worked in 2007, with the former listing 1,744.77 [261-1, at 12–13], and the latter listing 1,763.60 [272-1, at 7].

[9] Again, there is a minor discrepancy between Plaintiff's 2008 hours as reported in his weekly time sheets (723.05) and in Rosebud's year-end report (738.65). [See 261-1, at 14–15; 272-1, at 8.]

articulated in his complaint: *i.e.*, that Rosebud reduced his hours from 34 hours per week to 30 hours per week because he filed his charge of discrimination (as opposed to Plaintiff's now-debunked claim from his charge of discrimination that this reduction in hours occurred six months earlier, in July 2007). While Plaintiff's counsel did not elicit this testimony at trial or argue it at closing, Defendants raised the issue with Plaintiff on cross-examination, giving him the opportunity to confirm this allegation at trial, which he did. [See Tr. Dec. 10, 2015, at 845–46; 880; 887.] Based on Plaintiff's testimony, it is possible that the jury considered this reduction in Plaintiff's hours beginning in December 2007 in concluding that Defendants retaliated against Plaintiff for filing his charge of discrimination.[10] Accordingly, the Court will ignore this second reduction in hours in determining Plaintiff's average work week for purposes of calculating his back pay.

The Court concludes that the relevant timeframe for determining Plaintiff's average work week is after Plaintiff requested a reduction in hours in 2006, but before Plaintiff's hours were involuntarily reduced in retaliation for filing his charge of discrimination at the end of 2007. While it is unclear as to precisely when Plaintiff requested his reduction in hours in 2006, the first noticeable reduction appears in the fourth quarter of that year, where Plaintiff's hours dropped to an average of 34.48 hours per week. This number remained relatively consistent throughout 2007, where Plaintiff worked an average of 33.87 hours per week. In the combined 15 months spanning October 2006 through December 2007, Plaintiff averaged 33.74 hours per

---

[10] Defendants contested Plaintiff's statement at trial, noting that Plaintiff did not file his charge of discrimination until January 7, 2008, and thus any reduction in hours that occurred on December 23, 2007 could not have been in retaliation for Plaintiff's filing of his charge of discrimination. However, Plaintiff testified briefly that he told Carlos Castaneda and Roque Mendoza that he was going to file charges *before* January 7, 2008, and he also implied that he filed a complaint on December 19, 2007. While this testimony leaves much to be desired, based on the close proximity between Plaintiff's filing of his charge of discrimination and his reduction in hours, coupled with the absence of any other explanation as to why Plaintiff's hours dropped at this time, the Court concludes that it is reasonable to believe that Defendants reduced Plaintiff's hours in December 2007/January 2008 in retaliation for filing his EEOC charge.

week. Based on this information, the Court sets Plaintiff's hourly work week at 34 hours for purposes of calculating back pay.

Taking into consideration the changes in minimum wage in Illinois over the relevant time period, the Court calculates Plaintiff's lump sum back pay as follows, with the understanding that Illinois' minimum-wage increases of $0.25 went into effect on July 1, 2008, 2009, and 2010:

| Year | Weeks | Hours per Week | Wage per Hour | Total |
|---|---|---|---|---|
| 2008 | 1 | 34 | $7.50 | $255.00 |
| 2008 | 26 | 34 | $7.75 | $6,851.00 |
| 2009 | 26 | 34 | $7.75 | $6,851.00 |
| 2009 | 26 | 34 | $8.00 | $7,072.00 |
| 2010 | 26 | 34 | $8.00 | $7,072.00 |
| 2010 | 26 | 34 | $8.25 | $7,293.00 |
| 2011 | 52 | 34 | $8.25 | $14,586.00 |
| 2012 | 52 | 34 | $8.25 | $14,586.00 |
| 2013 | 52 | 34 | $8.25 | $14,586.00 |
| 2014 | 52 | 34 | $8.25 | $14,586.00 |
| 2015 | 50 | 34 | $8.25 | $14,025.00 |
| | | | **Total** | **$107,763.00** |

Plaintiff also says that he should be entitled to 15 hours per week of overtime pay, claiming that such a figure is "reasonable." Because the Court already has concluded that Plaintiff is entitled to 34 hours per week in back pay, no amount of overtime pay is reasonable. Plaintiff's request for overtime pay is denied.

**b.    Failure to Mitigate**

Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (internal quotation marks and emphasis omitted). Thus, back pay awards must be reduced by "[i]nterim earnings and amounts earnable [by the employee] with reasonable diligence." 42 U.S.C. § 2000e–5(g)(1). Because the statutory text requires subtracting not only

actual "interim earnings" but also amounts "earnable with reasonable diligence," a plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment." *Hutchison*, 42 F.3d at 1044. Nor will a lack of job-seeking success excuse the plaintiff from this duty to mitigate; a plaintiff's "duty to mitigate [does] not evaporate in the face of his difficulties." *Payne v. Security Savings & Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991). Although the duty to mitigate falls on the plaintiff, see *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), it is the employer's burden to establish that the plaintiff failed to mitigate his damages. See *Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant[] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate [his] damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Id.*; see also *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986).

