# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                          |     |                            |
| ------------------------ | --- | -------------------------- |
| ROBERT SMITH,            | )   |                            |
|                          | )   |                            |
| Plaintiff,               | )   |                            |
|                          | )   | Case No. 11-cv-9147        |
| v.                       | )   |                            |
|                          | )   | Judge Robert M. Dow, Jr.   |
| ROSEBUD FARMSTAND, *et al.*, | ) |                          |
|                          | )   |                            |
| Defendants.              | )   |                            |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' motions to amend the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(b) [315] and for a new trial or reduction of damages through remittitur [316]. For the reasons set forth below, the Court denies Defendants' motion to amend [315] and grants in part and denies in part Defendants' motion for a new trial or remittitur [316].[1]

For Plaintiff's sexual harassment claim under Title VII of the Civil Rights Act (Claim 1), the Court reduces Plaintiff's compensatory damages to $50,000 and vacates any punitive damages award pursuant to 42 U.S.C. § 1981a(b)(3). For Plaintiff's racial harassment claim under 42 U.S.C. § 1981 (Claim 2), the Court remits Plaintiff's compensatory damages to $80,000 and his punitive damages award to $160,000. For Plaintiff's retaliation claim (Claim 3), the Court remits Plaintiff's compensatory damages to $60,000 and his punitive damages award to $120,000. For Plaintiff's Illinois Gender Violence Act claim (Claim 4), the Court remits the jury's damages award against Defendant Roque Mendoza to $1,000 in compensatory damages and $2,000 in punitive damages and the award against Defendant Carlos Castaneda to $1,500 in

---

[1] In accordance with Federal Rule of Appellate Procedure 4(a)(4)(A)(iv)–(vi), the 30-day time period for any party to file an appeal runs from the date of this order.

compensatory damages and $3,000 in punitive damages. Plaintiff must file on the docket a statement indicating whether he accepts or rejects remittitur. If Plaintiff accepts remittitur, the parties' joint submission on attorney's fees under Local Rule 54.3 will be due seven days after Plaintiff has so advised the Court and opposing counsel. If Plaintiff does not accept remittitur within 14 days of this order, the Court will grant Defendants' motion for a new trial on damages only and will defer consideration on attorney's fees until after the new trial.

## I.      Background[2]

Defendant Rosebud Farmstand operates a grocery store on the south side of Chicago. Plaintiff Robert Smith worked as a butcher in Rosebud's meat department from 2003 through 2008. Plaintiff is African American, and many of Rosebud's other employees are Latino. Most of the workers in the grocery store are paid minimum wage. In 2011, Plaintiff sued Rosebud Farmstand, alleging that Rosebud employees sexually harassed and racially discriminated against him during his employment. He also alleged that Rosebud retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), and their retaliatory conduct forced him to quit his job. Plaintiff further alleged that two of Rosebud's employees, General Manager Carlos Castaneda and Assistant Manager Roque Mendoza, committed acts of gender violence against him.

Plaintiff filed a six-count complaint, asserting claims for sexual harassment, racial harassment, retaliation, and constructive discharge pursuant to Title VII of the Civil Rights Act of 1964, a violation of the Illinois Gender Violence Act ("IGVA"), and racial harassment and retaliation in violation of 42 U.S.C. §1981. [1.] In November 2012, the Court granted Defendants' motion to dismiss Plaintiff's Title VII racial harassment and constructive discharge

---

[2] In this opinion, the Court has recited the relevant facts consistent with the standards that apply to Federal Rule of Civil Procedure 52 and 59 motions, as set out in greater detail below.

claims, but otherwise denied the motion. [30.] In December 2014, the Court granted summary judgment in favor of Defendants Castaneda and Mendoza for Plaintiff's Section 1981 claims. [165] In November 2015, the Court granted Defendant Rosebud's motion for summary judgment on Plaintiff's IGVA claim. [224.] After running this gauntlet, Plaintiff's Title VII sexual harassment claim, Section 1981 racial harassment claim, Title VII retaliation claim, and Section 1981 retaliation claims survived to be pursued against Rosebud and his IGVA claim survived to be pursued against Castaneda and Mendoza.

Because Plaintiff sought compensatory and punitive damages and equitable relief through his claims, the Court bifurcated the trial such that Phase I would be a jury trial covering liability on all claims and Phase II would be a bench trial covering equitable relief. In December 2015, the parties proceeded to trial. After seven days, the jury returned a verdict for Plaintiff on all counts and awarded $2,407,500 in damages. [246.] The jury's verdict broke down as follows:

| | Compensatory | Punitive |
|---|---|---|
| **Sexual Harassment (Title VII)** | $250,000.00 | $500,000.00 |
| **Racial Harassment (Section 1981)** | $250,000.00 | $500,000.00 |
| **Retaliation (Title VII & Section 1981)** | $250,000.00 | $500,000.00 |
| **IGVA – Castaneda** | $50,000.00 | $100,000.00 |
| **IGVA – Mendoza** | $2,500.00 | $7,500.00 |
| **Subtotals** | **$802,500.00** | **$1,605,000.00** |
| **Grand Total** | **$2,407,500.00** | |

Following the jury trial, the Court held a two-day bench trial on Plaintiff's requests for equitable relief. In September 2016, the Court denied Plaintiff's motions for judgment as a matter of law [237, 238, 242, 243], awarded Plaintiff $69,761.80 in back pay and $19,894.77 in

prejudgment interest, and denied the remainder of Plaintiff's requests. [See 293; 297; 310; 311.] Defendants have moved to amend the Court's Phase II findings of fact and conclusions of law [315], and requested a new Phase I trial or remittitur of the jury's damages awards [316].

## II. Legal Standard

Federal Rule of Civil Procedure ("Rule") 52(b) permits a court to "amend its findings— or make additional findings—and * * * amend the judgment accordingly" upon a motion by a party. A Rule 52(b) motion is "intended to correct manifest errors of law or fact or to present newly-discovered evidence." *U.S. ex rel. Russo v. Attorney Gen. of Ill.*, 780 F.2d 712, 716 n.4 (7th Cir. 1986). The moving party "must raise questions of substance by seeking reconsideration of material findings of fact or conclusions of law to prevent manifest injustice or reflect newly discovered evidence." 9 Charles A. Wright & Arthur R. Miller, *Fed. Prac. and Proc.* § 2582 (2017). The "primary purpose" for such a motion is to "enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and the judgment entered thereon." *Id.* It is not to relitigate arguments lost, advance new theories, or present new evidence that could have been presented before. *Id.* "Trial courts do not grant motions to amend when the amendment would be futile." *Id.*

A motion for a new trial is governed by Rule 59(a), which directs that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). When considering whether the jury's verdict goes against the manifest weight of the evidence, the Court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011) (citations omitted). But "[a] verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict."

4

*Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). "Jury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Id.* (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)).

### III.    Rule 52 Motion

Before turning to the substance of Defendants' motion to amend the Court's findings of fact and conclusions of law [315], the Court addresses Plaintiff's two threshold arguments that the Court should disregard Defendants' motion.

First, Plaintiff argues that Defendants violated the Court's "order" limiting "posttrial motions" to 25 pages and Defendants' briefs should be stricken. [322, at 1–2.] The Court entered no such order. The Court did grant Defendants' motion for leave to file a longer memorandum "in support of [their] motion for new trial and remittitur pursuant to Fed. R. Civ. P. 59" [303, at 1 (capitalization altered)]. [See 305.] That request did not speak to any motion other than a Rule 59 motion, and nothing in the Court's order purported to cap the total number of pages for all posttrial motions or preclude a separate Rule 52 submission. Defendants' Rule 52(b) motion is eight pages and did not require prior leave of the Court. See N.D. Ill. L.R. 7.1. Plaintiff's "motion to strike" [322, at 1] is denied.

Second, Plaintiff argues that Defendants' motion is untimely because it was filed more than 28 days from September 9, 2016. [322, at 2.] Plaintiff skips over the fact that the Court "vacated" its September 9 order and entered a "new final judgment order" to "incorporate[] both the matters tried to the Court and the matters tried to the jury [the prior] December (which were inadvertently omitted from the [September 9] final judgment order)." [297.] That order set the deadline to file any Rule 59 motions at October 14, 2016—28 days from the judgment. *Id.* Plaintiff essentially argues that the Court reset the deadline for Rule 59 motions, but not Rule 52

5

motions. Both rules have the same "hard" deadlines. *Coldwate v. Alcatel-Lucent USA, Inc.*, 587 F. App'x 315, 317 (7th Cir. 2014). Neither can be moved. It would make little sense for the 28-day clock to run against the vacated September 9 order for Rule 52(b) motions, but not for Rule 59 motions, and Plaintiff does not offer any basis in the Federal Rules that could support such a result. Defendants' Rule 52(b) motion—like their Rule 59 motion—is timely.

### A. Defendants' Claimed Legal Errors

Defendants argue that the Court's Phase II opinion contained two "errors of law that should be corrected for the appellate court." [315, at 2.] Both legal "errors" relate to the Court's back pay decision. The Court held that Plaintiff had satisfied his initial burden to establish a back pay amount [311, at 22–26], but that Defendants had failed to meet their burden to show that for all relevant time periods (1) Plaintiff failed to exercise reasonable diligence to mitigate his damages; and (2) there was a reasonable likelihood that Plaintiff would have been able to find comparable work by exercising reasonable diligence. *Id.* at 26–41. The Court distinguished between Plaintiff's unemployment in Arizona from 2008 through 2011 and his unemployment in Chicago from August 2012 to September 2013, and found that Defendants had only shown that Plaintiff had not exercised reasonable diligence in the latter period. *Id.* at 35. However, the Court found that Defendants did not show that comparable work was available to Plaintiff during this period, in part because Defendants relied on an expert witness whom the Court excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Defendants first acknowledge that "the Court articulated the correct legal standards" regarding its back pay analysis. [315, at 2.] Nevertheless, Defendants argue that the Court erred in its conclusion that Plaintiff met his initial burden of proof. *Id.* at 2–3. Defendants assert that Plaintiff "offered no evidence in his case in chief * * * of his claimed damages beyond his own

testimony," but the Court "unilaterality attempted to satisfy [his] burden for him." *Id.* Defendants argue that the Court should include the "legal conclusions" that Plaintiff failed to satisfy his burden, "the Court incorrectly attempted to carry his burden for him," Plaintiff presented "false and incredible testimony" instead of "competent evidence of his damages," and "no bay pay award can be justified based on the record before the Court." *Id.*

This argument lacks merit. Defendants do not pinpoint any specific "error of law" in the Court's legal analysis. They do not claim that the Court considered legally improper evidence. And they do not ever say how exactly the Court improperly applied the correct law to the facts of this case. They simply argue that Plaintiff failed to satisfy his initial burden. But that argument completely overlooks the evidence in the record and how it got there.

Notably, *Defendants* submitted Plaintiff's weekly time sheets into evidence before the Phase II hearing. [262-1, at 1–15.] At the Phase II hearing, Plaintiff testified about his typical regular and overtime hours. [See Tr. Apr. 4, 2016, at 61–65.] In the middle of that testimony, Defendants' counsel raised the issue of admitting Plaintiff's time sheets and even tried to read those documents into the record during Plaintiff's direct examination. *Id.* at 64. As the Court explained, there was no reason to take specific testimony from Plaintiff on whether he remembered his hours from over a decade ago when his actual hours records were available. *Id.* at 64–65. The Court stated that if there was no reason to dispute the accuracy of these records (and Defendants do not seriously contend that their own time sheets are inaccurate), then these records would be part of the Phase II record. *Id.* Moreover, *Defendants* filed a motion to supplement the Phase II record with "copies of Rosebud Farm, Inc. business records from 2004– 2008 reflecting pay information for Plaintiff including Plaintiff's W-2s and employee payroll journal statements that break out regular pay and overtime pay where applicable." [272, ¶ 2.]

The Court relied on Defendants' business records in conjunction with relevant testimony, Plaintiff's own backpay calculations [see 278, at 37–38; 280-25], and other readily available information (such as the increases to Illinois' minimum wage) in deciding whether Plaintiff had satisfied his initial burden. [311, at 22–26.] Defendants could have chosen not to submit any evidence and simply argued that Plaintiff had failed to meet his burden. They did not. Instead, they bolstered the record by submitting documentary proof of Plaintiff's historical earnings. Defendants cannot now complain that the Court should have disregarded the evidence that *they* added to the record when evaluating if Plaintiff's burden was met based on the record.