In the seven-and-a-half years between Plaintiff's constructive discharge and the jury's verdict on his claims of discrimination, Plaintiff worked for eight separate employers (he worked for Party City twice) in various cities in Arizona and in Chicago, Illinois:

| Place of Employment | Location | Dates | Total Earned | Reason for Leaving |
|---|---|---|---|---|
| Party City | Gilbert, AZ | 2008 | $826.07 | Unclear |
| Washington Inventory Service | Tempe, AZ | Mar 2009 – unknown | $387.00 | Quit, vehicle problems |
| Labor Ready | Tempe, AZ | 2010 | $78.00 | Enrolled in college |
| Party City | Gilbert, AZ | October 2011 | $962.00 | Seasonal work |
| Way To Go Transportation | Tempe, AZ | Nov 2011 – Aug 2012 | $4,533.00 | Moved to Chicago |
| Citywide Janitorial | Chicago, IL | Sept 2013 – June 2014 | $8,478.00 | Moved to Arizona |
| 7-Eleven | Mesa, AZ | June 2014 – Oct 2014 | $5,235.08 | Terminated |
| Goodwill | Mesa, AZ | Nov 2014 – Feb 2015 | $2,027.28 | Laid off |
| Labor Ready | Tempe, AZ | Mar 2015 – Present | $15,474.77 | Employed at time of trial |
| | | **Total** | **$38,001.20** | |

Plaintiff's post-Rosebud wages are supported by various employment records and tax documents that the parties introduced into evidence during Phase II, and Plaintiff does not dispute that these interim earnings should be subtracted from his back pay award.

But Defendants have lodged multiple arguments as to why Plaintiff's back pay award should be reduced further, or eliminated altogether. First and foremost, Defendants question Plaintiff's diligence in seeking employment after his constructive discharge from Rosebud, and dispute the credibility of his testimony to the contrary. For example, Plaintiff testified at length about how, throughout the approximately four years in which he was unemployed during the relevant back pay period, he would spend five hours per day reviewing ads in local newspapers and applying for jobs online, and then he would spend an additional three hours patrolling the streets in a four-mile radius around his home looking for jobs. But despite these herculean efforts, Plaintiff was unable to produce any records showing that he applied for even a single job—no emails or letters from prospective employers, no personal notes tracking applications, no copies of job applications, etc. The scant evidentiary record reflecting Plaintiff's efforts consists of the fact that he actually was hired by eight different companies (implying that he must have applied for at least some of those jobs), and copies of two job applications from employers that did not hire Plaintiff (Walmart and Fry's Food Store), which Defendants obtained by subpoena. Defendants further attack Plaintiff's credibility by highlighting discrepancies between Plaintiff's discovery responses and his trial testimony, where Plaintiff's representations regarding his job-search efforts went from *de minimus* during discovery to monumental once Plaintiff took the stand. Finally, Defendants round out their argument by referring to their expert, Dr. Cohen, who testified about the vast number of job advertisements in Chicago and Arizona during the years following Plaintiff's employment at Rosebud.

To establish the affirmative defense of failure to mitigate, Defendants must show both that Plaintiff failed to exercise reasonable diligence and that comparable work was available. As to the former, Plaintiff plainly failed to exercise reasonable diligence in tracking and reporting

his job-searching diligence, especially considering that Plaintiff was represented by counsel by at least December 2011 (*i.e.*, when this case was filed). Defendants formally requested information regarding Plaintiff's mitigation efforts sometime in 2012, and when Plaintiff first responded in January 2013, he did not list *any* information about his efforts to seek employment after June 2008, except for the job that he secured at Party City in October 2011 (*i.e.*, he did not list the other jobs that he allegedly secured during that period—including his first stint at Party City in 2008, or his positions at Washington Inventory Service, Labor Ready, or Way To Go Transportation—or *any* jobs that he applied for but did not get). It was not until August 2013 that Plaintiff supplemented his responses to provide *any* information about his mitigation efforts, claiming that he "d[id] not recall all the places at which he applied for employment," but that he "d[id] recall some places," listing only the name, address, and phone number of nine Arizona businesses.[11] [See 261, at 1–2.] Plaintiff did not provide any information regarding his job-search efforts in Chicago, despite the fact that he was unemployed and living in Chicago at the time he filed that supplemental response, and had been for approximately one year. Plaintiff filed additional supplemental discovery responses in September 2013 [261-1, at 34–35], adding information about his work at Washington Inventory Service and Citywide Janitorial, and then again in January 2015 [261-1, at 36–37], adding information about his work at 7-Eleven and Goodwill, but in both instances still failed to disclose any additional information about his mitigation efforts during the approximately four years he was unemployed.

The key consideration for purposes of Defendants' affirmative defense is the extent to which Plaintiff's Phase II testimony about his vast mitigation efforts is credible. During Phase II,

---

[11] At his deposition the following month, Plaintiff expanded his list of applications to include 16 businesses located in Arizona: Fry's Food Store, Valero In The Zone, Target, Super Target, Walmart, McDonald's, Wendy's, Auto Zone, Shell gas station, places within the San Tan Mall (Dillard's, Macy's, and a theater), Sky Harbor Airport, Sprint, T-Mobile, and Pool City. [271-1, at 24–25, 28–29.]

Plaintiff testified that he spent five hours per day searching and applying for jobs from home (using local newspapers and online searches), and then an additional three hours walking the streets of nearby neighborhoods, searching and applying for jobs in person. If this is true, Plaintiff's mitigation efforts far exceeded what is necessary to show reasonable diligence. However, Plaintiff's discovery responses—even as supplemented over the years and including Plaintiff's deposition testimony—tell a different story, showing that Plaintiff's only applied for approximately 20 jobs in his four years in Arizona,[12] and the only evidence of any job searching in Chicago is the fact that Plaintiff was hired by Citywide Janitorial. If *this* version of the story is true, then Plaintiff's efforts to mitigate his damages likely fell short of what is required under the law. For example, in *Payne v. Security Savings & Loan Association, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991), the plaintiff was *not* diligent in seeking comparable employment when his efforts "slowed to a trickle," where he looked for employment only a few hours per week, contacting only a dozen-or-so employers per year over a two-year span.