Defendants' second "manifest error of law" was the conclusion that they had failed to satisfy their burden to show that "there was a reasonable chance [Plaintiff] might have found comparable employment." [315, at 3.] Defendants again emphasize Plaintiff's lack of credibility and that "he lied on every [job] application he completed." *Id.* at 4. More to the point, Defendants argue that Plaintiff "had been a consistent employee at Rosebud Farmstand for five years," which "supports an inference he had a reasonable chance of being employable for another entry-level minimum wage job." *Id.* Defendants also rely on "common sense," claiming Plaintiff testified that he applied for thousands of jobs and he would have had a reasonable chance of "obtaining jobs" had he not omitted his criminal history from his job applications. Thus, Plaintiff's "own testimony about availability and his own testimony about lying support the legal conclusion [that Plaintiff] had a reasonable chance of finding comparable employment if he was truthful based on the facts *here* as applied to the law." *Id.* (emphasis by Defendants).

As with Defendants' first argument, it is difficult to see how Defendants have identified an "error of law"—let alone a manifest error. Defendants were required to identify "comparable employment," which is defined as a position that affords the prevailing party "virtually identical

promotional opportunities, compensation, job responsibilities, working conditions and status as the position from which she was discharged." *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994). Defendants still do not point to specific record evidence establishing a "reasonable likelihood" that Plaintiff would have found a "comparable job" with reasonable diligence. *Id.* Defendants' claim that Plaintiff had a reasonable chance of finding another "minimum wage job"—maybe comparable, maybe not—based on the fact he worked for Rosebud for five years is speculative and underdeveloped. Defendants certainly do not cite any case law suggesting that the Court was *required* to credit this vague assertion as a matter of law. The same is true of Defendants' unsubstantiated claim that Plaintiff could have obtained a job had he disclosed his prior criminal convictions on his job applications. Even assuming that Plaintiff never disclosed his criminal convictions on any job application, it is hard to see why full disclosure would have made it more likely (as a mere matter of probabilities) that he would have found a comparable job. And again, if this was a *legal* error, Defendants do not identify any law that requires a different result.

Finally, Defendants' claim that the "Court's failure to factor [Plaintiff's] lack of truthfulness into its analysis of Defendants' ability to fully develop its proof to support its failure to mitigate defense was, respectfully, an error of law" is wrong on multiple fronts. [325, at 4.] Credibility determinations are not errors of law. Defendants do not explain how they were inhibited from "fully" developing their proof or why Plaintiff's lack of credibility precluded them from showing whether comparable jobs were available in the market or there was a reasonable likelihood that Plaintiff could have secured one of those jobs. Nor do they cite any law suggesting that a court *must* "factor" such credibility issues into a holding that a defendant did not meet its affirmative defense burden. Regardless, the Court *extensively* discussed

Plaintiff's credibility issues in the context of Defendants' failure to mitigate defense, noting the many inconsistencies in Plaintiff's description of his job seeking efforts. [See 311, at 29–34.] To say that the Court failed to consider Plaintiff's credibility in its analysis is to ignore the opinion that the Court wrote. *Id.* at 32 ("The Court concludes that Defendants, having successfully attacked Plaintiff's credibility, have met their burden in showing that Plaintiff was not reasonably diligent in seeking employment during the 13-month period spanning August 2012 to September 2013."). Neither alleged "error of law" requires correction.

### B. Defendants' Claimed Factual Errors

Defendants identify seven alleged factual errors in the Court's opinion—errors which must be "manifest" and pertain to "questions of substance" to warrant relief under Rule 52(b). Defendants' errors fall *far* short of that standard. Most concern additional facts that Defendants wish the Court would add to its opinion, not factual errors on substantive issues that would meaningfully change the Court's analysis. All can be described as quibbling on the margins.[3] Nevertheless, the Court will address each factual "error" that Defendants protest.

First, Defendants argue that the Court erroneously "omitted * * * from its summary" of Plaintiff's post-Rosebud job seeking regimen that Plaintiff testified that "in addition to five hours each day he spent on line and then walking the streets for three hours in a four-mile radius in Mesa," he also testified that he "spent another five hours after that three days a week going to employment agencies in Mesa." [315, at 5.] As Defendants acknowledge, the Court provided a "summary" of the testimony. Defendants fail to explain why omitting this one fact from a summary was either a manifest error or bears on a question of substance in the Court's opinion.

---

[3] To the extent Defendants contend that these "corrections" are needed so that the Seventh Circuit will have a "complete record" of this case [315, at 6], their Rule 52(b) motion was unnecessary. Defendants' prior motions and hearing transcripts are part of the record. References to specific sentences from these motions do not need to be pasted into the Court's opinion to be part of the "record" for appeal.

The Court concluded that Plaintiff's job search efforts in Arizona "fell somewhere between the hyperbolized story that Plaintiff presented" and a "trickle" of job applications. [311, at 33.] Leaving one more gratuitous example of Plaintiff's hyperbole out of the opinion was not error.

Second, Defendants note that Plaintiff did not provide "evidence relating to the funds he received * * * from the Illinois Department of Employment Security ['IDES']," as the Court requested. [315, at 5.] Defendants argue that "[t]he Court appears to overlook the significance of this factual issue its [order], which bears directly" on the back pay award. *Id.* The Court considered and declined to deduct Plaintiff's unemployment benefits from his back pay award. [311, at 44.] Defendants fail to explain how this collateral "factual issue"—presumably, Plaintiff's failure to produce to Defendants evidence regarding the funds that he received from IDES [297, at 22]—had any impact on the Court's factual findings. Plaintiff's failure to produce evidence of a benefit that the Court concluded it would not deduct from the back pay award did not impact the award's size either way.

Third, although the Court "acknowledge[d] the limited number of written [job] applications" that were produced in response to subpoenas, "[t]he Court ignores, however, the impact of how [Plaintiff] completed those applications and the mistakes he made and the lies he told on his potential entitlement to back pay for those periods" and this should be "incorporated into the back pay discussion." [315, at 5.] It is not clear what factual error Defendants believe needs to be corrected in the Court's opinion based on this testimony. The Court discussed "the various false statements that Plaintiff made on his job applications" in its original opinion and how they "chip away at Plaintiff's credibility" and "strengthen Defendants' efforts to show that Plaintiff failed to mitigate his damages." [311, at 31.] The Court did not "ignore" this evidence

or omit this evidence from its back pay discussion, and Defendants' failure to articulate how this evidence should be "incorporated" proves that very point.

Fourth, Defendants argue that the Court "misstates the facts" about how Plaintiff traveled to work at one of his jobs and is inconsistent with other testimony that he used his girlfriend's car, rather than his aunt's car, to get to work. [315, at 6.] Defendants claim that Plaintiff did not offer records to show that the car he used broke down or that this is why he quit his job, and this "lack of credibility should be acknowledged" in the record. *Id.* Absent from this argument is any explanation as to how Defendants think that this issue is a "matter of substance" or "manifest" error that must be corrected. Even so, the Court stated that "Plaintiff testified that he was using his aunt's car to drive from Gilbert, AZ to Tempe, AZ for his job at Washington Inventory Service." [311, at 42.] That sentence mirrors Plaintiff's testimony. [See Tr. Apr. 4, 2016, at 102–03.] That Defendants believe this testimony was also inconsistent with other evidence does not mean the Court misstated Plaintiff's testimony in its opinion.

Fifth, Defendants argue that the Court should include in its opinion that Plaintiff "testified he lied on every application he completed about his criminal background which amounted to 5000 applications according to his testimony." [315, at 6.] Both facts are already in the Court's opinion. [See 311, at 31 (stating, "This evidence *does not* substantiate Plaintiff's claim that he spent eight hours per day applying for jobs throughout his four years of unemployment, which would have yielded hundreds if not thousands of applications" and noting that Plaintiff had not included his criminal history on some job applications.).] Defendants fail to persuade the Court that any more detail is needed to avoid a "manifest error."

Sixth, Defendants argue that Plaintiff "offered no evidence" beyond his own testimony "that he quit his job at Labor Ready because he enrolled in college" and that "the Court

committed an error of fact in giving [Plaintiff] mitigation credit during this period" in light of the "absence of any school records." [315, at 6.] Yet Defendants proposed findings of fact on this exact subject notwithstanding Plaintiff's lack of school records. [See 279, ¶ 42 ("Smith testified he was a full-time student from September 2010 to the fall of 2011 taking classes six days a week for six hours a day."); id. ¶ 43 ("Smith testified he stopped looking for work because he decided to go to school and he did not look for jobs while he was in school").] It is hard to see how the Court erred in finding that Plaintiff testified that he was enrolled in college [311, at 42] when Defendants argued that the Court should make this finding *and* reduce Plaintiff's backpay award based on that finding [279, ¶ 151]. Of course, Defendants do not cite any case law—indeed, they cite nothing—suggesting that Plaintiff was required to submit his school records before the Court could evaluate whether Defendants met their burden to show that Plaintiff was not entitled to back pay while he was in school. That is because there is no obligation. Defendants have failed to show that Court committed a "manifest" factual error on this issue.

Seventh, Defendants argue that Plaintiff "changed his story * * * about the timing of his planning to move to Arizona" in the Phase II trial. They argue that "[t]he Court overlooked a significant portion of" Plaintiff's testimony when it stated, citing page 86 of the trial transcript, that Plaintiff's "admission lacks any substantive detail, such as *when* Plaintiff spoke about moving to Arizona." [311, at 45.] Plaintiff's actual testimony on cross-examination was

> Q: Isn't it accurate you talked to your family about moving to Arizona before you left Rosebud Farmstand?
>
> A: Yes.

[Tr. Apr. 4, 2016, at 86.] If there is "substantive detail" in this exchange about when Plaintiff had this conversation, the Court does not see it. The time period of "before you left Rosebud" does not refer to a time, date, or even a year. Such an open-ended and undefined time period

13

does not qualify as "substantive detail." Defendants' counsel could have asked additional questions to clarify this time period, but they did not. Moreover, Defendants do not explain how adding the phrase "before you left Rosebud" to the opinion would have actually changed the Court's analysis when the Court already acknowledged that "Defendants' theory raises a yellow flag as to the timing of events leading up to Plaintiff's move." [311, at 45.] The Court's description of this testimony was not a factual error warranting relief under Rule 52(b).

Accordingly, Defendants' motion to amend the Court's findings of fact and conclusions of law pursuant to Rule 52(b) [315] is denied.

## IV.    Rule 59 Motion

Defendants advance seven arguments in favor of a new trial or remittitur: (1) Plaintiff's "false testimony" in the Phase II equitable hearing "mandates" overturning the jury's verdict in Phase I; (2) Plaintiff's closing argument was improper; (3) Plaintiff violated several motion *in limine* rulings; (4) Title VII's damages caps require reducing the jury's verdict; (5) the compensatory damages for Plaintiff's federal claims were "grossly excessive"; (6) the punitive damages for Plaintiff's federal claims were unconstitutionally excessive; and (7) the damages for Plaintiff's Illinois Gender Violence Act claim were not supported by the testimony. [316.] The Court takes each argument in turn.

### A.    Whether Plaintiff's Phase II Testimony Requires A New Phase I Trial

Defendants correctly note that when this Court was the factfinder in the Phase II equitable hearing, the Court made several adverse findings about Plaintiff's credibility based on his Phase II testimony. [See 311, at 30–33, 45.] According to Defendants, Plaintiff's "rampant lying and providing false testimony in Phase II, when the jury no longer was present, supports the undeniable conclusion that [Plaintiff's] testimony before the jury during Phase I similarly suffered from the same infirmities." [316, at 8.] Defendants' argument has two features: (1)

14

Plaintiff's subsequent testimony and the Court's credibility findings about that testimony are sufficient to set aside the jury's verdict; and (2) the Court's "pre-trial evidentiary rulings had a prejudicial impact on Defendants' ability to expose [Plaintiff's] significant credibility problems." *Id.* at 9–10. Neither argument can succeed.

Defendants' first contention conflates multiple issues. To start, a district court "cannot grant a new trial just because it believes the jury got it wrong." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). The relevant issue for a Rule 59 motion is not whether Plaintiff's testimony—standing alone and regardless of all other evidence in the case—was credible; it is whether the jury's verdict is against the "manifest weight of the evidence." *Venson*, 749 F.3d at 656. "In conducting its own assessment of the evidence presented, the district court cannot remove a piece of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight." *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). "[T]he district court is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if 'reasonable persons could not believe' it because it 'contradicts indisputable physical facts or laws.'" *Id.* Defendants do not attempt to show that the inconsistencies in Plaintiff's Phase I and II testimony satisfy this standard.

Furthermore, Phases I and II involved different factfinders who decided different questions based on different witnesses' testimonies. In Phase I, it was "the jury's job—not the district court's job * * *—to figure out who's telling the truth." *Lowe v. Consol. Freightways of Delaware, Inc.*, 177 F.3d 640, 643 (7th Cir. 1999). Defendants cite no authority by which a judge can substitute his or her credibility assessments from one stage of a bifurcated trial for the jury's assessments at another stage. In the typical case, the judge "does not act as a 13th juror in

approving or disapproving the verdict." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) (citations and internal quotations omitted). That principle is not inapplicable simply because this case involves equitable and legal issues that were required to be bifurcated.