Defendants impeached Plaintiff with these vast discrepancies at trial, to which Plaintiff testified that he "pretty much rushed through" his discovery responses. [Tr. Apr. 4, 2016, at 115–19.] The only evidence that favors Plaintiff's story is the fact that after he supplemented his responses by listing a handful of businesses in Arizona to which he applied, Defendants subpoenaed those businesses, and while only two responded (Walmart and Fry's), they confirmed that Plaintiff did in fact apply there. But this only substantiates, to some degree, the *named* places where Plaintiff allegedly applied, which, even at trial, did not exceed a few dozen

---

[12] It was revealed during Phase II that Plaintiff received unemployment benefits from the state of Illinois in 2008 ($3,956.00), 2009 ($10,019.00), and 2010 ($4,728.00). Defendants imply that Plaintiff, who was either living with his aunt(s) or his girlfriend at the time and thus not paying rent, was using these funds to pay for the basic necessities of life, lessening his need to find a job. Plaintiff denied receiving any unemployment benefits after January or February 2009, despite what was reported on his tax transcript. [Tr. Apr. 5, 2016, at 392–94.]

businesses. This evidence *does not* substantiate Plaintiff's claim that he spent eight hours per day applying for jobs throughout his four years of unemployment, which would have yielded hundreds if not thousands of applications.

Defendants further attack Plaintiff's credibility by pointing to various false statements that Plaintiff made on his job applications, including lies regarding his place of residence[13] and his criminal history (*i.e.*, failing to disclose that he was a convicted felon). The Court agrees that these lies, which Plaintiff admitted, cast a shadow on Plaintiff's credibility (although Plaintiff's justification for these lies is that it made him a more viable candidate, which implies that Plaintiff was, in fact, interested in getting a job). Defendants also impeached Plaintiff throughout his Phase II testimony, highlighting various inconsistencies between that testimony and Plaintiff's discovery responses and deposition testimony. For example, Plaintiff testified that Rosebud did not pay him overtime in many instances and that in some weeks he would work in excess of 70 hours per week, but these statements are contradicted by Plaintiff's time sheets and payroll records, which show that he was paid all of his overtime wages and that he never worked more than 70 hours per week (he topped out at 65.98 hours in September 2004 [261-1, at 7]). While many of these impeachments can be chalked up to Plaintiff's lack of diligence in fully responding to discovery requests or his on-the-stand hyperbole (as opposed to sanctionable lies, as Defendants argue), they all chip away at the credibility of Plaintiff's Phase II testimony, and thus strengthen Defendants' efforts to show that Plaintiff failed to mitigate his damages.

---

[13] Plaintiff's girlfriend (who is the mother of his four children) was the recipient of government-funded housing in Arizona, but as a term of that program, she was not allowed to house any convicted felons. Defendants imply that Plaintiff changed his story about where he lived in Arizona (*i.e.*, with his girlfriend or with one or more of his aunts) to avoid exposing any wrongdoing on the part of his girlfriend. The Court excluded testimony on this point at trial, but informed the parties that it would take this information into consideration in awarding any equitable relief to Plaintiff.

Taking all of this into consideration, the Court concludes that Defendants successfully established, in part, that Plaintiff failed exercise reasonable diligence in seeking comparable employment. The sharp contrast between Plaintiff's pre-trial discovery responses (beginning with almost zero disclosed job applications and gradually advancing to several dozen) and his Phase II testimony (describing a 40-hour week of job searching) raises a yellow flag as to Plaintiff's credibility. The hue of this yellow flag deepens when considering Defendants' successful impeachment of Plaintiff's testimony on multiple occasions, as well as the general implausibility of Plaintiff's Phase II testimony. Based on the militaristic description of Plaintiff's job-search efforts—a regimented eight-hour day spanning four years of unemployment, constituting some 8,000 hours of job searching—it simply is not credible that Plaintiff could not produce a single witness or document to corroborate the details of his search (no emails or letters from prospective employers, no personal notes tracking applications, no copies of job applications, etc.). While Plaintiff's failure to track and report his mitigation damages may be excusable, at least to some extent, before he entered into litigation (*i.e.*, pre-2011 periods of unemployed), his post-filing failures, when he was represented by counsel and subject to the requirements of Rule 26, are not. This includes Plaintiff's one-year period of unemployment from August 2012 (when Plaintiff moved back to Chicago), until September 2013 (when Plaintiff began working for Citywide Janitorial). The Court concludes that Defendants, having successfully attacked Plaintiff's credibility, have met their burden in showing that Plaintiff was not reasonably diligent in seeking employment during the 13-month period spanning August 2012 to September 2013, while Plaintiff was unemployed and living in Chicago.

Once the Court discredits Plaintiff's testimony regarding his post-filing job-search efforts in Chicago, it becomes difficult to justify not discrediting Plaintiff's identical pre-filing efforts in

Arizona as well. That is, Plaintiff testified that he followed the same job-search regimen (*i.e.*, five hours of newspaper reading and online searching, followed by a three-hour foot patrol of the area), during all of his periods of unemployment, both in Arizona and Chicago. However, as mentioned, Plaintiff was not engaged in litigation during his gaps in employment from 2008 through 2011, and had not yet been served with discovery requests regarding his job-search efforts. In addition, Plaintiff did provide the names of several dozen businesses where he did apply during this period, and at least some of that testimony has been corroborated by the subpoena responses from Walmart and Fry's, substantiating Plaintiff's story to some degree. After a careful assessment of this conflicting evidence, the Court finds that Plaintiff's job search efforts between 2008 and 2011 fell somewhere between the hyperbolized story that Plaintiff presented in his Phase II testimony and the "trickle" of applications deemed unreasonable in *Payne*, likely closer to the latter.