Likewise, the fact that Plaintiff's Phase II testimony had credibility problems does not equate to a finding as a matter of law that every single statement Plaintiff ever made under oath was a lie. The sheer breadth of Defendants' argument shows its unworkability. Plaintiff did not testify in a vacuum. The jury heard from other witnesses who corroborated various aspects of Plaintiff's allegations, including his racial harassment claims. [See, *e.g.*, Tr. Dec. 8, 2015, at 270; 272, 278–79; Tr. Dec. 10, 2015, at 928–929, 938–39.] The jury also heard from Defendants' witnesses, who had *significant* credibility issues of their own. [See, *e.g.*, Tr. Dec. 12, 2015, at 1119.] In the context of this case, the claim that the jury should have concluded that Plaintiff was lying makes little headway where the jury reached the same conclusions about Defendants. In short, the jury in this case weighed conflicting testimony and the many, many inconsistencies in the record and decided to credit Plaintiff's allegations over Defendants' denials.[4] "That was the jury's prerogative," and it was not against the manifest weight of the evidence. *Lowe*, 177 F.3d at 642–43. The Court will not override the jury's conclusion based on this Court's separate responsibility for determining credibility in a different stage of the case.

To be clear, Defendants are correct that "[i]f a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial." *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). To satisfy this standard,

---

[4] Defendants assert that "it is inconceivable that any rational jury could believe what Smith testified happed at work for a period of five years could have happened in a public workplace and that he endured this outlandish, alleged conduct for so long and did not quit much earlier." [316, at 10–11.] That is undoubtedly a question that *many* victims of sexual harassment and workplace abuse have faced. A rational jury could have found that Plaintiff did not find the prospect of leaving his minimum wage job and risking extended unemployment so easy despite the unrelenting racial and sexual harassment that he faced. To say this conclusion is irrational is to deeply misunderstand these complicated dynamics.

however, Defendants "must show that they maintained a meritorious claim at trial and that because of [Plaintiff]'s fraud or misrepresentation—in this case, the presentation of false testimony—they were prevented from fully and fairly presenting that claim." *Othman v. City of Chi.*, 2016 WL 612809, at *2 (N.D. Ill. Feb. 16, 2016) (collecting cases). Defendants do not come close to doing so.

First, Defendants never establish that Plaintiff's testimony was *false*. Rather they claim that the Court has "good reason to believe that [his] Phase I testimony was equally implausible" as his Phase II testimony. [316, at 10.] For example, Defendants argue that Plaintiff's "trial testimony about being subject to daily" racial and sexual harassment over a five-year time period "is strikingly similar in style to his incredible description of his job search efforts." *Id.* at 9. That kind of loose comparison does not prove falsity. Moreover, Defendants note that Plaintiff gave "false testimony" in Phase II "about where he lived, the cars he drove, how he looked for jobs and his lies about his criminal history [on his job application]." Again, none of that testimony on collateral issues establishes that Plaintiff testified falsely that he was subject to racial and sexual abuse by Defendants. Indeed, Defendants mostly highlight examples where Plaintiff's Phase II testimony was inconsistent. "But in order to warrant a new trial, inconsistencies are not enough; the evidence presented at trial must be *false*, and [Defendants] must prove the falsity—a form of fraud under Rule 60(b)(3)—by clear and convincing evidence." *Othman*, 2016 WL 612809, at *3; *White v. Anthology, Inc.*, 2009 WL 4215096, at *2 (N.D. Ill. Nov. 16, 2009) (explaining that the standards under Rule 60(b)(3) and Rule 59 are the same). "Merely pointing out an inconsistency in testimony—absent any proof that the trial testimony was actually false—is insufficient to warrant the 'extraordinary remedy' of a new trial." *Othman*, 2016 WL 612809, at *3. And a claim that the Court should infer Plaintiff was

17

not credible about all subjects based on his subsequent testimony about different subjects is not the same as demonstrating by clear and convincing evidence that Plaintiff gave "false testimony" under oath before the jury.

Second, Defendants do not explain how Plaintiff's inconsistent Phase II testimony precluded them from fully and fairly presenting their case before the jury. Plaintiff's "false testimony" from Phase II was generated *after* the Phase I jury trial, which means this future impeachment material did not exist at the time of jury trial. Defendants do not articulate how they were prevented at the time at the time of the Phase I trial from fairly presenting their Phase I case because, for example, Plaintiff had not yet testified inconsistently about whether he used his Aunt's or girlfriend's car to commute to work in Arizona. Defendants' presentation of their case before the jury could not have been impeded by their inability to introduce testimony from the future about largely collateral impeachment subjects. Defendants cite nothing to the contrary.[5]

In fact, Defendants do not claim that Plaintiff's future false testimony inhibited their case at all (which is sufficient to fall short of satisfying *Antevski*). Instead, they argue that it was the Court's motion *in limine* rulings that did so, which they say had a "prejudicial impact" on their "ability to expose" Plaintiff's credibility issues. [316, at 9.] Of course, *every* evidentiary ruling that did not go Defendants' way may have caused some vague amount of "prejudice" in the sense that it limited their ability to admit certain evidence or make certain arguments. *U.S. ex rel. Williams v. Lane*, 644 F. Supp. 1449, 1456 (N.D. Ill. 1986) ("Of course *every* adverse

---

[5] Many of these inconsistencies are strained. Plaintiff testified in Phase II that "talked to [his] family about moving to Arizona before [he] left Rosebud," which occurred in June 2008 [Tr. Apr. 4, 2016, at 86], but he testified in Phase I that he "first found out that [he was] going to be moving to Arizona * * * like around the first week of July [2008]" [Tr. Dec. 14, 2015, at 1376]. It is possible that Plaintiff discussed moving to Arizona in June before his move was confirmed in July. Again, Defendants failed to ask about when the Phase I conversation occurred. Even assuming these answers are inconsistent, Defendants fail to persuade the Court that they did not received a fair trial because they could not elicit this weak impeachment on an issue irrelevant to Plaintiff's sexual and racial harassment claims.

evidentiary ruling leaves a party with one less fact to put before (and argue to) the jury."). That does not mean that the ruling was wrong or led to an unfair trial. See, *e.g.*, *U.S. ex rel. Howse v. Carter*, 1998 WL 422294, at *4 (N.D. Ill. July 22, 1998) ("A criminal defendant has a constitutional right to present evidence in his or her defense, but that does not make every exclusion of evidence potentially favorable to the defendant a constitutional violation." (internal citation omitted)).

Indeed, Defendants never explain how they think the Court erred in any of its *in limine* rulings, merely claiming that these decisions "unfairly stifled Defendants' ability to expose before the jury [Plaintiff's] propensity to lie and willingness to lie under oath." [316, at 9.] For example, Plaintiffs complain that the Court "limited Defendants' inquiry into [Plaintiff's] criminal felony conviction to one question" and precluded use of his job applications to show his "propensity to lie." *Id.* Plaintiff has two convictions—one of which was over ten years old and excluded under Federal Rule of Evidence 609(b) and the other was admitted under Federal Rule of Evidence 609(a), but sanitized pursuant to *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624 (7th Cir. 2009). [223, at 10.] The Court allowed Defendants "to elicit testimony that Plaintiff is a convicted felon, the date of the conviction, and the sentence imposed." *Id.* Plaintiff's counsel asked those questions during Plaintiff's direct examination [Tr. Dec. 9, 2015, at 516–17], and then Defendants asked roughly fifteen questions about this same topic on cross [Tr. Dec. 10, 2015, at 866–868]. The Court *also* allowed Defendants to explore the fact that Plaintiff lied on his job applications, but precluded use of "extrinsic evidence * * * to attack the witness's character for truthfulness" pursuant to Federal Rule of Evidence 608(b). [See Tr. Dec. 7, 2015, at 110–112; 223, at 8 n.1] Defendants asked about ten questions on this subject. [See Tr. Dec. 10, 2015, at 794–95.] Defendants do not explain how Plaintiff's job applications themselves

19

(*i.e.*, extrinsic evidence) were admissible in this context or the Court abused its discretion in sanitizing Plaintiff's conviction. Asserting that the Court "limited" Defendants to "one question" reimagines the trial record. Defendants fail to show that any of the Court's evidentiary rulings were erroneous, "the[se] error[s] ha[d] a substantial and injurious effect or influence on the determination of a jury, and the result [was] inconsistent with substantial justice." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (internal citations omitted). Accordingly, no new jury trial is warranted based on Plaintiff's Phase II testimony.

### B. Plaintiff's Closing Argument

Plaintiff's closing argument did not get off to the best start. In this sexual and racial harassment case, Plaintiff's attorney began his closing as follows:

> [Plaintiff's Counsel]: About two weeks ago, we in our country suffered a tragedy in San Bernardino, California, linked to terrorism. Within the last few weeks in Paris, terrorists –

> [Defendants' Counsel]: Objection, your Honor. This is beyond the scope this trial.

> THE COURT: You have got 45 minutes, so I would cut to the chase, but I don't find anything objectionable at the moment.

> [Plaintiff's Counsel]: Terrorists murdered innocent people laughing and eating their dinner at a restaurant and other places. In the Middle East terrorists have murdered tens of thousands of people creating chaos in countries not having the order of law. A country that does not have laws to protect the common good is a country that breeds anarchy. Merriam Webster's dictionary defines anarchy as "A situation of confusion and wild behavior in which the people in a country, group, organization, et cetera, are not controlled by rules or laws." Anarchy fuels the terrorists need for control. It's all about power. Power to control others. In my research over the years, some social scientists have stated that sexual harassment –-

> [Defendants' Counsel]: Your Honor, he's talking about giving an opinion on social science research which is not in the record.

> [Plaintiff's Counsel]: This is a closing argument. They can disregard it. They can accept it.

> THE COURT: I'm going to overrule the objection. You can use your 45 minutes as you see fit within bounds, and so far you haven't crossed the bounds, so go ahead.
>
> [Plaintiff's Counsel]: Some social scientists have stated that sexual harassment is not about sexual desire; it's about power. The same can be said for racial harassment. Power over the person to abuse the person, to make the other person feel less. Make them their slave. * * *

[Tr. Dec. 14, 2015, at 1377–78.] Plaintiff's attorney then repeated throughout his closing that Rosebud "is a company without rules" and a "company that breeds anarchy in which employees engage in wild behavior, and use that wild behavior over Mr. Smith." *Id.* at 1379.[6]

Defendants argue that Plaintiff's "terrorism analogy" and "terrorism theme" was "clearly injurious," "highly inflammatory," and "clearly intended to poison the jury against Defendants." [316, at 12–13.] Moreover, Defendants contend that they "objected twice to this argument," and suffered "substantial prejudice" when "the Court characterized the theme as nothing objectionable." *Id.* at 12. These arguments—which play fast and loose with the record—do not require a new trial in this case.

Let's start with Defendants' objections. Defendants concede that (at most) they "objected twice to this argument," with both objections occurring in the opening moments of Plaintiff's closing. [316, at 12.] Defendants' failed to object to *any* of the other anarchy references in Plaintiff's closing and cannot now complain of those comments. See, *e.g.*, *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997) ("Because defendants did not object to any other

---

[6] [See also Tr. Dec. 14, 2015, at 1381 ("Because all of us, including the Judge, the lawyers, and you, must follow the law. Because if we don't, we're going to get closer and closer, if not today, then tomorrow, to anarchy."); *id.* at 1388 ("No rules against sexual harassment, so why would they correct it? No policies against racial harassment, so why would they correct it? It's open game. It's anarchy as defined by Merriam Webster. Wild behavior."); *id.* at 1391 ("So the employees feel they have free reign. It's wild behavior. Our definition of anarchy as defined by Merriam Webster. Those are the claims."); *id.* at 1398 ("Remember Merriam Webster says anarchy involves wild behavior. No rules. And that's what we find at Rosebud. Uncontrolled behavior."); *id.* 1401 ("But without a strong foundation we, as a country, will collapse. We'll become like other parts of the world that have no order of law, that have anarchy. They have wild behavior."); accord 316, at 12 (citing these same transcript pages).]

comments, they did not preserve them for appellate review"). The time to object was during or immediately after closings, not in a post-trial motion over a year later. See *Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir. 1985) (holding that the relevant time for objecting to "immoderate" comments during closing argument was "at the time the immoderate comments were made"); *Houskins v. Sheahan*, 549 F.3d 480, 494 (7th Cir. 2008) (holding that plaintiff waived his objection to statements in defense counsel's closing by "fail[ing] to object to the statements at the time they were made").