If the Court were to credit Plaintiff's testimony only to the extent that he was able to recall the name of the businesses to which he applied—and thus discredit Plaintiff's testimony as far as it relates to the hundreds of businesses whose names he could not recall—that would leave Plaintiff with several dozen applications from 2008 to 2011. But the Seventh Circuit held in *Payne* that 10 or 12 applications per year was insufficient to show reasonable diligence. *Payne*, 924 F.2d at 111. Plaintiff testified, however, that he applied to these businesses every six months or so, which would increase his application tally from 10 or 12 per year to 60 or 70 per year, and thus arguably within the sphere of reasonableness. But the records that Defendants subpoenaed do not support Plaintiff's testimony. That is, Fry's Food Store produced only one application from Plaintiff dated November 8, 2009. And while Walmart produced four applications, Plaintiff

testified that only one of those applications was actually his (implying that more than one "Robert Smith" has applied at Walmart).

That being said, the Seventh Circuit has instructed that if a plaintiff proves discrimination or retaliation, back pay may only be denied "for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination * * * and making persons whole." *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 880 (7th Cir. 1994). While Plaintiff's lack of corroborating evidence is troubling, Plaintiff was under no obligation to take or keep notes about his job hunt during this period in time. And while Plaintiff could only remember several dozen of the places to which he applied over a three-year period, see *Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 825 (N.D. Ill. 2015) (plaintiff adequately mitigated his damages by "submit[ing] dozens of job applications" in approximately a one-year period), his testimony and even his discovery responses came several years after the relevant time period, and thus Plaintiff's lapse in memory is not altogether unforgivable. The two subpoenaed applications refute Plaintiff's statement that he applied to each business more than once, but two subpoena responses do not constitute a representative data set. While Defendants successfully impeached Plaintiff's credibility on several occasions, and while the Court agrees that Plaintiff hyperbolized his job-search efforts, the Court nonetheless concludes that Defendants have not met their burden in showing that Plaintiff did not exercise reasonable diligence in regard to Plaintiff's pre-litigation efforts in Arizona from 2008 through 2011. To hold otherwise would put an unnecessary burden on plaintiffs to produce documentary evidence of their pre-litigation job-search efforts, and would frustrate the statutory purposes of eradicating discrimination and making discrimination victims whole. See *Hutchison*, 42 F.3d at 1044; *O&G Spring & Wire Forms Specialty Co.*, 38 F.3d at 880.

Having addressed Plaintiff's job-search efforts, the Court must next address the second element of Defendants' affirmative defense: whether there was a reasonable likelihood that Plaintiff might have found comparable work by exercising reasonable diligence. Because the Court already concluded that Plaintiff exercised reasonable diligence during his periods of unemployment in Arizona from 2008 to 2011 but not during his period of unemployment in Chicago from August 2012 to September 2013, the only relevant question is whether comparable work was available to Plaintiff during that latter period. Defendants rely on their expert witness, Dr. Cohen, for this information.

Dr. Cohen is the President of Employment Research Corporation out of Ann Arbor, Michigan, which is a firm that specializes in employment research. Dr. Cohen obtained a Ph.D. in economics from MIT with specialties in econometrics and labor economics. He has worked for the U.S. Bureau of Labor Statistics; taught classes in statistics, economics, labor market information, human resource management, and econometrics; has written dozens of articles and books on labor market issues; has been a consultant and/or expert in over 1,000 audits and/or cases on labor issues; and has been a testifying expert in hundreds of discrimination cases regarding labor markets. In this case, Defendants asked Dr. Cohen to evaluate the labor market for occupations relevant to Plaintiff during all relevant times. Again, while Dr. Cohen's opinion covered both Maricopa County in Arizona and Chicago, Illinois, only the latter market is relevant for the Court's purposes, and only as it relates to the period from August 2012 to September 2013.

To assess the availability of comparable employment openings, Dr. Cohen searched for entry-level positions in the following areas: Service Occupations (which includes cooks, dishwashers, janitors, etc.); Sales and Related Occupations and Office and Administrative

Support Occupations (which includes counter and rental clerks, shipping and receiving clerks, stock clerks, and order fillers), and Production, Transportation, and Material Moving Occupations (which includes laundry workers, production workers, vehicle and equipment cleaners, laborers, material movers, machine feeders, packagers, etc.). For the years 2012 and 2013, Dr. Cohen reported that, in the city of Chicago, there were job advertisements for 11,598 and 18,751 of the aforementioned occupations, respectively. Dr. Cohen also reported that the average unemployment rate in Chicago in 2012 was 10.1 percent.

Plaintiff criticizes Dr. Cohen's lack of nuance in his statistical reporting, referring to his "expert opinion" as a "generalized labor market analysis" that fails to show whether comparable work existed. For example, Dr. Cohen does not offer any geographical distinctions in his bulk reporting of job advertisements in Chicago. Because Chicago is a rather large city, a certain number of the available jobs likely were too far from Plaintiff's home to be considered comparable positions. Nor did Dr. Cohen discuss the wages or hours of the available positions. See *NLRB v. Midwestern Personnel Servs., Inc.*, 508 F.3d 418, 427 (7th Cir. 2007) (questioning the relevance of a similar report from Dr. Cohen that collected statewide employment data, noting that the report "did not provide specific data for the relevant geographical areas" and it lacked "any information regarding the hours, wages, and locations of the supposedly available positions"). Further, despite acknowledging that Plaintiff would not be a match for all open positions, Dr. Cohen made no adjustments to his report on that basis. Dr. Cohen also failed to consider the fact that Plaintiff is African-American and a convicted felon.[14]

_____

[14] Defendants argue that these details are irrelevant because (a) Plaintiff never had a face-to-face interview, and so his race would not have been disclosed to any of the potential employers, and (b) Plaintiff testified that he lied about his criminal history on his job applications, and so his prospective employers would not have based their hiring decisions on that factor either. But had a prospective employer considered hiring Plaintiff based on his application, the employer likely would have interviewed Plaintiff at some point, and perhaps would have run a background check on Plaintiff, thus exposing any