Of Defendants' two timely objections, one was to "social science research" not in the record. [Tr. Dec. 14, 2015, at 1378.] It had nothing to do with "terrorism" rhetoric. "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) (citation and internal quotation marks omitted). Defendants' other objection—which came halfway through Plaintiff's counsel's second sentence—was to "scope." [Tr. Dec. 14, 2015, at 1377.] They did not object to prejudice, request a curative instruction, or seek a mistrial. "In this circuit, a general objection to 'relevance' is not sufficient to preserve an objection under Rules 404(b) or 403." *United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005) (citation, ellipses, brackets, and internal quotation marks omitted); accord *United States v. Saunders*, 826 F.3d 363, 371 (7th Cir. 2016). Thus, Defendants' "scope" objection, which the Court construed to mean relevance, did not preserve a Federal Rule of Evidence 403 objection.

Assuming that Defendants can overcome their preservation issues,[7] this new trial argument must still fail. The Seventh Circuit has "repeatedly explained that improper comments during closing argument rarely rise to the level of reversible error." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) (citation and internal quotations omitted). "To warrant a new trial,

---

[7] Defendants do not attempt to show that they can satisfy plain error.

statements made during closing argument must be plainly unwarranted and clearly injurious to constitute reversible error." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 730 (7th Cir. 1999) (internal quotation marks and brackets omitted). This is not one of those rare cases.

Notwithstanding Defendants' characterizations, Plaintiff's "theme" was not terrorism. It was lawlessness, anarchy, and wild behavior. Plaintiff's counsel repeated *those* statements. Statements about "terrorism" did not reappear in his closing after this introduction, and describing Plaintiff as perpetuating a "poisonous terrorist theme" [316, at 12] is simply inaccurate. In the context of a case about ongoing sexual and racial harassment and testimony that Defendants had consistently failed to train their workers on these issues, references to anarchy and wild behavior do not exceed the bounds of reasonable rhetorical devices.

That said, Plaintiff's opening references to terrorist incidents in San Bernardino, Paris, and the Middle East are unquestionably over-the-top. International terrorism and violent extremism have "no conceivable connection to Defendants" to "a group of guys working at a small neighborhood grocery store." [316, at 13.] And that mismatch was strikingly obvious to the jury members, many of whom grimaced when Plaintiff's attorney started his closing this way. See *Ruizdelatorre v. City of Miami Beach*, 2008 WL 5381431, at *18–20 (S.D. Fla. Dec. 22, 2008) (declining to grant new trial in a Section 1983 case for false arrest where plaintiff's attorney referenced misconduct at Abu Ghraib during his closing). The Court's comment that Plaintiff's attorney should "cut to the chase"—a comment that came approximately 15 seconds into the start of his closing—confirmed this subject's inapplicability for the jury.[8] Defendants may not have objected further because they though these references risked backfiring and

---

[8] In response to Defendants' "scope" objection and having heard a sentence and a half of Plaintiff's closing, the Court also said that it did not "find anything objectionable *at the moment*." [Tr. Dec. 14, 2015, at 1377 (emphasis added).] To extrapolate from that exchange that the Court blessed the rest of Plaintiff's closing [316, at 12] misconstrues the record.

alienating the jury.  Or Defendants could have withheld their objections because they thought that any reasonable jury would have seen through any purported analogy between terrorism and sexual harassment in the workplace.  In light of the glaring disconnect between this case about sexual misconduct at a small butcher shop on the South Side of Chicago and references to "Middle East terrorists" murdering thousands of people, Plaintiff fails to persuade the Court that these non-sequiturs overwhelmed the juror's passions and inhibited their ability to rationally weigh the rest of the evidence they heard over the other seven days of the trial.  These comments were not clearly injurious.

Certainly, there are cases where such statements would warrant a new trial.  In *United States v. Tomkins*, the defendant was accused of sending "a series of threatening letters to investment firms and their employees and then mailed packages to two investment managers containing what appeared to be pipe bombs."  *United States v. Tomkins*, 782 F.3d 338, 341 (7th Cir. 2015).  Given the clear risk that jury could associate his behavior with terrorism, this Court granted the defendant's motion to exclude the words "terrorist" and "terrorism."  *United States v. Tomkins*, 2012 WL 1357701, at *2 (N.D. Ill. Apr. 19, 2012).  Such statements would be equally inappropriate in non-terrorism cases with arguable connections to mass casualties or religious or politically motivated acts of violence.  The same might be said in cases with witnesses who practice Islam or are of Middle Eastern national origin.  The instant case, however, involved Latino workers and employment discrimination.  Defendants make no argument that either has any plausible present-day connection to terrorism that could trigger a jury's passions.[9]  While inappropriate, this rhetoric does not merit a new trial based on the facts of this particular case.

---

[9] Along these lines, the Court granted Defendants' motion to exclude evidence relating to any witness's immigration status.  [223, at 12.]

## C.   Plaintiff's Alleged Violations Of Motion *In Limine* Rulings

Defendants argue that Plaintiff violated this Court's motion *in limine* rulings about wealth comparisons, drug use at work, evidence about security cameras, and complaints of other employees.   Defendants also argue that the Court erroneously admitted co-worker Gary Holloway's deposition testimony in lieu of his live testimony.   Defendants face preservation obstacles for most of these arguments, and their preserved objections do not warrant a new trial.

### 1.   Wealth Comparisons

The Court granted Defendants' motion to "bar Plaintiff from comparing Defendants' perceived wealth to Plaintiff's poverty."   [223, at 20–21.]   During Plaintiff's closing, his attorney argued

> Let's take a look at Rosebud.   All you have to find is that Rosebud acted with reckless disregard of the law.   Reckless disregard.   They had no training. Nothing.   Mr. Smith and others have to repeatedly complain, even though there are laws that say they have to stop this illegal conduct, be it sexual or racial harassment; that's reckless disregard.   It's thumbing up your nose to the laws and saying, "I don't give a damn what the law says.   I'm going to do what I want to do.   I'm Rosebud.   I'm more interested in making $36,000,000 in sales than fool around with those laws."

[Tr. Dec. 14, 2015, at 1397.]   The Court's *in limine* ruling prohibited "comparisons" of the parties' "relative" wealth or poverty.   [223, at 20–21.]   The Court did not preclude references to Rosebud's earnings; Defendants did not move in limine on that subject.   [See 183, at 19–20.] But even if the Court's ruling had encompassed mere wealth references, Defendants did not object to this comment, which means their argument is not preserved.   See *Willis v. Lepine*, 687 F.3d 826, 838 (7th Cir. 2012) ("[T]he plaintiffs also contest three other occasions where defense counsel allegedly violated the court's motion-in-limine ruling.   But the plaintiffs did not object to these three other alleged violations, so the plaintiffs have not preserved this argument for appeal."); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) ("When a defendant

does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal.").

Plaintiff's attorney treads closer to the line later in his closing. In discussing punitive damages, his attorney stated that

> Like I said, you might consider that Rosebud has 36,000,000 in sales. They have a retail and a wholesale business and, of course, they're going to get up here and say we're just a little store with 23 people. They have $1.8 million in salaries and over $4 million in real estate. You might remember that [Rosebud's Secretary] got up and said, 'Well, we haven't had a profit since 2010.' Hmm. A lawsuit was filed in 2011. You know, there's a lot of legal ways to take tax deductions, et cetera, to reduce your taxes and even show a loss. Did Rosebud want to show a loss so they could argue to you that they've been at a loss since this lawsuit was filed?

[Tr. Dec. 14, 2015, at 1399.] Following these statements, Plaintiff's attorney started the conclusion of his closing argument by saying

> Finally, as I began this closing statement, I'm going to end it. It's all about power. And the power has shifted to you. Rosebud knew it had power over Mr. Smith. He needed a job. Even at $6.50 an hour, he had bills to pay. You have the power to make wrong into right. And you may find that the way to do that is to choose the option of moving to the next step and finding in favor of Mr. Smith.

[Tr. Dec. 14, 2015, at 1399–1400.] Once again, Defendants did not object and have not preserved this argument. *Willis*, 687 F.3d at 838. But even if they had, any comparison here is indirect at best. Plaintiff's attorney discussed Defendants' financial information in the context of the amount of a punitive damages award. See, *e.g.*, *El-Bakly v. Autozone, Inc.*, 2008 WL 1774962, at *5 (N.D. Ill. Apr. 16, 2008) (summarizing Illinois and federal law in the Seventh Circuit and concluding that "Defendants' financial information is relevant and can be considered if Plaintiff succeeds in making a showing that he has a colorable claim for punitive damages"). He then shifted topics and returned to his overarching argument about how Defendants believed they could continue to harass Plaintiff with impunity and why Plaintiff waited so long to quit (*i.e.*, his difficult financial circumstances). Closings were not first time that the jury had heard

that Plaintiff earned minimum wage or that this theme had come up. [See, *e.g.*, Tr. Dec. 11, 2015, at 1091.] In other words, the only apparent association between these two distinct concepts is their proximity in Plaintiff's closing argument and their general connection to financial status. Such an oblique connection did not violate the Court's motion *in limine* ruling and does not warrant a new trial.

### 2.    Drug Use

Defendants argue that Plaintiff "violated the Court's order prohibiting questions to or about any party relating to alleged drug use at work." [316, at 14.] That is not what the Court ordered. Defendants moved to preclude Plaintiff from introducing evidence regarding alleged drug use by Defendants' employees. The Court denied that motion "to the extent it seeks to exclude evidence that, in general, Rosebud Farmstand employees sometimes used drugs during work hours," but granted the motion and excluded evidence "that any party to this lawsuit used drugs while at work." [223, at 15.] Thus, the Court allowed questions about whether witnesses observed drug use at work, including "questions to * * * any party" on this subject.

At least one exchange that Defendants complain of was consistent with the Court's order. Plaintiff was asked on direct examination whether he had "ever witness[ed] other Rosebud employees at work -- at Rosebud -- using drugs," Defendants objected, and the Court overruled the objection by directing Defendants' counsel back to its *in limine* ruling. [Tr. Dec. 9, 2015, at 658–59.] Defendants then objected to foundation (*id.* at 659) and Plaintiff's attorney attempted to lay a foundation by asking how Plaintiff knew that these employees were using drugs (*id.* at 660). Defendants do not explain how these questions violated the Court's actual order.

Defendants also challenge another exchange, which occurred during Defendant Mendoza's cross-examination:

27

Q:  Have you ever had any kind of white powder at Rosebud?

A:  No, I do not know what you're referring to.

Q:  Have you ever put some white powder on your finger and then stuck it in your nose and then sniffed?

A:  (Laughing.) No, never.

Q:  Do you know what cocaine is?

A:  I do know what it is.  I do not know it.  I do know it's a drug, but I don't have knowledge of it.

Q:  Have you ever used cocaine at Rosebud?

A:  No, of course not.

Q:  Have you ever seen any of your workers put some white substance on their finger, then stick it in their nose and then sniff?

A:  No.

Q:  Or maybe the right word is snort, have you ever seen them snort it, to get it up into their nasal area as quickly and as strongly as possible?

A:  No.

[Tr. Dec. 14, 2015, at 1236.]  This exchange directly violated the Court's order prohibiting questions about whether a *party* used drugs at work [223, at 15], and Plaintiff offers no justification for doing so.  But two elements are missing from this exchange:  any objection from Defendants and any answer that significantly prejudiced Defendants.  By failing to object to this exchange, their objection is waived.  *Naeem*, 444 F.3d at 610.  In addition, all of Defendant Mendoza's answers were in the negative and dismissive—laughing at Plaintiff's counsel for asking such questions.  Although these questions were improper, the tone and content of Defendant Mendoza's answers likely diffused much of the prejudice from these questions.

As is plain from this issue and the other transcript excerpts that have been included in this opinion, this "trial was far from perfect, but imperfection is not what triggers a new trial.  A new

trial is granted if the verdict is against the manifest weight of the evidence or if a prejudicial error occurred." *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 480–81 (7th Cir. 2000). Following that standard, Defendants fail to show that a new trial is warranted based on these unobjected-to questions and answers denying drug use in the context of what the jury heard over the course of the entire trial.

### 3. Security Cameras

Defendants argue that Plaintiff "crossed the line when he argued to the jury the inferences they should draw based on the presence of security cameras at Rosebud" and violated the Court's motion *in limine* on this subject. [316, at 15–16.] This framing also misstates the Court's order. The relevant section of the Court's *in limine* order is titled "Motion to Bar References to Alleged Spoliation or Destruction of Evidence." [223, at 13.] As the Court explained, Defendants moved "to bar Plaintiff from introducing evidence regarding Plaintiff's prior allegation that Defendants *destroyed* surveillance tapes to hide relevant evidence from Plaintiff." *Id.* (emphasis added). The Court also agreed that "any argument or inference that Defendants *purposefully destroyed* relevant evidence would be highly prejudicial to Defendants." *Id.* (emphasis added). The Court agreed that "the only potential probative value of this evidence would be the inference that incriminating evidence existed before Defendants destroyed it" and the Court would not disturb Magistrate Judge Gilbert's finding that this would be speculative. *Id.*[10] In other words, the Court's ruling prohibited argument about "destruction" of these video tapes and any inferences that could be drawn from that alleged spoliation. It did not preclude inferences "based on the presence of security cameras at Rosebud." [316, at 15.]