Before assessing Dr. Cohen's opinion, the Court notes that the parties said very little about what constitutes "comparable" work for Plaintiff. The Seventh Circuit has referred to "comparable work" as a position that affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status" as the previous position. *Hutchison*, 42 F.3d at 1044. Plaintiffs are not obliged to "go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). Plaintiff questions why Dr. Cohen considered non-butcher jobs to be comparable to Plaintiff's job at Rosebud, but Plaintiff has failed to persuade the Court that the only comparable jobs for Plaintiff would be butcher jobs. Plaintiff testified at trial that he was hired into an entry-level position at Rosebud Farmstand, and he remained at this same entry-level position, earning the minimum wage, throughout his time at Rosebud. Based on this information, a liberal reading of what constitutes "comparable" work would include all entry-level positions that paid the minimum wage and involved indoor work with limited manual labor. While some of the subcategories in Dr. Cohen's "comparable" categories include occupations that arguably fall outside of this scope (*e.g.*, landscaping), the majority of the positions, at least at face value, appear to be "comparable"—*e.g.*, they are consonant with Plaintiff's skills and involve conditions that are not substantially more onerous than his position at Rosebud Farmstand.

Regardless, based on the alleged shortcomings articulated above, Plaintiff urges the Court to strike Dr. Cohen's report and his expert opinions. Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d

_____

lies he might have told about his criminal history. In short, these factors are relevant to Plaintiff's employment prospects.

726, 737 (7th Cir. 2009). Rule 702 requires that the district judge act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741–42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589.

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis*, 663 F.3d at 893–94 (quoting Fed. R. Evid. 702); see also *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining the "three-step analysis" for assessing the admissibility of expert testimony). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

*Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it

enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); see also *Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis omitted) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007))); *Lewis*, 561 F.3d at 704–05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation." (citation omitted)).

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, as the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another," and while "[t]rained experts commonly extrapolate from existing data[,] * * * nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. In other words, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). In short, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Where that link is missing, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146.

The Court agrees with Plaintiff that Dr. Cohen's testimony should be stricken, and the Court's *Daubert* analysis for reaching that conclusion is relatively straightforward. That is, the

fault in Dr. Cohen's report is that it just isn't useful. All that Dr. Cohen provides is unrefined data: a raw number of yearly job advertisements in Chicago (the whole city, presumably), and the city's unemployment rate. While that is a good starting point, the amorphous number of job advertisements, absent any cogent points of reference, tells the Court very little about whether Plaintiff had a legitimate opportunity to secure those jobs had he applied. If the number had been, say, 7,000 instead of 11,000 in a given year, how, if at all, would that have impacted Plaintiff's likelihood of finding comparable employment? And there are numerous nuances particular to this case that Dr. Cohen did not consider (because he was not asked to), such as Plaintiff's specific attributes (*e.g.*, his location within Chicago, his race, and his criminal history), as well as specifics about the job advertisements (*e.g.*, the available hours, wage, job location, job duties, applicant pool, etc.). Also unhelpful is Dr. Cohen's recounting of Chicago's unemployment rate—a fact that the Court easily could locate on its own—which he referenced to support his conclusion that the job market in Chicago was, at times, "pretty good." [Tr. Apr. 4, 2016, at 340.]

Theoretically, Dr. Cohen's unrefined data could be useful if Defendants manipulated the data into a cohesive argument. But that didn't happen here. Instead, Defendants conclude from Dr. Cohen's data that there were, in fact, comparable jobs available to Plaintiff in all markets at all times. Surely, if Dr. Cohen had offered this opinion based on the data provided, the Court would strike the opinion under *Daubert* because admitting any conclusions based on Dr. Cohen's unrefined data would be tantamount to admitting opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Gen. Elec.*, 522 U.S. at 146. Here, Defendants stop short of asking Dr. Cohen to make that conclusion, and instead offer the conclusion themselves. But whether the conclusion represents the *ipse dixit* of the expert or the *ipse dixit* of Defendants or

their lawyers, it is still inadmissible. Thus, even if the Court didn't strike Dr. Cohen's "opinions" under *Daubert*, Defendants would still fall short of achieving their evidentiary burden.

Put differently, with or without their expert to rely upon, Defendants offer little to satisfy the second prong of their failure to mitigate defense. To be clear, the Court is not saying that there were not comparable positions available to Plaintiff at the relevant times, it merely concludes that Defendants have failed to meet their burden to establish that fact. And because Defendants "must prove *both* that the claimants were not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that the claimants might have found comparable employment," Defendants' failure to mitigate defense fails. *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818–19 (7th Cir. 1990) ("We agree with the district court that, because Gurnee failed to establish that there was a reasonable chance the claimants could have found comparable employment, the defendant failed to sustain its burden of proof."); see also *Stragapede*, 125 F. Supp. 3d at 825 (concluding that the plaintiff failed to exercise reasonable diligence to find work over a certain period of time, but nonetheless denying the defendant's failure to mitigate defense because it failed to show that there was a reasonably likelihood that the plaintiff might have found comparable work).

### c.    Other Reductions

Defendants also argue that the Court should limit Plaintiff's equitable award based on the fact that he voluntarily quit or abandoned several jobs. For example, Plaintiff allegedly quit his job at Washington Inventory Service (where he earned $387.00 in wages in 2009) because the vehicle he was using to get to this job broke down, and thus he lost his only viable source of transportation. Defendants argue that they should not be penalized by Plaintiff's failure to procure transportation. The Court disagrees. In theory, there are instances where a vehicle failure

41

would not justify quitting a job for mitigation purposes—for example, if Defendants established that Plaintiff had sufficient funds to repair the vehicle but elected not to, or if the job was accessible through public transportation, or if Plaintiff had offers to carpool with nearby co-workers, etc. But Defendants did not make any such arguments here. To the contrary, Plaintiff testified that he was using his aunt's car to drive from Gilbert, AZ to Tempe, AZ for his job at Washington Inventory Service. It could be that without his aunt's generosity, Plaintiff would not have been able to accept the job in the first place. Plaintiff's reason for quitting does not conflict with his duty to mitigate his damages.