---

[10] Magistrate Judge Gilbert's order addressed whether Defendants had duty to preserve the video tapes upon notice of Plaintiff's lawsuit, and concluded that they did not. [128.]

In that context, the comments that Defendants challenge are not improper. Plaintiff testified that one security camera is "facing towards the meat counter towards the customers" and "you can see what [the employees are] doing and you can see the customer." [Tr. Dec. 9, 2015, at 674.] In closing, Plaintiff's attorney argued that Defendants knew of the harassment (because Plaintiff complained), and then turned to the argument that they "should have known." [Tr. Dec. 14, 2015, at 1385–86.] Plaintiff's attorney argued, "Even if you don't find that Rosebud should have known about that, how about the security videotapes. They've got two cameras in the meat department." *Id.* at 1386. Defendants objected that this issue could pertain to the *in limine* ruling and Court allowed Plaintiff's attorney to proceed but construed Defendants' objection as a standing one. *Id.* Plaintiff's attorney continued:

> They have got two security cameras. Carlos Castaneda admitted that he has a monitor in his office, and that the security cameras picked up motion. You might remember I asked him, "If I were walking around and I moved my arm and put it between somebody's legs and touched their private parts, would the camera pick that up?" "Yes." You would think that if they were so surprised, as everybody seems to be practiced to state, when they received Mr. Smith's charge of discrimination, at a minimum they would have checked the security tapes and said, "Wait a minute, this never happened. Look at the tapes. Here Department of Human Rights, here EEOC, look at these tapes. What Mr. Smith is saying is not true, and I've got the tapes to show them." They never did that. I asked Carlos Castaneda and just about everybody else. "Did you look at the tapes? Did you think about asking about it?" "Oh, no, no, no, we didn't. No." Why not? Because you already knew what goes on in the meat department. You knew Mr. Smith had been complaining over and over and over again.

*Id.* at 1387. Plaintiff's attorney never directly asserts that Defendants destroyed the security tapes because they had incriminating evidence on them. He argues that Defendants had no need to check these tapes because they already knew that Plaintiff had been sexually harassed. That is a permissible inference from the presence of cameras and the testimony from Defendants' witness—neither of which directly presented spoliation issues before the jury. Accordingly, these comments did not violate the motion *in limine* order and do not merit a new trial.

### 4. Other Employee's Complaints

Defendants argue that Plaintiff violated the Court's motion *in limine* ruling regarding evidence of harassment involving other Rosebud employees. [316, at 14.] The Court held that it would "not permit mini-trials as to whether Defendants 'harassed' or 'retaliated' against Plaintiff's co-workers" and Plaintiff was "not entitled to argue that 'because Defendants harassed Plaintiff's co-workers, they must have also harassed Plaintiff." [223, at 14.] The Court went on to say "[o]bjections to exclude testimony or argument to this end will be sustained." *Id.*

In what has become a familiar pattern, Plaintiff's attorney violated (or came very close to violating) this *in limine* ruling and Defendants failed to object. In connection with his claim that Rosebud had actual knowledge of the harassment, Plaintiff's attorney argued during closing

> How did Rosebud know? Well, Mr. Smith repeatedly complained. Not only did Mr. Smith repeatedly complain, but Corey Barr complained, and Gary Holloway complained. Because these Rosebud male employees were doing the same thing to them. Humping from behind. When they would bend over, they would put their hands in between the legs and touch the testicles and the penis; so Rosebud knew.

[Tr. Dec. 14, 2014, at 1385–86.] Arguably, Plaintiff was not using this evidence of harassment to prove that he had been harassed, but to show that Defendants had "knowledge" of widespread harassment in the store. See Fed. R. Evid. 404(b). That, however, is a pretty fine distinction and could present propensity inference problems. For that reason, the Court may well have sustained an objection from Defendants had they made one. But they did not. "The point of the waiver rule is to raise objections and provide the trial judge with information before a mistake has occurred. Without this rule, litigants would sit on their hands, wait to see the result of the litigation, and then if the outcome is unfavorable come back and complain about a problem that could have been avoided." *Bankcard*, 203 F.3d at 482 ("[Plaintiff] was silent when it mattered and now says, 'Gee, we finally got around to checking the trial transcripts and it turns out the

jury received some stuff it shouldn't have, so let's have a whole new trial and negate the 2 weeks of time that the judge, clerk, court reporter, bailiffs, jurors, witnesses, attorneys, and parties spent on the first trial."). Defendants cannot secure a new trial now having failed to object to these comments at trial.

### 5.    Holloway's Deposition

At the end of the trial day on December 8, 2015, the Court asked Plaintiff to call his next witness, former co-worker Gary Holloway. [Tr. Dec. 8, 2015, at 442.] Mr. Holloway, who had been in the court house that day, could not be found and the Court adjourned for the day. *Id.* at 443. The next morning, Mr. Holloway still could not be found. [Tr. Dec. 9, 2015, at 446.] Plaintiff's counsel confirmed that "all efforts to find him either physically or electronically have failed." *Id.* at 447. The parties agreed that he had been served with a subpoena, and Plaintiff's counsel could not find him at the time he was supposed to testify. *Id.* at 450. Over Defendants' objections, the Court found that this witness was unavailable under Rule 32(a)(4) and permitted the parties to designate certain portions of the transcript in lieu of live testimony. *Id.* at 448–61. The Court then entered a written order further explaining its reasons for admitting this disposition testimony. [See 240.] The Court concluded that Plaintiff's counsel met his burden to show he exercised reasonable diligence to procure Mr. Holloway's live appearance. *Id.* at 2. The Court also noted that the jury had heard live testimony from three other witnesses (including Plaintiff) about the alleged racial and sexual harassment at Rosebud, and Mr. Holloway was not an "instrumental witness" for either side. *Id.* at 3 (collecting cases).

Defendants contend that this ruling was wrong [316, at 16–17], but do not say *how* other than the Court reached the wrong result. They do not discuss the Court's written ruling, explain

why it was wrong, or cite any additional law suggesting this issue entitles them to a new trial.[11] That is plainly insufficient. "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61. "The court must disregard all errors and defects that do not affect any party's substantial rights." *Id.* "Evidentiary errors satisfy this standard only if there is a significant chance that they affected the outcome of the trial." *Griffin v. Bell*, 694 F.3d 817, 827 (7th Cir. 2012).

Defendants assert that it was important for the jury to see Mr. Holloway's live testimony because he was "another convicted felon." [316, at 17.] Mr. Holloway's felony conviction, however, came out during his admitted deposition testimony. [Tr. Dec. 10, 2015, at 927 ("It was tough for me to find employment given my background as far as being a felon.").] Defendants fail to explain how the outcome of the trial was changed based on the fact that jury did not hear Mr. Holloway testify in person that he was a felon. Defendants also claim that Plaintiff's counsel's "failure to offer any proof, such as his cell phone or records of calls, emails or other evidence such as his own affidavit to substantiate his alleged attempts to locate[] Holloway." [316, at 17.] Of course, Defendants did not argue on the record that Plaintiff's counsel must provide this kind of proof or cite any case that requires this proof. Indeed, at the time, Defendants acknowledged that this issue was firmly within the Court's discretion. [See Tr. Dec. 9, 2015, at 458 ("It's a matter of your discretion, and we acknowledge that.").] As the Court

---

[11] Defendants again cite one case—*Griman v. Makousky*, 76 F.3d 151 (7th Cir. 1996)—that the Court discussed and distinguished in its written order. [240, at 3.] Rehashing this same argument is not persuasive. Moreover, in *Griman*, the Seventh Circuit held that the trial judge had not abused his discretion in declining to admit deposition evidence under Rule 32(a)(4)(E). That result does not dictate that a court necessarily abuses its discretion if it decides to admit such evidence. See *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 308–09 (7th Cir. 2010) (declining to grant a new trial where deposition admitted pursuant to Rule 32); *Rascon v. Hardiman*, 803 F.2d 269, 277 (7th Cir. 1986) (same).

explained in its ruling, Mr. Holloway was a minor witness, Defendants cross-examined him when they took his deposition, and the jury had heard similar testimony from three other witnesses about racial and sexual harassment at Rosebud. Defendants fail to show that admission of this deposition testimony pursuant to Rule 32 was erroneous, affected their substantial trial rights, or influenced the outcome of the trial.

### D. Title VII's Statutory Limitations On Damages

Title VII claims are constrained by statutory damages caps. See 42 U.S.C. § 1981a(b)(3). These caps provide outer limits on "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section." *Id.* The cap amount is determined by calculating the number of an employer's employees in a calendar year. Here, the parties dispute which cap applies and the specific claims to which the cap applies.

"A defendant bears the burden of proof in establishing the number of employees for the purposes of establishing entitlement to a Title VII damages cap." *Geraty v. Vill. of Antioch*, 2014 WL 5801440, at *7 (N.D. Ill. Nov. 7, 2014). Defendant Rosebud submits an affidavit from Norman Brucer, Rosebud's Secretary and custodian of records. [See 316-8; 318.] That affidavit attaches payroll records and affirms that "Rosebud, Farm, Inc. consistently [has] had less than 85 employees at all times." [318, ¶ 3.] In 2016, for example, Rosebud had a total of 45 employees. *Id.* ¶ 10. Accordingly, Defendants argue that the 100-employee cap applies and Rosebud's damages for Title VII claims are capped at $50,000. See 42 U.S.C. § 1981a(b)(3)(A) ("in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000").

Plaintiff responds that "no cap applies as Rosebud failed to meet their burden to prove the number of their employees." [321, at 17.] Plaintiff contends that his attorney sent emails in October 2016 seeking information about whether Defendants used independent contractors, part-time employees, leased employees, and seasonal employees, and Defendants failed to address that issue in their briefs. *Id.* at 17–18. That may be because Defendants' attorney said "there are no leased employees[,] seasonal employees[,] ICs [independent contractors], etc." [321-6, at 2.] In an attempt to further prove this negative, Rosebud submitted a second affidavit from Mr. Brucer making this very point. [324-1, ¶ 3.] This affidavit states that Defendants' collective bargaining agreement precludes leased employees, temporary employees, and independent contractors, and any seasonal employees would already be listed on the payroll records. *Id.* Plaintiff does not offer any factual basis to believe these representations are inaccurate and does not explain why Defendants' showing is insufficient.[12] Defendants have met their burden to show that they employ fewer than 101 employees, and the $50,000 cap applies.

Plaintiff concedes that if Defendants satisfy their burden, the $50,000 cap covers his sexual harassment claim. [321, at 17 ("[O]nly the sexual harassment claim would fall under the Title VII cap").] As a result, neither party disputes that the jury's $250,000 compensatory and $500,000 punitive damages awards for Plaintiff's sexual harassment claim (Claim 1) must be reduced to no greater than $50,000 total. [See 248.] The Court agrees.

The parties' other dispute is whether this statutory cap applies to Plaintiff's retaliation claim (Count 3), for which the jury also awarded $250,000 in compensatory and $500,000 in

---

[12] Plaintiff also contends that his attorney also asked whether "Rosebud [was] part of an integrated or joint enterprise or had subsidiaries." [321, at 17–18.] He does not otherwise elaborate on this objection. Mr. Brucer's affidavit includes the number employees who worked at the retail store (where Plaintiff worked) as well as the larger wholesale operation. [See, *e.g.*, 318, ¶ 4.] Thus, Defendants appear to have met Plaintiff's objection (at least in part) and Plaintiff does not explain where they fell short (if at all). Plaintiff's cursory statement is not an argument against Defendants' submissions that the Court can credit.

punitive damages. [See 248.] In *Smith v. Chicago School Reform Bd. of Trustees,* 165 F.3d 1142 (7th Cir. 1999), the Seventh Circuit considered whether a plaintiff could apply the statutory caps on a per-claim basis—recovering up to the cap maximum for *each* of her three racial discrimination counts. The Seventh Circuit held that she could not because the cap "sets a single-*party* limit rather than a single-*claim* limit." *Id.* at 1150. The Seventh Circuit reasoned that "[t]he unit of accounting is the litigant, not the legal theory," and expressly endorsed the result in *Hudson v. Reno*, 130 F.3d 1193 (6th Cir. 1997). *Id. Hudson* adopted the same conclusion and reasoning in the context of applying one cap to Plaintiff's sex discrimination, retaliation, and constructive discharge claims. *Hudson*, 130 F.3d at 1199–1201. Other courts have done the same. See *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 264 (5th Cir. 2011) (holding that sex discrimination claims and a retaliatory termination claim were both subject to the same Title VII damages cap); *Fogg v. Ashcroft*, 254 F.3d 103, 106–10 (D.C. Cir. 2001) (affirming reduction of race discrimination and retaliation claims to single, per-lawsuit cap); *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1246 (10th Cir. 1999) (affirming order "combining her separate damages awards for sexual harassment and for retaliation into a single [capped] award"); *Rau v. Apple-Rio Mgmt. Co., Inc.,* 85 F. Supp. 2d 1344, 1347 (N.D. Ga. 1999) ("[T]he plain language of § 1981a requires application of the cap to the action as a whole, not to each individual claim" for retaliation and sex discrimination claims), aff'd, 251 F.3d 161 (11th Cir. 2001). Thus, Title VII's damages cap applies to both harassment and retaliation claims.[13]

---

[13] Plaintiff's only citation for any argument to the contrary are to *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir. 1993) "as cited in" *Zamora v. Florida Atlantic University Board of Trustees*, 969 So. 2d 1108 (Fla. Dist. Ct. App. 2007). [321, at 17.] *Zamora* is a Florida appellate court decision interpreting damages caps under Florida's Civil Rights Act, Fla. Stat. Ann. § 768.28(5), which has different language than Section 1981a(b)(3). *Herrmann* is about whether an action for ERISA benefits was res judicata with plaintiff's Title VII suit. It precedes *Smith* by half a decade. Neither holds that retaliation claims are not subject to Title VII's damages caps. Plaintiff simply ignores *Smith* and its adoption of *Hudson* in his response.