Similarly, Defendants argue that Plaintiff should not receive back pay for the period of time he was enrolled in college, when he voluntarily removed himself from the workforce. Plaintiff testified that in the fall of 2010, he left his job at Labor Ready to enroll at Chandler–Gilbert Community College because he "was having problems finding a job" and he "felt that enrolling in school would help [him] find a job." [Tr. Apr. 4, 2016, at 32.] Plaintiff testified that he was enrolled full time at this college from September 2010 until the fall of 2011, and that he was not looking for jobs during this period. [Tr. Apr. 4, 2016, at 145–47.] On one hand, an employee "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment." *Hutchison*, 42 F.3d at 1044. On the other hand, the Seventh Circuit affirmed a district court's order concluding that a plaintiff *was* entitled to back pay while attending school. *Hanna v. Am. Motors Corp.*, 724 F.2d 1300, 1308 (7th Cir. 1984). In *Hanna*, the plaintiff was unemployed at the time he enrolled in school, and his reasoning for entering school was not to "reap greater future earnings," but because he "didn't have a job * * * and it was a means of getting some money" in the form of certain veterans' benefits that he received for enrolling. *Id.*; see also *Dailey v. Societe Generale*, 108 F.3d 451, 457 (2d Cir. 1997)

42

("We believe that a fact-finder may, under certain circumstances, conclude that 'one who chooses to attend school only when diligent efforts to find work prove fruitless,' satisfies his or her duty to mitigate." (citations omitted)); *Miller v. AT&T Corp.*, 250 F.3d 820, 839 (4th Cir. 2001) ("[T]he central question a court must consider when deciding whether a student-claimant has mitigated [his] damages is whether an individual's furtherance of [his] education is inconsistent with [his] responsibility to use reasonable diligence in finding other suitable employment." (citation omitted)).

Here, Plaintiff is distinguishable from the plaintiff in *Hanna* because Plaintiff quit his job at Labor Ready in order to enroll in college, curtailing his present earning capacity to do so. However, Plaintiff had only just begun working at Labor Ready (a temp agency where he earned a total of $78.00), and Plaintiff's total earnings in the two-year period preceding his enrollment totaled only $1,291.07, representing a drastic drop from his yearly earnings at Rosebud. Further, Plaintiff testified that despite his efforts to obtain entry-level positions during the recession years of 2008 and 2009, he surmised that he "didn't fit the candidate that [prospective employers] were looking for" because he didn't have a college education. [Tr. Apr. 5, 2016, at 249.] Regardless of whether Plaintiff's impressions were correct, the Court cannot say that his decision to enroll in college was inconsistent with his duty to mitigate his damages, despite having voluntarily left his position with the temp agency. Thus, the Court concludes that Plaintiff's back pay award should not be reduced during the period in which he was enrolled in college.

Defendants also argue that Plaintiff's equitable relief should be limited for the instances when he voluntarily relocated from Arizona to Chicago and back again. Specifically, Plaintiff quit his job at Way To Go Transportation in August 2012 to move to Chicago, but then did not start working again until more than a year later in September 2013. (By contrast, although

Plaintiff left Citywide Janitorial in June 2014 to move back to Arizona, he began working at 7-Eleven in Arizona that same month, leaving no measurable gap in work.) As to the 13-month gap following Plaintiff's initial move to Chicago, Plaintiff gave a reasonable explanation for his decision to relocate, which was that he became eligible for government-subsidized housing in Chicago that he had applied for before moving to Arizona (although he later returned to Arizona because the Chicago neighborhood was to crime-ridden). Taking advantage of government-subsidized housing—especially when Plaintiff applied for the housing before he left Chicago—is not inherently inconsistent with Plaintiff's duty to mitigate his damages, and Defendants have not convinced the Court otherwise. As such, Plaintiff's back pay award will not be reduced based on his relocations between Chicago and Arizona.

Further, Defendants suggest that the Court should deduct Plaintiff's unemployment benefits from his back pay award. Plaintiff collected unemployment compensation from the Illinois Department of Employment Security in the amount of $3,956 in 2008, $10,019 in 2009, and $4,728 in 2010. Whether to deduct unemployment compensation from an award of back pay is within the discretion of the trial court. See *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1428–29 (7th Cir. 1986) ("The majority of the other circuits * * * hold that unemployment benefits may never be deducted from backpay. * * * [T]his circuit's rule, which allows the district judge in his discretion to deduct or not deduct unemployment benefits in Title VII cases (and, we may assume, substantively similar section 1981 cases), may be unduly favorable to defendants."); see also *Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 826–28 (N.D. Ill. 2015) (offsetting unemployment benefits would confer a "discrimination bonus" on the defendant). The Court is persuaded by the reasoning in *Stragapede*, and exercises its discretion in declining to deduct Plaintiff's unemployment benefits from his back pay award.