Unfortunately, that does not resolve the matter here. Plaintiff asserts that the caps do not apply to the retaliation claim in this case because Plaintiff's retaliation claim was "under § 1981." [321, at 17.] That is wrong. Plaintiff's retaliation claim was under both Title VII and Section 1981 [246, at 25], and recasting his claim as purely under Section 1981 is a non-starter. But that raises another issue. Plaintiff's "retaliation" claim was presented to the jury as one claim: there was one "retaliation" instruction [246, at 30] and one line on the verdict form for liability, compensatory damages, and punitive damages for the "retaliation" claim (*id.* at 38–40). Plaintiff states that Defendants "failed to object that the retaliation jury instruction did not distinguish between Title VII and § 1981." [321, at 24.] That is not quite right either. Defendants proposed two separate instructions on these claims [182-7, at 40, 45]. They also separated the Title VII claim retaliation claim from Plaintiff's Section 1981 claims on the verdict form, but then combined both Section 1981 claims into a single "Racial Harassment" and "Retaliation" claim. *Id.* at 58–59. Defendants also objected to Plaintiff's proposed combined instruction before the jury conference as not providing enough detail. [199, at 3.] They objected again at the instruction conference. [Tr. Dec. 11, 2015, at 1194–1201.]

During the conference, after the parties discussed how crafting two instructions for the retaliation claims might confuse the jury and whether the parties would need to point out the differences between claims during closing, Defendants brought up the issue of the damages cap. The following exchange with the Court occurred next:

> THE COURT: Is the damage cap something that could be addressed in a verdict form? How do you propose to address the damage cap?
>
> [Defendants' Counsel]: Well, the damage cap under Title VII claims is $50,000.
>
> THE COURT: And what happens if the jury gives more than that? Then I just --
>
> [Defendants' Counsel]: Well, legally, they're capped.

THE COURT: So I have to reduce it.

[Defendants' Counsel]: Section 1981 claim there is no cap, statutory cap on damages.

THE COURT: And for retaliation, how would that play out in the retaliation, then?

[Defendants' Other Counsel]: Same thing.

[Defendants' Counsel]: Same thing.

THE COURT: No, I understand. But how would that play out if the jury gives an award for retaliation, how would we know whether it was the 1981 or the Title VII? We'd have to do that in the verdict form, right?

[Defendants' Counsel]: Right.

THE COURT: But in terms of an instruction on the law, I wonder if [Defendants' other counsel] is onto the right idea here, which is you take 90 seconds, if that's important enough to you in your closing and try to explain it to them. If you don't, I think the instruction's going to go right over their heads anyway.

[Defendants' Counsel]: Well, we'll talk about this after and if we have something to get to you, we'll get it to you.

THE COURT: That's fine. * * *.

*Id.* at 1198–99. Yet, Defendants did not object to a unified retaliation claim on the verdict form when the parties were asked if they had any objections to the verdict form. *Id.* at 1206–08. The parties continued to submit and object to jury instructions over the weekend, but none of Defendants' proposals or objections related to the verdict form. [See Tr. Dec. 14, 2015, at 1214–31 (summarizing the issues from the parties' weekend correspondence).] And at no time did Defendants submit a verdict form that had two separate entries for Title VII retaliation and Section 1981 retaliation. Accordingly, although Defendants were sensitive to the risks of a combined claim, they failed to object or submit a verdict form that reflected this problem at the moments when it was critical to do so. At a minimum, that constitutes forfeiture.

The question, therefore, is what results. Neither side provides this Court with any guidance. "Both Title VII and § 1981 support a cause of action for retaliation and require a plaintiff to establish the same prima facie elements to recover." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001); accord *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986). As a result, the Court has looked to cases where (1) two claims resting on substantively similar liability theories were submitted to a jury as a single claim, (2) only one of the claims had a damages cap, and (3) the jury awarded damages in excess of the cap. This fact pattern arises most frequently where one claim is brought under Title VII (capped) and the other is under a state's anti-discrimination law (uncapped). In such circumstances, courts typically reallocate awards between the capped and uncapped claims to maximize the recovery awarded by the jury.[14] Courts rest their reasoning in part on the fact that Title VII remedies are

---

[14] *Bradshaw v. Sch. Bd. of Broward Cty., Fla.*, 486 F.3d 1205, 1207–08 (11th Cir. 2007) ("To declare that any part of [plaintiff's] injury could be remedied under only one of the two statutes would be senseless; * * * So if Title VII cannot remedy the full extent of her injury because of its damage cap, then the remaining portion of her injury should be remedied as much as possible under the Florida [Civil Rights Act], and vice versa."); *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 66 (1st Cir. 2005) ("Several appeals courts have addressed the problem of allocating damages where the jury provides one damage award for parallel state and federal discrimination claims but the award exceeds the applicable federal cap. All have approved the method employed by the district court here, namely, considering the unspecified award as fungible between the state and federal claims and allocating the award so as to maximize the plaintiff's recovery while adhering to the Title VII cap."); *Hall v. Consol. Freightways Corp. of Del.*, 337 F.3d 669, 679–80 (6th Cir. 2003) ("[W]here the jury was instructed in such a fashion sufficient to support punitive damage awards under both the federal as well as the state statute, Plaintiff should be entitled to the balance of the award in excess of the federal $300,000 cap under state law."); *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570–71 (3d Cir. 2002) ("§ 1981a does not prevent a claimant from recovering greater damages under a state law claim that is virtually identical to a capped federal claim" and "given the similarity of the claims and the jury's unapportioned award of damages * * * it was entirely reasonable for the trial court to apportion the damages so as to allow [plaintiff] to recover the entire jury award, as reduced by the district court."); *Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349 (D.C. Cir. 1999) (holding that where jury allocated damages under the Title VII claim and the state civil rights claim and damages on the Title VII claim exceeded the cap, the district court should have reallocated those damages to the state claim); *Mascarella v. CPlace Univ. SNF*, 2015 WL 5304102, at *5 (M.D. La. Sept. 8, 2015) ("As the Court held previously, Plaintiff's federal claim award is limited to $300,000.00 by § 1981a. Accordingly, the Court will allocate $240,000.00 in compensatory damages to Plaintiff's state law discrimination claim."). The reallocation sometimes works by allocating damages from the state claim to the federal one. See, *e.g.*, *Johnson v. Texarkana Arkansas Sch. Dist. No. 7*, 2012 WL 527907, at *5 (W.D. Ark. Feb. 16, 2012) ("Because the retaliation claim was submitted to the

not be construed to limit state law claims. See 42 U.S.C. § 2000e-7 ("Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State[.]"). A similar limitation exists with respect to Section 1981 claims. See 42 U.S.C. § 1981a(b)(4) ("Nothing in this section [concerning damages caps] shall be construed to limit the scope of, or the relief available under, section 1981 of this title."). The few courts to have considered this issue in a similar posture have reached the same result. See *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 910 (9th Cir. 1999) (affirming the district court's reasoning that "'[t]o the extent that plaintiff's damages exceed $300,000, the excess can be attributed to claims other than those brought under Title VII'" and concluding that defendant "misreads the statute to argue that [plaintiff] was entitled to remedies under only one, but not both federal statutes. Section 1981a does not force a plaintiff to choose between Title VII and § 1981 remedies[.]"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1064 (8th Cir. 1997) ("Because § 1981 was a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply.").

Mindful of this case law from other circuits and Congress's statutory command, the Court agrees that Section 1981a(b)(3)'s damages cap applies to both Plaintiff's sexual harassment claim and the Title VII component of his retaliation claim and limits his total combined damages award to, at most, $50,000 for these two claims. The Court allocates the remainder of the damages from Claim 3 to Plaintiff's Section 1981 retaliation claim.

Section 1981a(b)(3) "contains no command as to how a district court is to conform a jury award to the statutory cap." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 441 (7th Cir. 1997). The Seventh Circuit has "upheld a decision that took the entire cut out of the

---

jury under a single instruction and theory, the Court will not apply the Arkansas damages cap to override the uncapped § 1983 claim. Any award beyond the Arkansas damages cap is simply allocated to the § 1983 retaliation claim.").

award of punitive damages and another that took the entire cut out of the award of compensatory damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004). It has also noted that "in a normal suit punitive damages are something added on by the jury after it determines the plaintiff's compensatory damages," so it is "probably the sensible thing for the judge * * * not to make a pro rata reduction * * * but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." *Id.* Compensation is the primary purpose of Section 1981(a)'s remedies, and "[t]he more common approach is to take the entire cut from punitive damages." *Alford v. Aaron's Rents, Inc.*, 2011 WL 2669626, at *1 (S.D. Ill. July 7, 2011); accord *Tart v. Elementis Pigments, Inc.*, 191 F. Supp. 2d 1019, 1024 (S.D. Ill. 2001); *Williams v. Pharmacia Opthalmics, Inc.*, 926 F. Supp. 791, 794 (N.D. Ind. 1996).

Here, the jury found that Plaintiff required a significant damages award to compensate him for Defendants' sexual harassment and retaliation. Consistent with that judgment, the Court will first apply the jury's compensatory award toward the statutory cap. That award exhausts the entire $50,000 limit, leaving no room for additional punitive damages. The Court reduces the $250,000 compensatory damages award for the sexual harassment claim to $50,000 and vacates the jury's $500,000 punitive damages award for Claim 1. Because no additional damages can be awarded under Title VII, Plaintiff's entire $250,000 compensatory damages award and $500,000 punitive damages award for Claim 3 must be reallocated to the Section 1981 retaliation claim.

### E.     Whether Plaintiff's Compensatory Damages Awards Are Excessive

"When it is apparent as a matter of law that certain identifiable sums in the verdict should not be there, or where the compensatory award results in a windfall or is excessive, the verdict must be reduced accordingly." *O'Sullivan v. City of Chi.*, 474 F. Supp. 2d 971, 973 (N.D. Ill.

2007). "To determine whether an award of compensatory damages is excessive, we consider whether the damages awarded (1) were monstrously excessive; (2) had no rational connection between the award and the evidence; and (3) were roughly comparable to awards made in similar cases." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013). "Remittitur is a common feature in Title VII and other cases involving damage awards for emotional anguish." *O'Sullivan*, 474 F. Supp. 2d at 974. "If the court decides that a remittitur is appropriate, the plaintiff has the choice to either accept the remittitur or receive a new trial on damages." *Florez v. Delbovo*, 939 F. Supp. 1341, 1343 (N.D. Ill. 1996). "If the plaintiff accepts the remittitur, the motion for a new trial on damages must be denied." *Id.*

Defendants argue that the compensatory damages awards for Plaintiff's Title VII sexual harassment claim, Section 1981 racial harassment claim, and his retaliation claim are all "grossly excessive" relative to the evidence presented. [316, at 19.] These arguments largely track Defendants' arguments for judgment as a matter of law under Rule 50, which the Court previously denied. [311, at 4–20.] To the extent these arguments materially differ, the Court will address them here.