44

Finally, Defendants argue that Plaintiff is not entitled to any equitable award because he "thoughtfully prepared his decision to quit while still employed." [279, at 36.] Defendants rely on *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1996), where the Seventh Circuit held that an employee who planned to quit prior to being discharged was not entitled to back pay. But the evidence here does not support Defendants' argument. In *Ilona of Hungary*, the plaintiff took active steps towards preparing for a new job after she was terminated by acquiring a site and applying for a zoning permit to build a sandwich shop. *Id.* Here, Defendants' counsel elicited testimony from Plaintiff on cross-examination that he talked to his girlfriend and his children about moving to Arizona before doing so. [Tr. Apr. 4, 2016, at 86.] But this admission lacks any substantive detail, such as *when* Plaintiff spoke about moving to Arizona, what those conversations entailed, and what, if any, steps he took to facilitate that move. While the Court acknowledges that Defendants' theory raises a yellow flag as to the timing of events leading up to Plaintiff's move—*i.e.*, Plaintiff was convicted of a felony in 2006, and the terms of his probation meant that he could not leave the state of Illinois until January, 2008, which is when he filed his charge of discrimination—Defendants have not provided sufficient evidence to advance this theory into a cognizable defense.

### d. Back Pay Calculation

The Court calculated Plaintiff's back pay at $107,763.00. After deducting $38,001.20 for the amount Plaintiff earned during the relevant period, the Court concludes that Plaintiff is entitled to back pay in the amount of $69,761.80.

### e. Prejudgment Interest

Plaintiff also requests prejudgment interest as part of his equitable relief. Prejudgment interest is presumptively available for violations of federal law. See *Shott v. Rush–Presbyterian–*

45

*St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003). However, "the decision whether or not to award such interest is within the discretion of the trial court." *Taylor*, 593 F.2d at 787 (finding no abuse of discretion where district court refused to award prejudgment interest). The decision "turns upon whether the amount of damages is easily ascertainable." *Gurnee*, 914 F.2d at 820 (quoting *Donnelly v. Yellow Freight Sys.*, 874 F.2d 402, 411 (7th Cir. 1989)). Here, the Court concludes that Plaintiff is entitled to prejudgment interest on his back pay award of $69,761.80.

When calculating prejudgment interest, the Seventh Circuit directs courts to use the prime rate. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). Prejudgment interest also should be compounded monthly. See *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1263 (N.D. Ill. 2015). The Court awards prejudgment interest on the back pay award at a rate of 3.35 percent,[15] compounded monthly for the approximately 90-month period spanning from June 28, 2008 to December 15, 2015,[16] totaling $19,894.77 in interest.

### 2. Front Pay

Plaintiff also requests front pay as part of his claim for equitable relief. Front pay, which is a substitute for reinstatement where reinstatement is inappropriate, "represents the wages the plaintiff would have earned had [he] not been fired measured from the date of the judgment to some reasonable point in the future." *Gracia*, 130 F. Supp. 3d at 1255. Put another way, front pay is "the discounted present value of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment." *Williams v. Pharmacia, Inc.*, 137

---

[15] This is the average of the prime rates between June 2008 and December 2015. *See* Board of Governors, Federal Reserve System, *Historical Data, Selected Interest Rates,* http://www.federalreserve.gov/releases/ h15/data.htm (last visited Sept. 9, 2016) (download spreadsheet for "Bank prime loan" at hyperlink for "monthly" data).

[16] Although judgment has not yet been entered due to the delay in adjudicating Phase II of the trial, the Court exercises its discretion in setting the cut-off point for pre-judgment interest at the 90-month mark, which incorporates the jury's verdict on liability.

F.3d 944, 953 (7th Cir. 1998) (internal alterations omitted). The award "must be grounded in available facts, acceptable to a reasonable person and not highly speculative." *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994). Front pay awards often are limited in duration, and are awarded for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Williams*, 137 F.3d at 954 (quoting *Ward v. Tipton Cnty. Sheriff Dept.*, 937 F. Supp. 791, 796 (S.D. Ind. 1996)); see also *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004) ("Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination."); *Hutchison*, 42 F.3d at 1045 (holding that a denial of front pay was reasonable when the jury "may reasonably have set a date between termination and judgment by which [the employee], using reasonable diligence, should have found 'comparable' employment"). In other words, "[t]he familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for comparable employment." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006) (the claimant must "present persuasive evidence of inability to find a substitute job").

Plaintiff requests $550,819.00 in front pay. Plaintiff calculates front pay by assuming that he would have worked at Rosebud Farmstand until his retirement at age 65 (25 years in total, spanning from 2017 until 2041), earning $8.25 per hour, 40 hours per week, 52 weeks per year, plus 15 hours of weekly overtime paid at time and a half, less $4,780 per year based on Plaintiff's average annual earnings over the past eight years.

The Court concludes that Plaintiff is not entitled to front pay because he has successfully mitigated his damages. At the time of trial, Plaintiff was employed by Labor Ready in Tempe, AZ, where he had been working for the past 12 months. Labor Ready pays Plaintiff $8.50 per

hour, which is more than the $8.25 minimum wage in Illinois. In the nine months that Plaintiff worked at Labor Ready in 2015, he earned a total of $11,237.77, and in the first three months of 2016, Plaintiff earned $4,237.00. By way of comparison, Plaintiff earned $12,338.84 at Rosebud in 2007, which was the relevant timeframe that the Court used for determining Plaintiff's average work week (*i.e.*, after Plaintiff requested a reduction in hours). In short, at the time of trial, Plaintiff had maintained a comparable job for more than 12 months that afforded him a salary (adjusted for inflation) equal to or greater than that of what he was likely to earn had he continued to work at Rosebud Farmstand.