Defendants contend that there was "limited testimony at trial supporting [Plaintiff's] claim for compensatory damages." [316, at 20.] They emphasize that Plaintiff said his work performance was excellent and he did not seek psychological help. *Id.* But they omit that Plaintiff testified he did not seek psychological help because he "didn't have money to go to a therapist." [Tr. Dec. 10, 2015, at 788.] Defendants acknowledge that Plaintiff testified that he does not "feel comfortable when [he] see[s] Hispanic men," and puts his back against the wall when he is in the same room so that they can walk by him. *Id.* But they omit that the evidence substantiating this professed anguish was Plaintiff's two days of testimony about incidents where

42

his Rosebud co-workers "touched, grabbed, and fondled his private parts during work hours" and that this conduct was sufficiently severe or pervasive enough to create a hostile or abusive atmosphere. [311, at 7–8.] Plaintiff also testified that after he filed his EEOC charge on January 7, 2008, co-workers harassed him by telling him that he was no longer welcome at Rosebud, slamming knives on cutting boards when he was nearby, breaking Plaintiff's portable television, scratching his car, cracking his windshield, slashing his tires, and walking by him carrying trays of meat with protruding knives such that Plaintiff had to move to avoid being cut. *Id.* at 11. Plaintiff further testified that these actions made him feel "unwelcome," "disrespected," "nervous," and "scared," and ultimately caused him to quit his job. *Id.* (citing Tr. Dec. 10, 2015, at 782–83). Mr. Holloway testified that he saw Plaintiff cry based on some of this physical abuse. [Tr. Dec. 10, 2015, at 919–20.] Defendants also cite Plaintiff's testimony that he "had to start taking pain medication"—specifically ibuprofen—for headaches at the end of the day after work, which he took about twice a day for five years. [Tr. Dec. 9, 2015, at 666–67.]

Defendants mainly argue that the jury's $750,000 total compensatory damages award is "monstrously excessive" based on this testimony. [316, at 21.] But that argument is moot because one of those $250,000 awards must be reduced by Title VII's statutory cap. Defendants fail to persuade the Court that a $50,000 award for Plaintiff's sexual harassment and Title VII retaliation claims is excessive, let alone that the jury's award for these claims should be remitted to zero. Generally, a "statutory cap suggests that an award of damages at the capped maximum is not outlandish." *AutoZone*, 707 F.3d at 840. "An award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001). In this circumstance, "[i]t was the jury's job to gauge [Plaintiff's] distress and determine

43

an appropriate amount to compensate [him]." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1023 (7th Cir. 2016). That the jury chose to credit Plaintiff's testimony about his mental distress does not render a $50,000 award outlandish or inappropriate.

Cases have permitted comparable awards. See, *e.g.*, *Gracia*, 842 F.3d at 1023 (affirming decision declining remittitur beyond the $50,000 statutory cap based on testimony that plaintiff was depressed following her job loss); *Marion Cty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 931 (7th Cir. 2010) (remitting $200,000 award to $20,000 where plaintiff's "suffering was extremely brief and only indicated that [plaintiff] had undergone '[w]eekly' therapy sessions for '[s]everal months' for '[s]ituational depression'"); *Fleming v. Cnty of Kane*, 898 F.2d 553, 561–62 (7th Cir. 1990) (affirming remittitur $80,000 damages award to $40,000 where plaintiff discharged for whistle-blowing activities suffered embarrassment, humiliation, depression, serious headaches, and sleeplessness); *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 923–24 (C.D. Ill. 2002) (remitting compensatory damages award to $50,000 where plaintiff withdrew from her normal activities "for about a two-week period, had difficulty sleeping, cried, and experienced stomach aches" and became depressed), aff'd, 324 F.3d 851 (7th Cir. 2003). But "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006) (explaining that precise analogizing to other cases is not necessary). Title VII cases are fact specific, which makes comparisons to other cases "rarely dispositive." *Id.* A $50,000 compensatory damages award is reflective of the testimony in this case about Defendants' persistent harassment and extensive retribution, Plaintiff's persistent headaches, his inability to afford therapy, and his ongoing fears of further sexual assault by Hispanic men. The Court cannot say that an award of

this size for this conduct is "merely the product of the jury's fevered imaginings or personal vendetta." *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995).

The jury's $500,000 compensatory damages awards for Plaintiff's racial harassment and retaliation claims under Section 1981 are a different story. Defendants urge the Court to apply Title VII's cap to Plaintiffs Section 1981 claims [316, at 19] even though Section 1981 is not limited by Title VII's damages cap, 42 U.S.C. § 1981a(b)(4). Not only would such a result offend Congress's express direction to the contrary, but the Court has stated no fewer than three times throughout this case that Plaintiff's Section 1981 claims are *not* subject to damages caps. [See 30, at 14 n.3; 165, at 24 n.9; 311, at 3. n.3.] That is the law of the case. Defendants cite no court that has enforced these caps against a Section 1981 claim in the compensatory damages context, and that omission is telling. Thus, the relevant issue is whether the evidence at trial can support a $250,000 compensatory damages award for Plaintiff's Section 1981 racial harassment claim and a $250,000 compensatory damages award for Plaintiff's Section 1981 retaliation claim. The Court concludes that it cannot.

"It goes without saying that the courts can and should preclude double recovery by an individual." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 333 (1980). As far as the Court can tell, the only specific injury compensated through Plaintiff's racial harassment claim was emotional distress from being called racial epithets throughout his tenure with Rosebud. That is the evidence that Plaintiff highlights now. [321, at 19–20 (citing Tr. Dec. 10, 2015, at 896–97).] The same is true for the emotional distress Plaintiff experienced based on Defendants' retaliatory conduct. [Tr. Dec. 10, 2016, at 782–83.] Similarly, his closing argument asked or compensation for "racial insults," "feeling rejected," "loss of enjoyment," and "loss of good feelings." [Tr. Dec. 14, 2015, at 1396.] That is about it.

45

Plaintiff's headaches and increased use of ibuprofen was, at a minimum, not claim specific (indeed, it could have had any number of causes) and stopped in 2009. [Tr. Dec. 9, 2015, at 666–67.] Incremental increased ibuprofen use cannot support a $500,000 award, and Plaintiff has already received compensation for this injury through the award for his Title VII claims. Likewise, when asked why Plaintiff does not "feel comfortable" around Hispanic men and puts his back against wall, he testified that it was based Defendants' sexual harassment and retaliatory conduct—not their racial harassment. [See Tr. Dec. 10, 2015, at 788–97 ("Q: What about your experience at Rosebud causes you to feel you have to get out of the way and put your back against the wall? A: Getting my dick grabbed. Getting my ass grabbed. Getting my balls grabbed. Machetes being slammed on the meat counter. Being humped on. You know, just all that I went through working there is the reason why I did what I did."). Said differently, Plaintiff does not describe any ongoing depression, medical or psychological treatment, or articulable consequences from conduct traced to his racial harassment claim—a conclusion confirmed by the fact that none of those harms were discussed by Plaintiff in closing. Even accepting that some aspect of this injury might still require compensation through his Section 1981 retaliation claim, a *significant* portion has been compensated through Plaintiff's Title VII award.

Plaintiff compares this case to *Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012) [321, at 20], but that case actually provides a helpful contrast to this one. In *Zeno*, a jury awarded a high school student $1.25 million for Title VI violations based on allegations that he was subject to daily racial harassment when he transferred to a predominately white school. The district court remitted that award to $1 million and the Second Circuit affirmed. The Second Circuit found that the evidence supported an award of this size for several reasons. First, the Second Circuit explained that plaintiff's "testimony alone arguably might not support

46

his claim of emotional distress," but that was not the case here because other witnesses (including his mother) corroborated that plaintiff felt increasing frustration, loneliness, and other emotional anguish. *Id.* at 672. Second, the plaintiff suffered tangible adverse educational consequences by accepting an individual education plan diploma as a result of this conduct, which meant he could attend community colleges but would not be accepted by most trade schools, colleges, employers, or the military. *Id.* at 663. "As a consequence, the jury reasonably could have found that his ability to attend college or enter the workforce was significantly and adversely impaired." *Id.* at 672. Third, the Second Circuit explained that his was not a "garden variety" employment discrimination case: "[Plaintiff] was not an adult losing sleep due to workplace stress. Rather, he was a teenager being subjected—at a vulnerable point in his life— to three-and-a-half years of racist, demeaning, threatening, and violent conduct." *Id.* Fourth, the Second Circuit explained, "A review of cases in the educational context indicate that verdicts range from the low six figures, to the mid-six figures, to as much as $1 million." *Id.* at 673. Every one of these reasons cuts against the size of Plaintiff's award here: his mental distress testimony was almost entirely uncorroborated;[15] he did not suffer any lingering professional consequences by leaving his minimum wage job with Rosebud;[16] his claim *is*, in part, that he was an adult losing sleep due to workplace stress; and this case did not arise in the educational context. If that were not enough, the district court in *Zeno* still *remitted* the jury's original $1.25 million award by 20 percent. In short, *Zeno* amply supports the propriety of remittitur here.

---

[15] Plaintiff attaches various affidavits from other employees to his motion [321-8; 321-9; 323] and even one from himself [321-10], but those affidavits were not in evidence at trial and were not considered by the jury. Even so, those affidavits perfunctorily assert that Plaintiff was upset, frustrated, or angry, and offer little detail that gives weight to Plaintiff's identical assertions.

[16] Plaintiff points out that he went on welfare after leaving Rosebud [321, at 21]. That fact could not have informed the jury's award here because the parties stipulated that Defendants would not reference during the trial any public assistance that Plaintiff received [203, at 8].

Nevertheless, the Court respects the jury's Section 1981 liability finding and its implicit decision to credit Plaintiff's testimony that he suffered extensive racial harassment at Rosebud. The examples of blatantly intolerable invective that Plaintiff described at trial could reasonably cause a person to experience emotional distress, and Plaintiff's testimony that these degrading insults were persistent only reinforces that conclusion. Yet courts have still remitted emotional distress awards of this size. See *Deloughery v. City of Chi.*, 422 F.3d 611, 615 (7th Cir. 2005) (remitting $250,000 in compensatory damages for mental and emotional suffering to $175,000 where a "highly motivated female police officer, with a family heritage in law enforcement" was terminated in retaliation for filing a sex and national origin EEOC charge and the jury found that she suffered "significant trauma"); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 714 (7th Cir. 2004) (finding that the "jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary to compensate" plaintiffs in a race discrimination case when the evidence showed that plaintiffs suffered from "continuing mental and physical ailments arising from * * * problems at work, including depression," high blood pressure, memory loss, and "severe" impact on his motivation); *Tullis*, 243 F.3d at 1068 (upholding $80,000 compensatory damages award for emotional distress where plaintiff felt "degraded" and "backstabbed," he was without work for around ten months, his personal life was affected, he had to borrow money from friends, and he had his lights and phone shut off). While these amounts are not dispositive, the Court finds them somewhat instructive here.[17]

---

[17] Plaintiff contends that the $250,000 damages award was, in fact, *too low* and he "did not request additur because the jury's verdict must be respected." [321, at 23.] "Under federal law, a court generally may not increase a jury's determination of damages by additur." *Hibma v. Odegaard*, 769 F.2d 1147, 1154 (7th Cir. 1985); accord *Dimick v. Schiedt*, 293 U.S. 474, 485–87 (1935).

One additional point weighs in favor of the remittitur. Plaintiff's closing argument discussed compensatory and punitive damages separately, and in the portion of his argument regarding compensatory damages, Plaintiff urged the jury to do the following:

> In deciding the amount for compensatory damages, you might wish to send a strong message, not a weak message, but a strong message. A message that people won't laugh at. You want to send a message so that when others read of your decision -- and they will -- they will have respect for what you decided to do.

[Tr. Dec. 14, 2015, at 1396–97.] These statements were improper (although, once again, Defendants failed to object). "[C]ompensatory damages are limited to actual losses" and the "argument that the jury should 'send a message' is a punitive damages argument." *Bruce v. City of Chi.*, 2011 WL 3471074, at *6 (N.D. Ill. July 29, 2011). In light of the size of the jury's compensatory damages award, the risks of double recovery, and the lack of specific, articulable injuries that Plaintiff can identify, the Court believes that Plaintiff's prejudicial, inappropriate arguments likely influenced the jury to increase its compensatory damages award improperly.

Weighing all of these factors and the evidence and argument that the jury heard, the Court concludes that a rational connection between the $500,000 award and the evidence in this case is lacking, and therefore grants the Defendants' motion to the extent it seeks a remittitur of the compensatory damage awards of the Section 1981 racial harassment and retaliation claims. The Court will grant Defendants' motion for a new trial on damages unless Plaintiff accepts, within 14 days of this order, a reduction of the compensatory damage award to $80,000 for his Section 1981 racial harassment claim and $60,000 for his Section 1981 retaliation claim—an amount the Court concludes is within the range of reasonableness given the facts of this case. *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392 (7th Cir. 1984).

### F.      Whether Plaintiff's Punitive Damages Awards Are Excessive

"[P]unitive damages should be awarded only if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence."  *Waits v. City of Chi.*, 2003 WL 21310277, at *4 (N.D. Ill. June 6, 2003).  Courts focus on three factors to determine whether a punitive damage award is excessive:  (1) the degree of reprehensibility of Defendants' misconduct; (2) the disparity between the actual or potential harm suffered by Plaintiff and the punitive damages award; and (3) the difference between punitive damages awarded by the jury and the parallel remedies available.  *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75 (1996).