Plaintiff's success in gaining comparable employment at Labor Ready was no fluke. Indeed, Plaintiff maintained a job at Citywide Janitorial in Chicago for 10 months before he decided to move back to Arizona. And after Plaintiff's move in June 2014, he immediately found work at 7-Eleven and, despite being terminated from that job five months later, found another job the following month at Goodwill. Similarly, after his four-month stint at Goodwill ended, Plaintiff started work at his current job at Labor Ready the following month. In other words, Plaintiff has stayed consistently employed since September 2013, demonstrating his ability to find, secure, and sustain comparable employment. Again, Plaintiff is only entitled to front pay up until the point when he should have found comparable employment. After several years of difficulty in the job market, Plaintiff has done so. Based on Plaintiff's proven success in gaining comparable employment, the Court concludes that he is not entitled to front pay.

Plaintiff's request for front pay also must be denied because Plaintiff failed to provide the Court with an appropriate discount rate—*i.e.*, the *discounted present value* of his proposed future earnings. "[W]hen a party fails to provide the district court with the essential data necessary to calculate a reasonably certain front pay award, the court may deny the front pay request."

*McKnight*, 973 F.2d at 1372. "Such information includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, *and the applicable discount rate*." *Id.* (emphasis added); see also *Stragapede*, 125 F. Supp. 3d at 833 ("Although it might seem like a technical requirement, the failure to provide the discount rate is grounds for refusing to award front pay."). Plaintiff acknowledges his duty to provide a discount rate, but says that "instead of applying a discounted rate for the time value of money by receiving tomorrow's wages today, the plaintiff will simply utilize the same hourly rate of $8.25 for the next 25 years." [280-25, at 3 n.2.] Plaintiff does not provide any legal authority to support his attempted side-stepping of this well-established requirement, and the Court is not inclined to credit Plaintiff's efforts here. Plaintiff failed to provide the Court with information necessary to calculate his front pay award, and thus his claim for front pay is denied on this basis as well.

### 3. Unpaid Overtime

Plaintiff testified at trial that on many occasions he worked up to 25 hours of overtime per week, but was not paid time-and-a-half. To combat Plaintiff's testimony, Defendants produced copies of Rosebud's payroll records showing the number of regular and overtime hours that Plaintiff worked while employed by Rosebud, as well as the corresponding wages paid. [See 261-1; 282-1.] The records show that Plaintiff was paid time-and-a-half for all overtime hours worked, as set forth in the chart above. Plaintiff has not provided any credible evidence in response. Further, Plaintiff has failed to explain how these alleged unpaid overtime wages are related to his claims in this lawsuit. The Court concludes that Plaintiff is not entitled to any allegedly unpaid overtime wages.

### 4. Negative Tax Consequences

Plaintiff requests that Defendants compensate him for the negative tax consequences associated with receiving a large lump-sum payment of back pay. Plaintiff cites *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015), where the Seventh Circuit joined the Third and Tenth Circuits in holding that a district court has the authority to issue a tax-component award to Title VII plaintiffs to compensate for the negative consequences of receiving lump-sum awards of back pay, which are taxable as wages in the year received. However, the Seventh Circuit frowned upon the district court's failure to explain how it decided to award plaintiff a tax-component equal to 15 percent of the back pay award, advising that "it would be wise for district courts to show their work if and when they adjudge similar tax-component awards in the future." *Id.* Here, Plaintiff provides no guidance as to how the Court might go about calculating an appropriate tax-component, suggesting instead "that the parties work together to agree to the plaintiff's extra taxes." [278, at 40.] The Seventh Circuit has held that "when a party fails to provide the district court with the essential data necessary to calculate a reasonably certain [equitable damages] award, the court may deny the * * * request." *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992). While *McKnight* dealt with front pay, the principle is the same. Because this Court cannot compensate Plaintiff for his negative tax consequences without explaining its calculation, and because Plaintiff has failed to provide the Court with the data necessary to make that calculation, Plaintiff's request is denied.

### 5. Attorneys' Fees

A prevailing plaintiff in a Title VII of § 1981 action is entitled to attorneys' fees and costs that are directly attributable to those claims. 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 1988(b). If Plaintiff wishes to pursue attorneys' fees in this case, he must file a separate fee petition with

the Court addressing his entitlement to such fees, and the Court will set a briefing schedule on Plaintiff's motion at that time.

### 6. Unclean Hands Defense

As mentioned above, as part of this omnibus order, the Court granted Plaintiff's motion [274] to amend its answer to add an "unclean hands" defense. As to the merits of that defense, Plaintiff argues that the unclean hands doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." [279, at 29 (quoting *ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 329–30 (1994)).]

As discussed in detail above, while the Court admonishes Plaintiff for his incomplete discovery responses and the inconsistencies between his trial testimony and his averments before trial—indeed, the Court discredited much of Plaintiff's Phase II testimony on this basis—the Court concludes that Plaintiff's discovery shortcomings and testimonial inconsistencies do not rise to the level that would justify denying him all equitable relief. See, *e.g.*, *Great Western Cities, Inc. v. Binstein*, 476 F. Supp. 827, 833–34 (N.D. Ill. 1979) (unclean hands defense was appropriate where plaintiff sought equitable relief "under a heavy cloud of massive land fraud allegations" that he "repeated[ly] fail[ed] to deny"); *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 601 (7th Cir. 1986) ("[T]he doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct.").

## IV.  Conclusion

For the reasons stated above, Defendants' motions for judgment as a matter of law [237, 238, 242, 243] are denied. Upon review of the parties' presentations at trial and their post-trial

briefing, the Court awards Plaintiff $69,761.80 in back pay and $19,894.77 in prejudgment interest. In addition, Defendants' motion to supplement the Phase II record [272] is granted, Defendants' motion to amend their answer [274] is granted, and Plaintiff's motion to strike [288] is denied. With these matters decided, final judgment will be entered in favor of Plaintiff. The parties have until October 7, 2016 to file any Rule 59 motions, responses are due November 4, 2016, and replies are due November 18, 2016.

Dated: September 9, 2016

_____
Robert M. Dow, Jr.
United States District Judge