Because of Title VII's statutory caps and the way the Court has allocated the jury's award, no punitive damages have been awarded under Plaintiff's sexual harassment (Claim 1) and Title VII retaliation (Claim 3) claims.  It is "well settled that a plaintiff who establishes a cause of action under § 1981 may recover punitive damages under proper circumstances."  *Yarbrough*, 789 F.2d at 514.  And the sole issue is whether the jury's decision to award $500,000 on the Section 1981 racial harassment claim (Claim 2) and $500,000 on the Section 1981 retaliation claim (Claim 3) were excessive.[18]  The Court agrees with Defendants that this $1 million award should be remitted too.

"Evaluating reprehensibility involves inquiry into whether the injury was physical, whether it evinced a reckless disregard for the health of the target, whether the target had a

---

[18] Although the Court previously ruled on Defendants' Rule 50 motions, Defendants belatedly attempt to raise new Rule 50 issue:  Defendants lacked the requisite mental state under *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), to sustain a punitive damages award.  [316, at 24 (acknowledging "this point more appropriately would be included in a post-verdict Rule 50(b) motion").]  This attempt to present another Rule 50 argument comes too late.  Regardless, Defendants fail to show (in fact, they cite nothing beyond *Kolstad*) that Plaintiff's complaints, and Defendants' responses, were insufficient as a matter of law to warrant this finding by the jury.  [Cf. Tr. Dec. 9, 2015, at 686–694; Tr. Dec. 11, 2015, at 1059–62, 1066–69.]

financial vulnerability, and whether the injury was clearly intentional." *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (citing *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003)). Neither side discusses these considerations. Instead, Defendants argue that their conduct was not reprehensible because (1) Plaintiff's testimony was "highly suspect"; (2) Rosebud did not terminate Plaintiff after he was convicted of a felony in 2006; (3) there was a "paucity of evidence beyond [Plaintiff's] testimony that he ever complained about racial harassment before" he filed suit; and (4) Defendants responded promptly to Plaintiff's written EEOC charge. [316, at 25.] Again, the jury chose to credit Plaintiff's testimony, which included that he had repeatedly complained to Rosebud management for years before he filed his charge and they did nothing. Ignoring that evidence is unpersuasive.

Racism is reprehensible by definition. "[T]here can be no excuse for intentional, repeated ethnic harassment, so the reprehensibility here is worse than conduct that might have some legitimate purpose." *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 775 (9th Cir. 2005). However, none of the *State Farm* factors elevate the degree of reprehensibility beyond that present in many racial harassment cases. Specifically, Plaintiff argued in closing that Rosebud acted with "reckless disregard" [Tr. Dec. 14, 2015, at 1297], not intentionally (let alone "clearly" intentionally). Plaintiff's injuries from Defendants' racial harassment and retaliation were emotional, not physical. It is not clear that Plaintiff ever discussed his increased ibuprofen use with anyone at work, and there was no testimony that Defendants recklessly disregarded any health issues. This was not a financial crime, and while Rosebud paid Plaintiff (and all other employees) minimum wage, there was no testimony that Plaintiff was financially vulnerable or that Defendants preyed on that vulnerability. Thus, none of these factors take this case outside of the mine run of racial harassment and retaliation cases.

Defendants argue that these punitive damages awards are disproportionate, but their analysis is limited to comparisons with the Title VII $50,000 cap. [316, at 26.] Again, that cap does not apply to Plaintiff's Section 1981 claims and so that cap is not the right benchmark for comparisons with Plaintiff's compensatory damages award under *Gore*'s second factor. Moreover, this amount does not reflect Plaintiff's $89,656.57 equitable award. [311, at 52.] Assuming Plaintiff accepts remittitur, he will receive $279,656.57 in compensatory damages for these three claims. That is a punitive-compensatory ratio of roughly 3.6 to 1. Defendants fail to cite any case law showing that a ratio of that size is unconstitutionally high. See *State Farm*, 538 U.S. at 425 (noting that 4 to 1 ratio might be close to the line of constitutional impropriety); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003) (explaining that "[t]he Supreme Court did not, however, lay down a 4–to–1 or single-digit-ratio rule"). The Court is mindful, however, the jury awarded punitive damages that simply doubled the compensatory damages amount for each claim. [See 248.] "[P]unitive damages should be proportional to the wrongfulness of the defendant's actions," and here the jury implicitly found that a 2:1 ratio was proportionate. *Mathias*, 347 F.3d at 676.

Defendants fare better under the *Gore*'s third factor. Courts typically look to Title VII as providing analogous statutory remedies to Section 1981 claims. See *Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (collecting cases); *Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220 (E.D.N.Y. 2007) (collecting cases). The large discrepancy between Title VII's $50,000 cap for compensatory *and* punitive damages and the jury's $1 million punitive award weigh in favor of remittitur. Plaintiff received $0 in punitive damages for his Title VII retaliation claim based on application of the statutory caps. Plaintiff offers no argument that an award of $500,000 for an almost identical retaliation claim under Section 1981 is

proportionate. Although Title VII's cap is not dispositive, it is a factor that cuts against the jury's large award here.

Considering all of these factors, the Court concludes that some punitive damages are appropriate here to achieve punishment and deterrence beyond the compensatory damages award. Based on the evidence the jury heard, the jury's determination that punitive damages are appropriate, and the proportion reflected in its verdict, the Court reduces Plaintiff's punitive damages award to $160,000 for his Section 1981 racial harassment claim and $120,000 for his Section 1981 retaliation claim. The Court will grant Defendants' motion for a new trial on damages unless Plaintiff accepts remittitur to these amounts within 14 days of this order. *McKinnon*, 750 F.2d at 1392.

### G. Whether The IGVA Damages Awards Are Excessive

Defendants challenge the compensatory and punitive damages awards against Defendants Mendoza and Castaneda under IGVA as excessive. [316, at 27–29.] "When [state] substantive law governs a claim for relief, [state] law and decisions guide the allowable damages." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996). Regarding compensatory damages, "[t]he primary difference between the federal and state standards is that the former takes into account 'whether the award is comparable to those in similar cases,' whereas the latter does not." *Hammer v. Residential Credit Sols., Inc.*, 2015 WL 7776807, at *42 (N.D. Ill. Dec. 3, 2015) (internal citations omitted). When it comes to punitive damages, "relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Blount v. Stroud*, 395 Ill. App. 3d 8, 22 (2009). "The amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption." *Id.* Moreover,

unlike federal law, Illinois law does not require that "the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Id.* at 23. However, federal constitutional standards are still implicated when it comes to punitive damages awards. *Hammer*, 2015 WL 7776807, at *45.

As a recap, the jury awarded $2,500 in compensatory and $5,000 in punitive damages against Defendant Mendoza and $50,000 in compensatory and $100,000 in punitive damages against Defendant Castaneda on Plaintiff's IGVA claim. The Court starts with Defendant Mendoza.

Plaintiff testified that Defendant Mendoza "grabbed" his posterior and genitals "numerous" times from 2003 through 2007. [Tr. Dec. 9, 2015, at 519–22; 525–29; 539–45, 547–55.] He also testified that Defendant Mendoza propositioned him to go to a hotel room and have sex in 2004 and over twenty times in 2007, and at least one incident involved Defendant "shov[ing]" Plaintiff into a gate in a walk-in cooler. *Id.* at 542, 551–53. Mendoza testified that he and Plaintiff gave each other a "butt slap" in 2004, but he had never grabbed Plaintiff's genitals or posterior and had never propositioned him. [Tr. Dec. 11, 2015, at 1113–15, 1118.] Although much of Plaintiff's testimony on direct-examination lacked detail and he contradicted his timeline on cross-examination [Tr. Dec. 10, 2015, at 856–57], the jury was entitled to sort out these inconsistencies and credit Plaintiff's testimony over Defendant Mendoza's, as the Court has already ruled [311, at 19]. Defendants cannot simply ignore this testimony when arguing that the award against Defendant Mendoza is unsupported by the evidence.

Nevertheless, Defendants argue that the size of this award "appears to be the product of passion and prejudice and bears no relation to [Plaintiff's] alleged loss." [316, at 28.] That is an accurate assessment. First, liability could not have been imposed for any gender-related violence

that occurred prior to December 23, 2004. [246, at 31.] Some of the evidence that Plaintiff highlights relates to events before this date, and cannot be used to justify the jury's award. [See 321, at 29.] Second, Plaintiff's attorney violated the Court's motion *in limine* rulings by asking Mendoza point blank if he used drugs at work. [223, at 15; Tr. Dec. 14, 2015, at 1236.] Third, Plaintiff's attorney repeatedly came right up to the boundaries of referencing Mendoza's immigration status, which also violated the Court's *in limine* ruling and the Court's express admonition not to ask Mendoza how long he had lived in this country. [223, at 12; Tr. Dec. 11, 2015, at 1125–27, 1137, 1146.] Fourth, Plaintiff argues that "[a]side from Mendoza and Castaneda touching and grabbing [his] private parts, the jury found them liable for ignoring [his] repeated complaints and failing to stop the open, public sexual, racial harassment and retaliation." [321, at 30.] The Court granted summary judgment on Plaintiff's Section 1981 claims against Defendants Mendoza and Castaneda [165, at 25], and the fact even *Plaintiff* believes that he can only justify this award by arguing that the amount reflects these Defendants' liability for conduct not prohibited by IGVA (such as Mendoza's alleged failure to stop racial harassment at Rosebud) shows that this award does not bear a rational relationship to the evidence. Based on these issues, the factors discussed above, the fact that Mendoza earned close to minimum wage at the time of trial [Tr. Dec. 11, 2015, at 1107–08], the lack of injury beyond emotional distress tied to this claim, and the evidence presented at trial in support of this liability finding, the Court remits the jury's damages award against Defendant Mendoza to $1,000 in compensatory damages and $2,000 in punitive damages.

Regarding Defendant Castaneda, Plaintiff testified that Castaneda sexually harassed him twice in December 2003 [Tr. Dec. 9, 2015 at 511–14], again between February and March 2004 (*id.* at 514–15) and then once more in 2005 or 2006 (*id.* at 515). The jury could not award IGVA

55

damages for any of these incidents *except* the last one. [246, at 31; 311 at 17–19.] Even crediting this last incident happened [see Tr. Dec. 10, 2015, at 854 (Plaintiff testified that Defendant Castaneda did not touch him again after December 2003)], the sexual violence that Plaintiff described in this incident consisted of Defendant Castaneda "grabb[ing] my ass again." [Tr. Dec. 9, 2015, at 515.] Plaintiff fails to persuade the Court that a $150,000 damages award is proportionate to this degree of misconduct or how Defendant Castaneda's conduct was at least twenty times worse than Defendant Mendoza's conduct.

Indeed, Plaintiff makes almost no effort to do so. Plaintiff emphasizes that Defendant Castaneda would make racist remarks [321, at 30], but that is not a basis for awarding damages under IGVA. And, as noted, even Plaintiff believes the jury held Castaneda responsible for "failing to stop the open, public sexual, racial harassment, and retaliation" through the IGVA claim. [321, at 30.] Based on the size of the verdict, the Court agrees with Plaintiff that the jury used the IGVA claim to penalize Castaneda for misconduct that it was legally prohibited from punishing. Plaintiff's sweeping contention that Defendant Castaneda "aided and abetted all male employees to touch and grab [Plaintiff's] private parts" (*id.*) is totally unsupported by the evidence, which is likely why he cites nothing to support that contention. Taken together, remittitur is necessary. Applying the relevant factors and considering the evidence at trial and the fact that Castaneda was Plaintiff's General Manager, the Court remits the jury's damages award against Defendant Castaneda to $1,500 in compensatory damages and $3,000 in punitive damages. As with the other remitted damages awards, the Court will grant Defendants' motion for a new trial on damages unless Plaintiff accepts this remittitur within 14 days of this order.

## V. Conclusion

For the foregoing reasons, Defendants' motions to amend the Court's findings of fact and conclusions of law pursuant to Rule 52(b) [315] is denied. Defendants' motion for a new trial or reduction of damages through remittitur [316] is granted in part and denied in part. For Claim 1, the Court reduces Plaintiff's compensatory damages to $50,000 and vacates any punitive damages award pursuant to 42 U.S.C. § 1981a(b)(3). For Claim 2, the Court remits Plaintiff's compensatory damages to $80,000 and his punitive damages award to $160,000. For Claim 3, the Court remits Plaintiff's compensatory damages to $60,000 and his punitive damages award to $120,000. For Claim 4, the Court remits the jury's damages award against Defendant Mendoza to $1,000 in compensatory damages and $2,000 in punitive damages, and the award against Defendant Castaneda to $1,500 in compensatory damages and $3,000 in punitive damages. If Plaintiff does not accept remittitur within 14 days of this order, the Court will grant Defendants' motion for a new trial on damages only.

Dated: July 14, 2017

_____
Robert M. Dow, Jr.
United States District Judge